UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY,<br>ALLSTATE FIRE & CASUALTY INSURANCE COMPANY,<br>AND<br>ALLSTATE PROPERTY & CASUALTY INSURANCE<br>COMPANY,<br><br>      Plaintiffs,<br><br>vs.<br><br>HOLLIS NOVEL COMPREHENSIVE MEDICAL, P.C.,<br>STARRETT CITY MEDICAL, P.C.,<br>HILLCREST MEDICAL CARE, P.C.,<br>SMART CHOICE MEDICAL, P.C.,<br>AZU AJUDUA, M.D.,<br>ROLANDO JOSE MENDEZ CHUMACEIRO, M.D.,<br>PETER KHAIM a/k/a PETER KHAIMOV,<br>ALEKSANDR GULKAROV,<br>ROMAN ISRAILOV,<br>VYACHESLAV MUSHYAKOV,<br>ARKADIY KHAIMOV,<br>RX FOR YOU CORP.,<br>SUTTER PHARMACY INC. d/b/a RX FOR YOU,<br>EXCELLENT CHOICE PHARMACY CORP.,<br>A&P HOLDING GROUP CORP.,<br>ANTURIO MARKETING INC.,<br>P&K MARKETING SERVICES INC.,<br>K&L CONSULTANTS INC.,<br>LL CONSULTING GROUP INC. d/b/a BILLING FOR YOU,<br>KEEPERS FOR YOU CORP., AND<br>ALL NETWORK MARKETING CORP.,<br><br>      Defendants. | C.A. No. |

## PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Allstate Insurance Company, Allstate Fire & Casualty Insurance Company, and

Allstate Property & Casualty Insurance Company (collectively, "Allstate" and/or "plaintiffs"), by

their attorneys, Smith & Brink, P.C., allege as follows:

1

## I.    <u>INTRODUCTION</u>

1.    This action involves a complex and sprawling scheme to defraud that was carried out using professional corporations and pharmacies that were operated and controlled in violation of New York law.

2.    The first aspect of this scheme involves several purportedly physician-owned professional corporations ("PCs"), namely Defendants Hollis Novel Comprehensive Medical, P.C ("Hollis"), Starrett City Medical, P.C. ("Starrett"), Hillcrest Medical Care, P.C. ("Hillcrest"), and Smart Choice Medical, P.C. ("Smart Choice") (collectively, "PC Defendants").  The PC Defendants were actually operated and controlled by laypersons.

3.    As set out below, the laypersons (i.e., Defendants Peter Khaim a/k/a Peter Khaimov ("Khaim"), Aleksandr Gulkarov ("Gulkarov"), and Roman Israilov ("Israilov") (collectively, "Manager Defendants")) partnered with licensed physicians (i.e., Defendants Azu Ajudua, M.D. ("Ajudua") and Rolando Jose Mendez Chumaceiro, M.D. ("Chumaceiro") (collectively, "Physician Defendants")) to organize and then operate the PC Defendants under the names and medical licenses of the physicians.

4.    The PC Defendants were purposely organized to circumvent New York law and its strong prohibition against what is known, colloquially, as the illegal corporate practice of medicine.

5.    In New York, the illegal corporate practice of medicine occurs when a physician is represented to the public as the sole officer, director, and shareholder of a PC, yet the PC is actually owned, operated, and controlled by laypersons who are not licensed or authorized to practice medicine or derive financial benefit from the delivery of professional medical services.

6.     In schemes like this, the laypersons disguise their control of the PCs through various means with the goal of siphoning-off the PCs' professional fees and profits, which are generated through the delivery of medical services to patients.

7.     Layperson control over medical PCs is prohibited in New York because when physicians are beholden to non-physicians, the desire to generate profits is placed ahead of patient care, which creates an ethical conflict and undermines the quality of care.

8.     New York is an ideal venue for schemes like these because every automobile owner is required to purchase insurance, and every insurance company is required to provide coverage of up to $50,000.00 per person for reasonable, accident-related medical expenses.

9.     The Defendants' scheme was propelled by Khaim, Gulkarov, and Israilov's illegal ownership and control of the PC Defendants.

10.     The Defendants used the PC Defendants as vehicles to bill for an array of tests and treatments that were medically unnecessary, excessive, and clinically worthless.

11.     Khaim's, Gulkarov's, and Israilov's positions of control allowed them to (a) direct patient care, (b) ensure the delivery of a high frequency of tests and treatments to patients of the PC Defendants, and (c) guide the referral of patients to other providers that were under their ownership and control.

12.     Another aspect of this scheme involved writing prescriptions and billing for unnecessary medications.

13.     Patients of the PC Defendants were prescribed a broad range of prescription and non-prescription medications that were unnecessary, expensive, unwanted, unproven, and often ineffective.

14.     Khaim's, Gulkarov's, and Israilov's control over the PC Defendants ensured that all of the prescriptions were directed to specific pharmacies under their control.

15.     For example, Khaim and Gulkarov owned or controlled a series of pharmacies, namely Defendants Rx For You Corp. ("Rx for You"), Sutter Pharmacy, Inc. d/b/a Rx For You ("Sutter Pharmacy"), and Excellent Choice Pharmacy Corp. ("Excellent Choice") (collectively, "Pharmacy Defendants").

16.     The Pharmacy Defendants were superficially registered under the names of Defendants Vyacheslav Mushyakov ("Mushyakov") and Arkadiy Khaimov ("Khaimov"), but the pharmacies were actually under the control of Khaim and Gulkarov.

17.     Mushyakov and Khaimov were ideal candidates to serve as straw owners of the Pharmacy Defendants because they had familial or employment relationships with the Manager Defendants.

18.     As detailed with particularity below, Khaim, Gulkarov, and Israilov—acting in their personal capacities and as the owners of a series of management, marketing, realty, funding, and billing companies—conspired with Ajudua, Chumaceiro, Mushyakov, and Khaimov to purposely facilitate the unlawful operation of the PC Defendants and Pharmacy Defendants.

19.     This scheme evolved over many years, as Khaim, Gulkarov, and Israilov purposely and knowingly sought to avoid the provisions of New York law that prohibit non-physicians from exerting control over a physician-owned PC, including, but not limited to, the PC's management and financial affairs.

20.     Khaim, Gulkarov, and Israilov used several shell companies to control the PC Defendants and Pharmacy Defendants, including Defendants A&P Holding Group Corp. ("A&P Holding"), Anturio Marketing Inc. ("Anturio Marketing"), P&K Marketing Services Inc. ("P&K

Marketing"), K&L Consultants Inc. ("K&L Consultants"), LL Consulting Group Inc. d/b/a Billing For You ("Billing For You"), Keepers For You Corp. ("Keeper For You"), and All Network Marketing Corp. ("All Network Marketing") (collectively, "Shell Companies").

21.     Khaim, Gulkarov, and Israilov also used the Shell Companies to conceal the fact that the proceeds and profits of the PC Defendants flowed to them rather than to the Physician Defendants.

22.     The success of this scheme relied on a large base of patients who were eligible to claim reimbursement of their medical and pharmacy expenses under New York's No-Fault laws.

23.     Indeed, the PC Defendants' and the Pharmacy Defendants' patient base consisted of persons (i.e., "Claimants") who were allegedly injured in automobile accidents and therefore eligible for No-Fault coverage under an insurance policy issued by Allstate.

24.     As part of this scheme, Allstate Claimants were made to enter into assignment of benefit agreements with the PC Defendants and the Pharmacy Defendants, which gave these providers the right to seek payments directly from Allstate—payments that were funded using the Claimants' available No-Fault insurance coverage.

25.     Following the execution of these assignment of benefit agreements, the PC Defendants billed for a battery of treatments and tests, and the Pharmacy Defendants billed for medications purportedly dispensed and delivered to Allstate Claimants.

26.     The PC Defendants and the Pharmacy Defendants sought and collected No-Fault benefit payments directly from Allstate in every case.

27.     The Defendants carried out their scheme throught the U.S. Mail, which was used repeatedly to submit the PC Defendants' and the Pharmacy Defendants' records, bills, and other claim-related documents to Allstate.

28.     The records and bills mailed to Allstate contained warranties that the PC Defendants and Pharmacy Defendants were eligible to seek and collect No-Fault benefits from Allstate as assignees of the Claimants.

29.     Allstate reasonably relied on the facial validity of the records and bills mailed by (or on behalf of) the PC Defendants and the Pharmacy Defendants—and the representations contained therein—when making No-Fault benefit payments to the PC Defendants and the Pharmacy Defendants.

30.     The No-Fault benefit claims involved in this scheme were false and fraudulent— and the Defendants knew it—because the records and bills contained material misrepresentations concerning the PC Defendants' and the Pharmacy Defendants' right to be paid under New York's No-Fault laws.

31.     The PC Defendants and Pharmacy Defendants were never eligible to seek or collect No-Fault benefit payments from Allstate for the following reasons:

a.     The PC Defendants were unlawfully operated, managed and controlled by one or more individuals not lawfully authorized to (i) provide medical services, (ii) own or control a professional service corporation, or (iii) profit from a professional service corporation organized to provide medical services;

b.     The PC Defendants were purposefully caused to split their professional fees and profits with non-physicians;

c.     The PC Defendants billed Allstate for tests and treatments that were (i) not medically necessary, (ii) purportedly provided pursuant to a predetermined protocol, (iii) not rendered as represented (if rendered at all), (iv) intentionally inflated or misrepresented to justify the continuation of medical treatment, and (v)

purposely designed to financially enrich the non-physicians at the expense of patient care.

d.   The Pharmacy Defendants billed Allstate for medications that were (i) not medically necessary, (ii) prescribed according to financial relationships between the pharmacies and the prescribing providers, (iii) repeatedly dispensed in excessive amounts that were harmful to patients, (iv) charged at inflated amounts and not billed in accordance with the fee schedule, (v) never specifically formulated for individual patients, and (vi) mass produced and dispensed in violation of applicable regulatory and licensing requirements.

32.   By this Complaint, Allstate brings this action against the Defendants for: (a) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq.*; (b) common-law fraud; and (c) unjust enrichment.

33.   This action seeks actual damages of more than $864,396.00, which represent No-Fault benefit payments that Allstate was wrongfully caused to make to the PC Defendants and the Pharmacy Defendants during the course of this scheme.

34.   Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that it is not legally obligated to pay or reimburse the PC Defendants (or their agents) in connection with any pending or unpaid No-Fault benefit claims because: (a) the PC Defendants were unlawfully owned and controlled by laypersons (i.e., Khaim, Gulkarov, and Israilov); (b) the PC Defendants unlawfully channeled their professional fees and profits to Khaim, Gulkarov, and Israilov through a series of agreements; (c) the PC Defendants unlawfully billed for tests and treatments that were actually rendered by independent contractors rather than employees of the PC Defendants; and (d) the PC

Defendants billed Allstate for tests and treatments that were medically unnecessary, excessive, and clinically worthless, and in some cases, never actually rendered at all.

35.     Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that it is not legally obligated to pay or reimburse the Pharmacy Defendants (or their agents) in connection with any pending or unpaid No-Fault benefit claims because the Pharmacy Defendants, at all relevant times, submitted or caused to be submitted claims for pharmacy services that were excessive, not medically necessary, rendered pursuant to a pattern of treatment designed solely to ensure financial enrichment and submitted in violation of one or more regulatory and licensing requirements applicable to pharmacies, thus rendering the Pharmacy Defendants completely ineligible to receive reimbursement under New York's No-Fault laws.

36.     All of the acts and omissions of the Defendants described throughout this Complaint were undertaken intentionally.

37.     The Defendants' fraudulent scheme was designed to elicit payment of automobile insurance contract proceeds from Allstate to, or for the benefit of, the Defendants.

38.     In each claim at issue in this Complaint, an Allstate automobile insurance contract was the platform upon which the Defendants sought—and in many cases obtained—payment for the healthcare and pharmacy services that were not compensable under New York's No-Fault laws.

39.     The Defendants knew that the Claimants identified in this Complaint were eligible for insurance coverage pursuant to automobile insurance policies issued by Allstate.

40.     Allstate estimates that the Defendants purposely submitted to Allstate hundreds of bills on behalf of the PC Defendants and Pharmacy Defendants—bills that the Defendants knew were not compensable under New York's No-Fault laws.

## II.     THE PARTIES

### A.     PLAINTIFFS

41.     Allstate Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance Company are corporations duly organized and existing under the laws of the State of Illinois, having their principal place of business in Northbrook, Illinois.

42.     At all times relevant to the allegations contained in this Complaint, Allstate Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance Company were authorized to conduct business in New York.

### B.     DEFENDANTS

#### 1.     Manager Defendants

##### a.     *Peter Khaim*

43.     Peter Khaim ("Khaim") resides in and is a citizen of New York.

44.     Khaim does not hold a medical license, and Khaim is not authorized to practice medicine in the State of New York.

45.     Khaim is also not authorized or permitted under New York law to own, control, or profit from professional corporations organized to practice medicine.

46.     Khaim is the registered owner of Sutter Pharmacy and several Shell Companies, including A&P Holding, Anturio Marketing, and P&K Consulting.

47.     As set out below, Khaim used the Shell Companies as a way to control the PC Defendants and the Pharmacy Defendants.

48.     At all relevant times, Khaim, individually and through the Shell Companies, participated in the operation and management of the PC Defendants by exerting unlawful control over the PC Defendants, including the PC Defendants' professional fees and profits.

49.     As part of this scheme, Khaim caused the PC Defendants to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though the PC Defendants were unlawfully operated and controlled by laypersons.

50.     Even if he did not personally deliver medical services to patients of the PC Defendants, Khaim still participated in the operation and management of the PC Defendant enterprises by, among other things, (a) controlling and conducting the PC Defendants' affairs, (b) causing the PC Defendants to seek and collect payments for non-compensable medical services, and (c) siphoning-off the PC Defendants' professional fees and profits; therefore, Khaim is responsible for the fraudulent and non-compensable services that were purportedly rendered to patients of the PC Defendants and billed to Allstate under New York's No-Fault law.

51.     Khaim also participated in the ownership and control of the Pharmacy Defendants, both individually and through the Shell Companies.

52.     As part of this scheme, Khaim caused the PC Defendants to deliver prescriptions for medically unnecessary prescriptions to the Pharmacy Defendants, which the Pharmacy Defendants then dispensed to Allstate Claimants.

53.     Khaim also caused the Pharmacy Defendants to aggressively seek and collect payments from Allstate under New York's No-Fault laws for these medically unnecessary prescriptions.

54.     Even if he did not personally write prescriptions or dispense medications to Allstate Claimants, Khaim still participated in the operation and management of the Pharmacy Defendant

enterprises by (a) owning Sutter Pharmacy, (b) acquiring the business assets of Rx For You, and (c) funding and controlling Excellent Choice.

### b.  *Alexsandr Gulkarov*

55.    Alexsandr Gulkarov ("Gulkarov") resides in and is a citizen of New York.

56.    Gulkarov does not hold a medical license, and Gulkarov is not authorized to practice medicine in the State of New York.

57.    Gulkarov is also not authorized or permitted under New York law to own, control, or profit from professional corporations organized to practice medicine.

58.    Gulkarov is the owner of several Shell Companies, including Billing For You and Keepers For You.

59.    As set out below, Gulkarov participated in the operation and management of the Hollis, Starrett, Hillcrest, and Smart Choice enterprises as a management-level employee of each entity.

60.    Gulkarov also used the Shell Companies owned by him (i.e., Billing For You and Keepers For You) as a way to unlawfully control and profit from the Hollis, Starrett, Hillcrest, and Smart Choice enterprises.

61.    As part of this scheme, Gulkarov caused the PC Defendants to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though the PC Defendants were unlawfully operated and controlled by laypersons.

62.    Even if he did not personally deliver medical services to patients of the PC Defendants, Gulkarov still participated in the operation and management of the PC Defendant enterprises by, among other things, (a) controlling and conducting the PC Defendants' affairs, (b) causing the PC Defendants to seek and collect payments for non-compensable medical services,

and (c) siphoning-off the PC Defendants' professional fees and profits; therefore, Gulkarov is responsible for the fraudulent and non-compensable services that were purportedly rendered to patients of the PC Defendants and billed to Allstate under New York's No-Fault law.

c.     *Roman Israilov*

63.     Roman Israilov ("Israilov") resides in and is a citizen of New York.

64.     Israilov does not hold a medical license, and Israilov is not authorized to practice medicine in the State of New York.

65.     Israilov is also not authorized or permitted under New York law to own, control, or profit from professional corporations organized to practice medicine.

66.     As set out below, Israilov participated in the operation and management of the Hollis, Starrett, Hillcrest, and Smart Choice enterprises as a management-level employee of each entity.

67.     Israilov also used one of the Shell Companies owned by him (i.e., All Network Marketing) as a way to unlawfully control and profit from the Hollis, Starrett, Hillcrest, and Smart Choice enterprises.

68.     As part of this scheme, Israilov caused the PC Defendants to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though the PC Defendants were unlawfully operated and controlled by laypersons.

69.     Even if he did not personally deliver medical services to patients of the PC Defendants, Israilov still participated in the operation and management of the PC Defendant enterprises by, among other things, (a) controlling and conducting the PC Defendants' affairs, (b) causing the PC Defendants to seek and collect payments for non-compensable medical services, and (c) siphoning-off the PC Defendants' professional fees and profits; therefore, Israilov is

responsible for the fraudulent and non-compensable services that were purportedly rendered to patients of the PC Defendants and billed to Allstate under New York's No-Fault law.

### 2. **Physician Defendants**

#### a. *Azu Ajudua, M.D.*

70.     Azu Ajudua, M.D. ("Ajudua") resides in and is a citizen of New York.

71.     Ajudua is a physician who was licensed to practice medicine in the State of New York.

72.     Ajudua surrendered his New York medical license on July 23, 2019 following a conviction on felony charges relating to his participation in an unrelated healthcare fraud scheme.

73.     Prior to his felony conviction, Ajudua was reported to be the sole officer, director, and shareholder of Hollis, Starrett, and Hillcrest.

74.     Ajudua participated in this scheme by providing, or purporting to provide, medical services to patients of Hollis, Starrett, and Hillcrest, and by prescribing medications that were dispensed to these patients by the Pharmacy Defendants.

75.     Ajudua also participated in this scheme by falsely holding himself out to the public and to Allstate as the sole officer, director, and shareholder of Hollis, Starrett, and Hillcrest, and by allowing Khaim, Gulkarov, and Israilov to operate and control Hollis, Starrett, and Hillcrest and profit from their operation.

76.     Even though he did not fully control Hollis, Starrett, and Hillcrest, Ajudua still participated in the operation of the Hollis, Starrett, and Hillcrest enterprises by signing—or lending his name to— Hollis, Starrett, and Hillcrest's corporate and ownership documents, as well as the entities' treatment records and invoices; therefore, Ajudua is responsible for the fraudulent and

non-compensable medical services that were purportedly rendered to patients of Hollis, Starrett, and Hillcrest and billed to Allstate under New York's No-Fault laws.

77.     Ajudua is also responsible for certain fraudulent and non-compensable prescription medications that were dispensed to Claimants by the Pharmacy Defendants and billed to Allstate under New York's No-Fault laws.

### b.     *Rolando Jose Mendez Chumaceiro, M.D.*

78.     Rolando Jose Mendez Chumaceiro, M.D. ("Chumaceiro") resides in and is a citizen of the State of New York.

79.     Chumaceiro is a physician who was licensed to practice medicine in the State of New York during the relevant period.

80.     Chumaceiro participated in this scheme by providing, or purporting to provide, medical services to patients of Smart Choice, and by prescribing medications that were dispensed to these patients by the Pharmacy Defendants.

81.     Chumaceiro also participated in this scheme by falsely holding himself out to the public and to Allstate as the sole officer, director, and shareholder of Smart Choice, and by allowing Khaim, Gulkarov, and Israilov to operate and control Smart Choice and profit from its operation.

82.     Even though he did not fully control Smart Choice, Chumaceiro still participated in the operation of the Smart Choice enterprise by signing—or lending his name to—Smart Choice's corporate and ownership documents, as well as Smart Choice's treatment records and invoices; therefore, Chumaceiro is responsible for the fraudulent and non-compensable medical services that were purportedly rendered to patients of Smart Choice and billed to Allstate under New York's No-Fault laws.

83.     Chumaceiro is also responsible for certain fraudulent and non-compensable prescription medications that were dispensed to Claimants by the Pharmacy Defendants and billed to Allstate under New York's No-Fault laws.

### 3.     PC Defendants

#### a.     *Hollis Novel Comprehensive Medical, P.C.*

84.     Hollis Novel Comprehensive Medical, P.C. ("Hollis") is organized as a physician-owned professional corporation under New York law with a principal place of business located at 205-07 Hillside Avenue, Hollis, New York.

85.     At all relevant times, Ajudua falsely purported to be the sole officer, director, and shareholder of Hollis.

86.     As set out below, Khaim, Gulkarov, and Israilov participated in the operation and management of the Hollis enterprise by exerting unlawful control over Ajudua and Hollis, including Hollis's professional fees and profits.

87.     As part of this scheme, Hollis was caused to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though Hollis was unlawfully operated and controlled by laypersons.

88.     Because Hollis was unlawfully operated and controlled by laypersons, and thus operated in direct violation of N.Y. Bus. Corp. Law § 1508, Hollis was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

#### b.     *Starrett City Medical, P.C.*

89.     Starrett City Medical, P.C. ("Starrett") is organized as a physician-owned professional corporation under New York law with a principal place of business located at 105-10 Flatlands Avenue, Brooklyn, New York.

90.     At all relevant times, Ajudua falsely purported to be the sole officer, director, and shareholder of Starrett.

91.     As set out below, Khaim, Gulkarov, and Israilov participated in the operation and management of the Starrett enterprise by exerting unlawful control over Ajudua and Starrett, including Starrett's professional fees and profits.

92.     As part of this scheme, Starrett was caused to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though Starrett was unlawfully operated and controlled by laypersons.

93.     Because Starrett was unlawfully operated and controlled by laypersons, and thus operated in direct violation of N.Y. Bus. Corp. Law § 1508, Starrett was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

### c.    *Hillcrest Medical Care, P.C.*

94.     Hillcrest Medical Care, P.C. ("Hillcrest") is organized as a physician-owned professional corporation under New York law with a principal place of business located at 204-12 Hillside Avenue, Hollis, New York.

95.     At all relevant times, Ajudua falsely purported to be the sole officer, director, and shareholder of Hillcrest.

96.     As set out below, Khaim, Gulkarov, and Israilov participated in the operation and management of the Hillcrest enterprise by exerting unlawful control over Ajudua and Hillcrest, including Hillcrest's professional fees and profits.

97.     As part of this scheme, Hillcrest was caused to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though Hillcrest was unlawfully operated and controlled by laypersons.

98.     Because Hillcrest was unlawfully operated and controlled by laypersons, and thus operated in direct violation of N.Y. Bus. Corp. Law § 1508, Hillcrest was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

### d.     *Smart Choice Medical, P.C.*

99.     Smart Choice Medical, P.C. ("Smart Choice") is organized as a physician-owned professional corporation under New York law with principal places of business located at 409 Rockaway Boulevard, Brooklyn, New York and 1767 Southern Boulevard, Bronx, New York.

100.     At all relevant times, Chumaceiro falsely purported to be the sole officer, director, and shareholder of Smart Choice.

101.     As set out below, Khaim, Gulkarov, and Israilov participated in the operation and management of the Smart Choice enterprise by exerting unlawful control over Chumaceiro and Smart Choice, including Smart Choice's professional fees and profits.

102.     As part of this scheme, Smart Choice was caused to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though Smart Choice was unlawfully operated and controlled by laypersons.

103.     Because Smart Choice was unlawfully operated and controlled by laypersons, and thus operated in direct violation of N.Y. Bus. Corp. Law § 1508, Smart Choice was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

### 4.     <u>Pharmacy Defendants</u>

### a.     *Rx For You Corp.*

104.     Rx For You Corp. ("Rx For You") is a domestic business corporation organized under the laws of the State of New York.

105.   Rx For You maintains its principal place of business at 1767 Southern Blvd., Bronx, New York.

106.   Mushyakov was the purported owner of Rx For You.

107.   Mushyakov maintained close ties to one or more of the Manager Defendants during the course of this scheme.

108.   In furtherance of this scheme, Mushyakov was caused to sell Rx For You's business to Khaim.

109.   As part of this scheme, Claimants were made to enter into assignment of benefit agreements with Rx For You, which gave Rx For You the right to seek payments directly from Allstate—payments that were funded using the Claimants' available No-Fault insurance coverage.

110.   Following the execution of these assignment of benefit agreements, Rx For You purportedly dispensed medications to Claimants.

111.   Rx For You then sought and collected No-Fault benefit payments from Allstate.

112.   As alleged herein, because of the Defendants' unlawful conduct, Rx For You was never lawfully eligible to receive such payments from Allstate.

**b.**     ***Sutter Pharmacy Inc. d/b/a Rx For You***

113.   Sutter Pharmacy Inc. d/b/a Rx For You ("Sutter Pharmacy") is a domestic business corporation organized under the laws of the State of New York.

114.   Sutter Pharmacy maintains its principal place of business at 1767 Southern Blvd, Bronx, New York.

115.   Sutter Pharmacy was the successor pharmacy to Rx For You.

116.    After consummating a business transfer sale between Rx For You and Sutter Pharmacy, Khaim sought and obtained permission to operate Sutter Pharmacy under the assumed name "Rx For You."

117.    At all relevant times, Khaim directed the operation and management of Sutter Pharmacy.

118.    As part of this scheme, Claimants were made to enter into assignment of benefit agreements with Sutter Pharmacy, which gave Sutter Pharmacy the right to seek payments directly from Allstate—payments that were funded using the Claimants' available No-Fault insurance coverage.

119.    Following the execution of these assignment of benefit agreements, Sutter Pharmacy purportedly dispensed and/or delivered medications to Claimants.

120.    Sutter Pharmacy then sought and collected No-Fault benefit payments from Allstate.

121.    As alleged herein, because of the Defendants' unlawful conduct, Sutter Pharmacy was never lawfully eligible to receive such payments from Allstate.

### c.    *Excellent Choice Pharmacy Inc.*

122.    Excellent Choice Pharmacy ("Excellent Choice") is a domestic business corporation organized under the laws of the State of New York.

123.    Excellent Choice maintains its principal place of business at 409 Rockaway Avenue, Brooklyn, New York.

124.    Khaimov was the purported owner of Excellent Choice during the relevant period.

125.    As detailed below, Khaimov is Khaim's brother.

19

126.   Khaimov is not a licensed pharmacist nor does he have any professional medical training or credentials.

127.   As detailed below, Khaimov was purposely installed as Excellent Choice's owner as a means to facilitate this scheme.

128.   Upon information and belief, Khaim was the actual owner of Excellent Choice.

129.   Khaim, not Khaimov, exerted complete control over Excellent Choice's finances.

130.   Khaim also directed the operation and management of Excellent Choice.

131.   As part of this scheme, Claimants were made to enter into assignment of benefit agreements with Excellent Choice, which gave Excellent Choice the right to seek payments directly from Allstate—payments that were funded using the Claimants' available No-Fault insurance coverage.

132.   Following the execution of these assignment of benefit agreements, Excellent Choice purportedly dispensed and/or delivered medications to Allstate Claimants.

133.   Excellent Choice then sought and collected No-Fault benefit payments from Allstate.

134.   As alleged herein, because of the Defendants' unlawful conduct, Excellent Choice was never lawfully eligible to receive such payments from Allstate.

**5.** **Pharmacy "Owners"**

**a.** ***Vyacheslav Mushyakov***

135.   Vyacheslav Mushyakov ("Mushyakov") resides in and is a citizen of the State of New York.

136.   Mushyakov was the purported owner of Rx For You during the relevant period.

137.    Upon information and belief, Mushyakov was also employed or paid by Hollis and Starrett during the relevant period.

138.    As set out below, Mushyakov participated in the operation and management of the Rx For You, Hollis, and Starrett enterprises, and is thus responsible for the fraudulent and non-compensable pharmacy and medical services purportedly rendered to Claimants at issue in this Complaint.

### b.    *Arkadiy Khaimov*

139.    Arkadiy Khaimov ("Khaimov") resides in and is a citizen of the State of New York.

140.    Khaimov is Khaim's brother.

141.    Khaimov was the purported owner of Excellent Choice.

142.    As set out below, Khaimov participated in the operation and management of the Excellent Choice enterprise, and is thus responsible for the fraudulent and non-compensable pharmacy services purportedly rendered to Claimants at issue in this Complaint.

### 6.    **Shell Companies**

### a.    *A&P Holding Group Corp.*

143.    A&P Holding Group Corp. ("A&P Holding") is a domestic corporation organized under New York law.

144.    A&P Holding's principal place of business is located at 62-43A Woodhaven Boulevard, Rego Park, New York.

145.    According to the New York Department of State, Division of Corporations, Khaim is the President of A&P Holding.

146.    A&P Holding was purposely organized by Khaim to serve as the owner or leaseholder for certain properties used during the course of this scheme.

147.   Khaim caused A&P Holding to enter leasing agreements with the PC Defendants and the Pharmacy Defendants, and these agreements were purposely structured to give Khaim control over these entities and their finances.

148.   During the relevant period, Khaim knowingly used A&P Holding to unlawfully operate and control the PC Defendants, and to share in the professional fees and profits collected by the PC Defendants.

149.   Khaim also used A&P Holding as a way to operate and control the Rx For You, Sutter Pharmacy, and Excellent Choice enterprises.

**b.**     ***Anturio Marketing Inc. d/b/a Logic Consulting***

150.   Anturio Marketing Inc. d/b/a Logic Consulting ("Anturio Marketing") is a domestic corporation organized under New York law.

151.   Anturio Marketing's principal place of business is located at 62-43A Woodhaven Boulevard, Rego Park, New York.

152.   Khaim is the President and Chief Executive Officer of Anturio Marketing.

153.   During the course of this scheme, Khaim used Anturio Marketing to operate, control, and profit from the Hollis enterprise.

**c.**     ***P&K Marketing Services Inc.***

154.   P&K Marketing Services Inc. ("P&K Marketing") was a domestic corporation organized under New York law.

155.   P&K Marketing's principal place of business was located at 67-53 Woodhaven Boulevard, Rego Park, New York during the relevant period.

156.   P&K Marketing was owned and operated by Khaim during the relevant period.

157.   During the course of this scheme, Khaim used P&K Marketing to operate, control, and profit from the Hollis enterprise.

### d.      *K&L Consultants Inc.*

158.   K&L Consultants Inc. ("K&L Consultants") was a domestic corporation organized under New York law.

159.   K&L Consultants maintained a principal place of business in New Hyde Park, New York during the relevant period.

160.   K&L Consultants was owned and operated by Khaim during the relevant period.

161.   During the course of this scheme, Khaim used K&L Consultants to operate, control, and profit from the Hollis and Starrett enterprises.

### e.      *LL Consulting Group. Inc. d/b/a Billing For You*

162.   LL Consulting Group, Inc. d/b/a Billing For You ("Billing For You") is a domestic corporation organized under New York law.

163.    Billing For You 's principal place of business is located at 9609 66th Avenue, #6D, Rego Park, New York.

164.   According to the New York Department of State, Division of Corporations, Gulkarov is the Chief Executive Officer of Billing For You.

165.   During the course of this scheme, Gulkarov used Billing For You to operate, control, and profit from the Hollis, Starrett, Hillcrest, and Smart Choice enterprises.

### f.      *Keepers For You Corp.*

166.   Keepers For You Corp. ("Keepers For You") is a domestic corporation organized under New York law.

167.   Keepers For You's principal place of business is located at 9609 66th Avenue, #6D, Rego Park, New York.

168.   According to the New York Department of State, Division of Corporations, Gulkarov is the Chief Executive Officer of Keepers For You.

169.   During the course of this scheme, Gulkarov used Keepers For You to operate, control, and profit from the Starrett, Hillcrest, and Smart Choice enterprises.

### g.   *All Network Marketing Corp.*

170.   All Network Marketing Corp. ("All Network Marketing") is a domestic business corporation organized under New York law.

171.   All Network Marketing's principal place of business is located at 62-43A Woodhaven Boulevard, Rego Park, New York.

172.   Israilov is the owner of All Network Marketing.

173.   During the course of this scheme, Israilov used All Network Marketing to operate, control, and profit from the Hollis, Starrett, Hillcrest, and Smart Choice enterprises.

## III.   JURISDICTION AND VENUE

174.   Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. §§ 1331 and 1332.

175.   Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

176.   Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) and (c) whereas the vast majority of the acts known to Allstate alleged herein were carried out within the Eastern District of New York.

177.   At all relevant times, the Defendants have engaged in purposeful activities in New York by seeking and submitting payment demands for claims made under New York's No-Fault laws, as detailed, *infra*.

178.   The Defendants' activities in and contacts with New York were purposely sought and transacted to take advantage of the benefits available under New York's No-Fault laws.

179.   As the allegations and causes of action in the within Complaint arise from the Defendants' fraudulent demands for payment under the No-Fault laws of New York, there is no question that there exists a substantial relationship between the transactions at issue, and Allstate's causes of action.

## IV.   APPLICABLE NO-FAULT LAWS AND LICENSING STATUTES

### A.   GENERAL OVERVIEW OF NEW YORK'S NO-FAULT LAWS

180.   Allstate underwrites automobile insurance in the State of New York.

181.   New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay reasonable fees for necessary healthcare services.

182.   Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law § 5101, *et seq.*), and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. § 65, *et seq.*) (collectively, "the No-Fault laws"), automobile insurers are required to provide Personal Injury Protection Benefits (hereinafter, "No-Fault benefits") to Allstate claimants.

183.   Under the New York No-Fault law, individuals are entitled to be compensated for "basic economic loss" resulting from injuries caused by the operation of a motor vehicle.

184.   "Basic economic loss" is defined to include "all necessary expenses" for medical services.  N.Y. Ins. Law § 5102(a)(1); 11 N.Y.C.R.R. § 65-1.1.

185.   No-Fault benefits include up to $50,000.00 per Allstate claimant for reasonable expenses that are incurred for necessary healthcare goods and services.

186.   A patient can assign their No-Fault benefits to healthcare service providers.

187.   Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary medical services rendered, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3").

188.   NF-3 forms are important documents in the insurance industry.  They certify that the provider's request for payment is not materially false, misleading, or fraudulent.   11 N.Y.C.R.R. § 65.3-11(a); N.Y. Ins. Law § 403(d).

189.   Pursuant to N.Y. Ins. Law § 403(d), NF-3s must be verified by the healthcare provider subject to the following warning:  "Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime[.]"

190.   A medical provider makes a material misrepresentation when it submits an NF-3 form that either omits or misrepresents material information about the provider's eligibility to seek or collect payment under New York's No-Fault laws.

191.   A medical provider's omission or misrepresentation of material facts can take many forms, including false or misleading information about (a) the ownership of a PC seeking payment, or (b) the identity of the actual provider of the service.

192. A medical provider's representations about PC ownership and control are material because under New York law only a licensed physician can (a) practice medicine, (b) own and control a PC organized to practice medicine, (c) employ and supervise other physicians, and (d) derive economic benefit from the delivery of physician services (absent limited exceptions not applicable here).

193. Likewise, a medical provider's representations about the actual provider of the billed-for services are material because under New York law a medical provider operating as a PC is only eligible for compensation if the billed-for services are provided by an owner or employee of the PC.

194. If a PC uses independent contractors, instead of employees, to provide medical services, then the PC is not eligible to seek or collect payment under New York's No-Fault laws.

195. It is a material misrepresentation to submit NF-3 forms for treatment, testing, and other services that (a) are never provided; or (b) are billed as expensive/complex procedures when, in reality, a less complex and less expensive service was actually provided.

**B.   CONTROL OF PROFESSIONAL SERVICE CORPORATIONS**

196. New York's No-Fault laws expressly provide that "[a] provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York." *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

197. New York Business Corporation Law § 1504 provides that no professional service corporation may render professional services except through individuals authorized by law to render such professional services.

198.   New York Business Corporation Law § 1507 prohibits a professional service corporation from issuing shares to individuals unless they are "engaged in the practice of such profession in such a corporation."  It also prohibits such shareholder(s) from entering into any agreement, granting proxies, or transferring control to individuals who are not authorized by law to practice the profession for which the professional corporation is authorized to practice.

199.   Pursuant to New York Business Corporation Law § 1508, no individual may be a director or officer of a professional service corporation unless he is authorized by law to practice in this state a profession that such corporation is authorized to practice.

200.   Under New York Education Law § 6530(19), it is professional misconduct for a licensed physician to permit any person to share in the fees for professional services, other than a partner, employee, associate of a professional firm or corporation, professional subcontractor or consultant authorized to practice medicine, or a legally authorized trainee practicing under the supervision of a licensee.

201.   Under New York Education Law § 6530, it is also professional misconduct for a licensed physician to (a) practice the professional fraudulently, (b) order excessive tests or treatments not warranted by the condition of the patient, and (c) fail to maintain a record for each patient that accurately reflects the evaluation and treatment of the patient.

202.   Moreover, for a provider of healthcare services to be eligible to bill for and collect charges from an insurer for healthcare services pursuant to N.Y. Ins. Law § 5102(a), it must be the actual provider of the service.  Under the No-Fault laws, a professional service corporation is not eligible to bill or collect for services that were rendered by persons who are not direct employees of the professional service corporation, such as independent contractors.

203.   In New York, insurers are not precluded from seeking affirmative recovery against individuals and entities that have violated the above statutes and regulations.

204.   In *State Farm Mut. Auto. Ins. Co. v. Mallela*, 827 N.E.2d 758 (N.Y. 2005), the New York Court of Appeals upheld 11 N.Y.C.R.R. § 65-3.16(a)(12) by holding that corporations organized and registered to provide professional healthcare services that are fraudulently incorporated under New York Business Corporations Law §§ 1507 and 1508 and New York Education Law § 6507(4)(c) (i.e., those corporations that are operated and/or controlled by individuals or entities not licensed or authorized to provide the professional healthcare services that the corporations are organized and registered to provide) are not entitled to No-Fault reimbursement.

205.   When determining a medical provider's reimbursement eligibility under New York's No-Fault laws, insurers are allowed to "look beyond the face of licensing documents to identify willful and material failure to abide by state and local law," such as actual ownership of the practice by an unlicensed individual.  *Mallela*, 827 N.E.2d at 761.

206.   In a recent decision, the New York Court of Appeals made clear that *Mallela* does not require a finding of fraud for an insurer to withhold payments to a medical service corporation improperly controlled by non-physicians."  *Andrew Carothers, M.D., P.C. v. Progressive Ins. Co.*, 128 N.E.3d 153, 163 (N.Y. 2019) ("A corporate practice that shows 'willful and material failure to abide by' licensing and incorporation statutes may support a finding that the provider is not an eligible recipient of reimbursement under 11 N.Y.C.R.R. § 65-3.16(a)(12) without meeting the traditional elements of common-law fraud." (internal citation omitted)).

207.   In the matter *Metroscan Imaging, P.C. v. GEICO Ins. Co.*, 823 N.Y.S.2d 818, 821-822 (N.Y. App. Term, 2d Dep't 2006), the court held that an insurer may maintain a cause of action

against a fraudulently incorporated medical provider to recover monies paid on or after April 5, 2002 (the effective date of 11 N.Y.C.R.R. § 65-3.16(a)(12)).

208.    Moreover, in terms of the fees charged by healthcare providers, the New York Workers' Compensation Board has established a schedule of fees known commonly as the "Workers' Compensation Fee Schedule" ("Fee Schedule").

209.    The Fee Schedule is used by healthcare providers and insurers to determine the level of reimbursement payable on legitimate claims.

210.    Under Insurance Law § 5102(a)(1), the term "basic economic loss" covers "all necessary expenses incurred for…medical…surgical…physical therapy…[and] any other professional health services."

211.    In determining basic economic loss, the expenses incurred under Insurance Law § 5102(a)(1) "shall be in accordance with the limitations" of Insurance Law § 5108.

212.    Pursuant to Insurance Law § 5108(b), the Superintendent of Insurance "shall promulgate rules and regulations implementing and coordinating the provisions of [the No-Fault laws] and the workers' compensation law with respect to the charges for the professional health services specified" in Insurance Law § 5102(a)(1), "including the establishment of schedules for all such services for which schedules have not been prepared and established by the chairman of the workers' compensation board."

213.    As detailed below, the Defendants violated one or more of these New York statutes and regulations through the operation and management of the PC Defendants.

**C.    PROHIBITION ON INDEPENDENT CONTRACTORS**

214.    Under New York's No-Fault laws, an entity is only eligible for compensation if the billed-for services are provided by an owner or employee of the company.

215.    A provider's use of independent contractors, instead of employees, to provide, or to purport to provide, healthcare services renders the provider ineligible to receive No-Fault reimbursement for those services from insurers like Allstate. *See* DOI Opinion Letters, annexed hereto as Exhibit 1.

216.    During the course of this scheme, one or more of the PC Defendants submitted bills to Allstate seeking payment for services that were actually provided by independent contractors.

217.    For example, Ajudua has admitted that the persons who provided physical therapy services to Hollis patients were not employed by Hollis, but instead were employed by a professional staffing agency.

218.    Ajudua also admitted that Hollis' physical therapy contractors were retained and managed by Gulkarov, who was not licensed or trained to administer or supervise the provision of physical therapy services.

### D.    REIMBURSEMENT FOR PRESCRIPTION DRUGS UNDER NEW YORK'S NO-FAULT LAWS

219.    Compensation for "basic economic loss" resulting from injuries caused by the operation of a motor vehicle encompasses all "necessary expenses" for medical services—including prescription medication.

220.    The fee schedule applicable to pharmacies and prescription drugs is set forth under 12 N.Y.C.R.R. § 440.1, *et seq.*

221.    In terms of charges submitted by pharmacies for brand name prescription drugs, 12 N.Y.C.R.R. § 440.5(a) states that a provider may charge no more than the Average Wholesale Price ("AWP") for the national drug code ("NDC") for the drug on the day it was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

222.   Under 12 N.Y.C.R.R. § 440.2(a), AWP means the average wholesale price of a prescription drug as provided in the most current release of the Red Book published by Thomson Reuters or Medi-Span Master Drug Database by Wolters Kluwer Health, or any successor publisher, on the day a drug is dispensed.

223.   The NDC is a unique 10-digit, 3-segment numeric identifier assigned to each drug that reflects the vendor of the drug, identifies the drug itself, and indicates the quantity in which the drug is packaged. Each NDC number has a corresponding AWP, which identifies the price.

224.   For charges submitted by pharmacies for generic prescription drugs, 12 N.Y.C.R.R. § 440.5(a) states that a provider may charge no more than the AWP for the NDC for the drug on the day it was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

225.   In terms of charges submitted by pharmacies for Compounded Products, 12 N.Y.C.R.R. §§ 440.5(a) and (d) state that the maximum amount that a provider may charge for medically necessary compounded medications is determined at the ingredient level.

226.   For each brand name drug included in a Compounded Product, a provider may charge no more than the AWP for the NDC for the drug on the day it was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

227.   For each generic drug included in a Compounded Product, a provider may charge no more than the AWP for the NDC for the drug on the day it was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

E.   **LICENSING LAWS APPLICABLE TO COMPOUNDED PRODUCTS**

228.   The United States Food and Drug Administration ("FDA") is authorized to oversee the safety of food, drugs, and cosmetics under the Federal Food, Drug, and Cosmetic Act ("FDCA").

229.   Used primarily for pain management, compounded medications contain either a single active drug in an inactive base or several active drugs.

230.   Compounded medications are prepared and dispensed by compounding pharmacies, which are registered by the New York State Department of Education, with limited FDA oversight.

231.   Under New York Education Law § 6808, no person, firm, corporation or association shall possess drugs, prescriptions, or poisons for the purpose of compounding, dispensing, retailing, wholesaling, or manufacturing, or shall offer drugs, prescriptions, or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer, or outsourcing facility.

232.   If any person, firm, corporation, or association is a "manufacturer" or "outsourcing facility" and seeks to register as such with the New York State Department of Education in the manner required by New York Education Law § 6808, then such person, firm, corporation, or association must also register with the FDA and be listed as a manufacturer or outsourcing facility on the FDA's website.

233.   Indeed, compounded drugs are generally not FDA approved, though they may include FDA-approved drugs, and are generally exempt from the FDA approval process that applies to new drugs.

234.   Moreover, compounded medications are not subject to the rigorous drug review process that all commercially available prescription drugs must undergo to demonstrate safety and effectiveness prior to receiving FDA approval.

235.   Further, compounded medications generally do not have standardized dosages and duration for use, and the protocols for preparing each compound are not necessarily standardized.

236.    For all of these reasons, compounded preparations are likely to have batch-to-batch variability, and their sterility and purity cannot be guaranteed.

237.    In terms of compounded pain topical medications, such as those prepared and dispensed by the Pharmacy Defendants, such compounded medications have not been proven (with rare exceptions) to be more effective than commercially-available, manufactured drugs.

238.    In fact, compounded pain topical medications have not been approved for safety and efficacy by the FDA.

239.    However, under 21 U.S.C. § 353a, pharmacies may engage in compounding if the drug is compounded for an identified individual patient based on the receipt of a valid prescription or a notation, approved by the prescribing practitioner on the prescription order, that a compounded product is necessary for the identified patient.

240.    When compounded pain topical medications meet these requirements of Section 353a and are compounded for an individual patient, they can be exempted from the requirement, among others, that they obtain FDA approval. *See* 21 U.S.C. § 355(a) ("No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to [this section] is effective with respect to such drug.").

241.    When Congress adopted this provision of the FDCA governing compounding, its express intent was to "ensure continued availability of compounded drug products as a component of individualized therapy, while limiting the scope of compounding so as to prevent manufacturing [of drugs that would otherwise require FDA approval] under the guise of compounding." H.R. Rep. No. 105-399, at 94 (1997) (Conf. Rep.).

242.    As Congress stated at the time, the "exemptions in [the section] are limited to compounding for an individual patient based on the medical need of such patient for the particular

drug compound. To qualify for exemptions, the pharmacist or physician must be able to cite to a legitimate medical need for the compounded product that would explain why a commercially available drug product would not be appropriate. Although recording the medical need directly on each prescription order would not be required, this technique would be one of many acceptable ways of documenting the medical need for each compounded drug product. This medical need would not include compounding drugs that are essentially copies of commercially available drug products for largely economic reasons. The pharmacist may rely on appropriately documented input from the physician as to whether a commercially available drug product is not appropriate for the identified individual patient."  S. Rep. No. 105-43, at 67-68 (1997).

V.   **FACTUAL ALLEGATIONS RELEVANT TO ALL CLAIMS**

   A.   **THE NEXUS BETWEEN ALL DEFENDANTS**

243.   This scheme is sprawling, yet the Defendants are connected in several ways.

244.   This scheme was organized so that the PC Defendants and the Pharmacy Defendants appeared to be independent of each other even though each provider was ultimately under the control of Khaim, Gulkarov, Israilov, and the various Shell Companies owned by them.

245.   This scheme could not have succeeded without the cooperation of each defendant— cooperation that required each defendant to play specific roles, which were designed to create the appearance of independence while also giving Khaim, Gulkarov, and Israilov considerable control over the PC Defendants and the Pharmacy Defendants.

246.   Khaim, Gulkarov, and Israilov were the common connections among all the Defendants.

247.   Organizing the PC Defendants in the name of the Physician Defendants allowed Khaim, Gulkarov, and Israilov to act as undisclosed principals and beneficiaries of the PC

Defendants, which permitted the PC Defendants to maintain facial validity and enjoy the benefits of treating patients eligible for coverage under New York's No-Fault laws.

248.   Installing the Physician Defendants as the purported "owners" of the PC Defendants gave the PC Defendants, as physician-owned entities, the right to charge Allstate the highest rates allowed under the prevailing Fee Schedule.

249.   Control over the PC Defendants was achieved in several ways, including the installation of Gulkarov and Israilov as "managers" of the clinics from which the PC Defendants operated.

250.   Maintaining control over the PC Defendants also allowed Khaim, Gulkarov, and Israilov to orchestrate the structuring of agreements and transactions between the PC Defendants and the Shell Companies.

251.   These agreements and transactions channelled the PC Defendants' professional fees and profits to Khaim, Gulkarov, and Israilov instead of to the Physician Defendants.

252.   The PC Defendants were always under the control of Khaim, Gulkarov, and Israilov, neither of whom were lawfully permitted to (a) provide physician services, (b) maintain a controlling interest in a professional corporation organized and registered to provide physician services, or (c) receive the professional physician fees and profits of a physician-owned professional corporation.

253.   The PC Defendants were linked despite having different locations and different purported physician-owners (i.e., Ajudua and Chumaceiro).

254.   For example, each of the PC Defendants offered identical medical services, employed many of the same people (including close relatives of Khaim, Gulkarov, and Israilov),

prescribed the same medications, and engaged in transactions with many of the same Shell Companies.

255.   Owning and controlling the Pharmacy Defendants also allowed Khaim to control the flow of prescriptions given to patients of the PC Defendants, and then capitalize on the Pharmacy Defendants' ability to seek payment for these prescriptions under New York's No-Fault laws.

256.   A key aspect of this scheme involved prescriptions for compounded topical pain medications ("Compounded Products") in addition to other pain patches and lotions.

257.   Khaim used his position of power over the providers to ensure that all prescriptions given to the PC Defendants' patients were funneled to pharmacies that were owned and controlled by Khaim.

258.   The acts undertaken by each of the Defendants in this scheme intentionally exploited the generous benefits available under New York's No-Fault laws.

259.   As further described herein, the Defendants acted in concert and, in doing so, violated New York law and compromised patient care.

**B.**   <u>U</u>NLAWFUL <u>O</u>PERATION AND <u>C</u>ONTROL OF THE <u>PC</u> <u>D</u>EFENDANTS

260.   New York's No-Fault system is designed to provide patients and healthcare providers with compensation for the provision of healthcare services, and is also designed to require prompt payment of claims.

261.   As a result, the submission of bills by healthcare service providers for facially valid services will often result in prompt payment from a No-Fault insurer.

262.   However, New York's No-Fault laws and enacting regulations are clear that providers are not eligible to seek or receive No-Fault reimbursement under Insurance Law § 5102

if they fail to meet any New York State or local licensing requirement necessary to perform such service in New York.

263.   As explained below, the Defendants, throughout the course of this scheme, took advantage of New York's No-Fault system by (a) operating the PC Defendants in violation of one or more applicable New York state licensing requirements governing the provision of professional physician services, and (b) in certain instances, creating and submitting (or causing to be created and submitted) to Allstate false and fraudulent treatment records and invoices demanding payment for medical and pharmacy services.

1.   **Unlawful Operation and Control of Hollis Novel Comprehensive Medical, P.C.**

264.   Hollis was the first PC Defendant utilized in this scheme.

265.   Hollis was operated from a clinic located at 205-07 Hillside Avenue in Hollis, NY (hereinafter referred to as "Hillside Clinic") during the relevant period.

266.   Upon information and belief, the Hillside Clinic was already under the Manager Defendants' control at the time that Ajudua was recruited to join this scheme through a lease held by one of the Shell Companies owned by Khaim (i.e., K&L Consultants).

267.   Ajudua was recruited to take over the supposedly failing practice of another physician who was operating at the Hillside Clinic.

268.   Ajudua is no stranger to schemes like this, and was the perfect physician for this position.

269.   Indeed, during the relevant period, Ajudua allowed unlicensed persons to use his name and medical license to facilitate bogus diagnostic tests and false medical billing.

270.   Ajudua has admitted to signing referral forms for patients that he never saw.

271.   Ajudua also confessed to signing blank referral forms, which were used as a means to generate unlawful referrals for bogus diagnostic testing.

272.   Once recruited for this scheme, Ajudua was induced to organize Hollis for the purpose of providing medical services to patients of the Hillside Clinic.

273.   While Hollis was organized using Ajudua's name and medical license, Hollis was actually operated and controlled by Khaim, Gulkarov, and Israilov.

274.   Indeed, Ajudua played nothing more than an insignificant role in the organization, operation, and control of Hollis.

275.   Ajudua was supposedly introduced to Gulkarov prior to the formation of Hollis.

276.   At Gulkarov's recommendation, Hollis was incorporated using an accountant associated with the Defendants.

277.   Following the organization of Hollis, Gulkarov was installed as one of the managers of Hollis' practice and the Hillside Clinic.

278.   According to Ajudua, Gulkarov was responsible for many material aspects of Hollis' operation, including (a) keeping track of Hollis' finances and accounts receivable, (b) hiring employees of the Hillside Clinic, and (c) retaining collection attorneys and managing most of the legal actions concerning Hollis' unpaid No-Fault claims.

279.   Israilov was also installed as another manager of Hollis' practice.

280.   According to Ajudua, Israilov was in charge of managing the day-to-day operations of the Hillside Clinic, such as managing the clinic's staff and coordinating the transport of patients to and from the clinic.

281.   Khaimov also played a key role in the operation and management of Hollis.

282. According to Ajudua, Khaim was an "advertising guy" recommended by the outgoing physician at the Hillside Clinic.

283. Ajudua's characterization of Khaim was false, however.

284. As set out below, Khaim was the primary person in charge of this scheme.

285. The managers cemented their control over Hollis by installing Gulkarov's and Israilov's spouses as key administrators of Hollis and the Hillside Clinic.

286. For example, non-parties Regina Shakarova (Gulkarov's wife) and Victoria Shakarova (Israilov's wife) were hired to help run the front desk and billing operations of Hollis and the Hillside Clinic.

287. Overall, Ajudua had no meaningful control over Hollis or the operation of the Hillside Clinic.

288. Despite representing to the New York State Education Department and New York Secretary of State that he was the sole officer, director, and shareholder of Hollis, Ajudua was nothing more than a figure head—a nominal owner put in place by the Manager Defendants to satisfy PC ownership requirements under New York law.

289. The Defendants knew that Hollis was, at all times, controlled by Khaim, Gulkarov, and Israilov. The Defendants were also aware that the success of this scheme was contingent on their ability to conceal the fact that Khaim, Gulkarov, and Israilov, as non-physicians, were actually in control of Hollis.

290. While Khaim, Gulkarov, and Israilov appeared to the outside world as employees or associates of Hollis, they actually controlled all aspects of Hollis, including its finances and profits.

291.    Hollis was caused to enter into a series of agreements with several Shell Companies owned by Khaim, Gulkarov, and Israilov.

292.    The Shell Companies associated with the Hollis enterprise included Anturio Marketing, P&K Marketing, K&L Consultants, Billing For You, All Network Marketing, and A&P Holding.

293.    These Shell Companies provided no meaningful business services to Hollis or anyone else; in fact, the companies existed only to (a) conceal Khaim, Gulkarov, and Israilov's control over Hollis, and (b) facilitate the channeling of monies from Hollis.

294.    For example, Khaim's "marketing" companies, Anturio Marketing and P&K Marketing, purportedly provided Hollis with marketing services.

295.    In reality, however, Anturio Marketing and P&K Marketing never provided any genuine marketing services to Hollis; instead, these companies were used by Khaim to (a) cloak his involvement in expanding and controlling Hollis' business, and (b) conceal his personal enrichment from the operation of the Hollis enterprise.

296.    Gulkarov's company, Billing For You, had a similar relationship with Hollis.

297.    Billing For You was positioned as a provider of billing, collection, and other services to Hollis.

298.    This position was nothing more than a façade, however, because Billing For You never actually provided any genuine services to Hollis.

299.    For example, Hollis employed its own in-house biller who was responsible for billing the medical services purportedly provided to Hollis' patients.

300.    According to Ajudua, the in-house biller was compensated through payments from Hollis' payroll.

301.   Billing For You thus existed solely as a way for Gulkarov to enrich himself from the operation of the Hollis enterprise.

302.   Indeed, according to Ajudua, Gulkarov was paid as a member of Hollis' payroll, and the payroll payments were intended to compensate Gulkarov for all of the management services that he provided to Hollis, including the work he performed to collect Hollis' unpaid bills from insurance carriers.

303.   Despite Ajudua's representations concerning Gulkarov's role and compensation, Hollis was caused to make payments to Billing For You totaling over $17,000.00 during the course of this scheme.

304.   Ajudua, however, has testified that he was unaware of these payments, and he was unaware of any services that Billing For You provided to Hollis to earn that money.

305.   Just like Khaim and Gulkarov did through their Shell Companies, Israilov also played a part in siphoning professional fees and profits from Hollis.

306.   Israilov operated All Network Marketing, a company that supposedly provided marketing services to Hollis.

307.   Like Gulkarov, Israilov was paid as a member of Hollis' payroll, and the payroll payments were intended to compensate Israilov for all of the services that he provided to Hollis, including the work that Israilov performed to manage Hollis' day-to-day operations.

308.   In other words, there was no legitimate reason why Israilov should have received additional compensation from Hollis.

309.   Indeed, All Network Marketing provided no actual services or anything of value to Hollis.

310.    When asked, Ajudua claimed that he never heard of All Network Marketing, and he could not identify any services that All Network Marketing provided to Hollis.

311.    Consistent with the means and motives of this scheme, however, All Network Marketing still received payments totaling over $25,000.00 from Hollis.

312.    When questioned about these payments, Ajudua could not explain the payments.

313.    Hollis was also caused to transact with another Shell Company named A&P Holding, which was a realty holding company owned and controlled by Khaim and Gulkarov.

314.    A&P Holding did not provide any services to Hollis, yet A&P Holding received payments totaling over $17,000.00 from Hollis' operating account.

315.    Again, Ajudua could not explain why Hollis made these payments to A&P Holding.

316.    Overall, the agreements (if any) and transactions between Hollis and these Shell Companies were purposely structured to divert Hollis' professional fees and profits to Khaim, Gulkarov, and Israilov.

317.    Ajudua had absolutely no knowledge about (a) what the Shell Companies were, (b) what the Shell Companies did, or (c) why the Shell Companies were paid.

318.    Ajudua also lacked control over Hollis' transactions with the Shell Companies, and/or misrepresented material facts about his awareness of the Shell Companies or the transactions that Hollis engaged in with them.

319.    Notably, Ajudua confessed to giving Gulkarov access to Hollis' operating account, which, upon information and belief, likely enabled the Manager Defendants to bypass Ajudua and cause Hollis to make payments to their Shell Companies.

320.    In addition to exerting unlawful control over Hollis, the Manager Defendants also controlled the treatment of Hollis' patients by requiring Ajudua and the other persons working for

Hollis to (a) order diagnostic tests that were not medically necessary, and (b) prescribe expensive medications that were meant to be dispensed by pharmacies under Khaim's ownership and control.

321.   Indeed, many Hollis patients were prescribed medications that they neither wanted or needed, and these prescriptions were purposely directed to and dispensed by one or more of the Pharmacy Defendants.

322.   Several clear ties existed between Hollis and the Pharmacy Defendants that ensured that prescriptions stayed within the Defendants' network.

323.   For example, Mushyakov was the owner of Rx For You, and Rx For You was one of the preferred destinations for prescriptions given to Hollis patients.

324.   Despite owning Rx For You and having no clear relationship to Hollis, Mushyakov received several payments from Hollis.

325.   Upon information and belief, Rx For You was actually controlled by Khaim even though ownership was held in Mushyakov's name.

326.   As explained further below, ownership of Rx For You was eventually transferred to Khaim as a means to further this scheme.

327.   Overall, Ajudua knowingly and purposely relinquished control of Hollis to Khaim, Gulkarov, and Israilov in violation of New York law.

328.   Because Hollis was owned and controlled by laypersons (i.e., Khaim, Gulkarov, and Israilov) instead of by its supposed owner (i.e., Ajudua), Hollis was operated in violation of New York law and was therefore ineligible to seek or collect No-Fault benefit payments under Insurance Law § 5102(a)(1).

### 2.     Unlawful Operation and Control of Starrett City Medical, P.C.

329.   The Defendants sought to expand their network by opening another practice in Brooklyn.

330.   Ajudua claimed that he was approached by Khaim while they were working together through Hollis, and Khaim offered him the opportunity to open a new practice at a new location.

331.   Ajudua was an obvious and convenient choice to serve as the nominal physician-owner of the new practice because he already had ceded control of Hollis to the Manager Defendants at the Hillside Clinic.

332.   Ajudua accepted Khaim's offer, and the Defendants began to organize the new practice at the new location.

333.   The new practice was located at 105-10 Flatlands Avenue, Brooklyn, NY 11236 (the "Flatlands Clinic").

334.   According to Ajudua, Khaim owned the building that housed the Flatlands Clinic, and Khaim made a significant investment in the property to enable the opening of a medical clinic.

335.   Initially, Ajudua began operating at the Flatlands Clinic under Hollis, but transitioned to practicing under a new name (i.e., Starrett) once the new PC was organized.

336.   Starrett was organized using Ajudua's name and medical license, and Ajudua was represented to the public as Starrett's sole officer, director, and shareholder.

337.   The representations about Starrett's ownership were false, however, because Starrett was always under the control of Khaim, Gulkarov, and Israilov.

338.   In many ways, Starrett's practice at the Flatlands Clinic was simply a continuation of Hollis' practice at the Hillside Clinic.

339.   For example, both Gulkarov and Israilov were installed as the managers of the Flatlands Clinic where they continued to manage and control the day-to-day operations of Starrett and the Hillside Clinic.

340.   Gulkarov's and Israilov's spouses (i.e., non-parties Regina Shakarova and Victoria Shakarova) were also transferred over to the Flatlands Clinic where they continued assisting in the operation and control of Starrett and the Hillside Clinic.

341.   According to Ajudua, Khaim played a major role in starting Starrett's practice at the Flatlands Clinic.

342.   For example, Khaim helped organize a party, which was hosted at the Flatlands Clinic a few weeks prior to opening.

343.   According to Ajudua, the party was attended by approximately fifteen (15) different lawyers, and these lawyers became a source of patient referrals for Starrett and the Flatlands Clinic.

344.   Overall, Starrett was unlawfully operated and controlled by Khaim, Gulkarov, and Israilov in the same manner as Hollis.

345.   Despite representing to the New York State Education Department and New York Secretary of State that he was the sole officer, director, and shareholder of Starrett, Ajudua was nothing more than a figure head—a nominal owner put in place by the Manager Defendants to satisfy PC ownership requirements under New York law.

346.   The Defendants knew that Starrett was, at all times, controlled by Khaim, Gulkarov, and Israilov.  The Defendants were also aware that the success of this scheme was contingent on their ability to conceal the fact that Khaim, Gulkarov, and Israilov, as non-physicians, were actually in control of Starrett.

347.   While Khaim, Gulkarov, and Israilov appeared to the outside world as employees, landlords, or associates of Starrett, they actually controlled all aspects of Starrett, including its finances and profits.

348.    Similar to Hollis, Starrett was caused to enter agreements and/or engage in transactions with several Shell Companies owned by Khaim, Gulkarov, and Israilov.

349.    The Shell Companies associated with the Starrett enterprise included A&P Holding, K&L Consultants, Billing For You, Keepers For You, and All Network Marketing.

350.    Most of the Shell Companies never provided any actual services to Starrett or anyone else; in fact, the companies existed only to (a) conceal Khaim, Gulkarov, and Israilov's control over Starrett, and (b) facilitate the channeling of monies from Starrett.

351.    A&P Holding was the exception, as A&P Holding was used to facilitate a sublease agreement with Starrett.

352.    Despite Ajudua's belief, Khaim did not actually own the building that housed the Flatlands Clinic.

353.    Instead, Khaim, through A&P Holding, arranged a master lease with the owner of the building, and then Khaim caused A&P Holding to enter into a subleasing agreement with Starrett.

354.    Consistent with the means and motives of this scheme, even this tenant-subtenant relationship between A&P Holding and Starrett was used to exert control over Starrett and its finances.

355.    The terms of the A&P Holding-Starrett sublease were commercially unreasonable, as the agreement required Starrett to make monthly lease payments that far exceeded Khaim's and A&P Holding's actual costs to lease the Flatlands Clinic space from the owner.

356.    For example, Starrett made lease payments to A&P Holding totaling $13,000.00 each month, yet A&P Holding only paid $8,000.00 each month to the building owner.

357.   When asked about the size of Starrett's sublease obligations, Ajudua explained that the monthly lease payments were "very steep" because Khaim had invested about $128,000.00 of his own money to renovate the building.

358.   Overall, Khaim used the agreement and resulting transactions between Starrett and A&P Holding to recoup his renovation expenses and to enrich himself even further.

359.   Upon information and belief, Starrett made payments to A&P Holding totaling over $400,000.00 during the course of this scheme.

360.   The Manager Defendants also enriched themselves at Starrett's expense using their other Shell Companies.

361.   Upon information and belief, several other Shell Companies (i.e., K&L Consultants, Billing For You, Keepers For You, and All Network Marketing) engaged in transactions totaling around $130,000.00.

362.   Similar to the Hollis enterprise, these Shell Companies did not provide services or anything else of value to Starrett in exchange for these payments.

363.   Also similar to the Hollis enterprise, Ajudua did not know anything about (a) what the Shell Companies were, (b) what the Shell Companies did, or (c) why the Shell Companies were paid by Starrett.

364.   Like Hollis, the Manager Defendants also controlled how Starrett patients were treated by requiring Ajudua and the other persons working for Starrett to (a) order diagnostic tests that were not medically necessary, and (b) prescribe expensive medications that were meant to be dispensed by pharmacies under Khaim's ownership and control.

365.   Indeed, many Starrett patients were prescribed medications that they neither wanted or needed, and these prescriptions were purposely directed to and dispensed by one or more of the Pharmacy Defendants.

366.   Khaim, Ajudua, and their cohorts implemented several tactics to ensure that Starrett patients were given prescriptions, and that those prescriptions were funneled to pharmacies under the Defendants' control.

367.   As an example, non-party Andre Duhamel, M.D. ("Duhamel"), a licensed physician, worked for Starrett during the course of this scheme.

368.   According to Duhamel, Khaim and Ajudua directed him to prescribe certain medications to Starrett patients, including Terocin Patches and Diclofenac Gel, despite having never prescribed said products to his patients in the past.  *See* Affidavit of Andre Duhamel, M.D. at Exhibit 2.

369.   Khaim specifically instructed that these medications be prescribed to Starrett patients during their initial evaluations at the Flatlands Clinic, according to Duhamel.  *Id.*

370.   Upon information and belief, Khaim required that every Starrett patient be given prescriptions for these medications—regardless of want or medical need—with the intent that the prescriptions be directed to and dispensed by pharmacies under his ownership and control.

371.   As explained more fully below, Khaim specifically required the prescription of Terocin Patches and Diclofenac Gel because the prevailing Fee Schedule allowed the pharmacies to charge prices that far-exceeded the pharmacies' actual acquisition costs.

372.   Accordingly, there was a huge profit motive behind the indiscriminate prescribing and dispensing of these medications.

373.   Overall, Ajudua knowingly and purposely relinquished control of Starrett to Khaim, Gulkarov, and Israilov in violation of New York law.

374.   Because Starrett was owned and controlled by laypersons (i.e., Khaim, Gulkarov, and Israilov) instead of by its supposed owner (i.e., Ajudua), Starrett was operated in violation of New York law and was therefore ineligible to seek or collect No-Fault benefit payments under Insurance Law § 5102(a)(1).

### 3.   Unlawful Operation and Control of Hillcrest Medical, P.C.

375.   The Defendants expanded this scheme further by opening another clinic.

376.   This new clinic was located at 204-12 Hillside Avenue in Hollis, NY ("Hillcrest Clinic"), which was situated across the street from the Hillside Clinic (i.e., the clinic from which Hollis operated).

377.   Again, Ajudua was chosen to organize a new PC named Hillcrest Medical Care, P.C. ("Hillcrest") for the Hillcrest Clinic.

378.   Hillcrest was organized using Ajudua's name and medical license, and Ajudua was represented to the public as Hillcrest's sole officer, director, and shareholder.

379.   The representations about Hillcrest's ownership were false, however, because Hillcrest was always under the control of Khaim, Gulkarov, and Israilov.

380.   In many ways, Hillcrest's practice at the Hillcrest Clinic was simply a continuation of Hollis' practice at the Hillside Clinic.

381.   First, the Hillcrest Clinic was situated directly across the street from the Hillside Clinic.

382.   Upon information and belief, this location was selected because the Hillcrest Clinic was meant to absorb the Hillside Clinic's business upon closing down.

383.    Second, Gulkarov was installed as a manager of the Hillcrest Clinic where he continued to manage and control the day-to-day operations of Hillcrest.

384.    Third, Israilov's spouse (i.e., non-party Victoria Shakarova) was also transferred over to the Hillcrest Clinic where she helped facilitate the operation and management of Hillcrest and the Hillcrest Clinic.

385.    Despite representing to the New York State Education Department and New York Secretary of State that he was the sole officer, director, and shareholder of Hillcrest, Ajudua was nothing more than a figure head—a nominal owner put in place by the Manager Defendants to satisfy PC ownership requirements under New York law.

386.    The Defendants knew that Hillcrest was, at all times, controlled by Khaim, Gulkarov, and Israilov.  The Defendants were also aware that the success of this scheme was contingent on their ability to conceal the fact that Khaim, Gulkarov, and Israilov, as non-physicians, were actually in control of Hillcrest.

387.    Similar to Hollis and Starrett, Hillcrest was caused to enter agreements and/or engage in transactions with several Shell Companies owned by Khaim, Gulkarov, and Israilov, or persons closely related to them.

388.    The Shell Companies associated with the Hillcrest enterprise included Billing For You, Keepers For You, and All Network Marketing.

389.    Hillcrest also engaged in transactions with a company named NY Collections Services, which is a company that is owned, upon information and belief, by Khaim's spouse.

390.    Most of the Shell Companies never provided any actual services to Hillcrest or anyone else; in fact, the companies existed only to (a) conceal Khaim, Gulkarov, and Israilov's control over Hillcrest, and (b) facilitate the channeling of monies from Hillcrest.

391.   Overall, Ajudua knowingly and purposely relinquished control of Hillcrest to Khaim, Gulkarov, and Israilov in violation of New York law.

392.   Because Hillcrest was owned and controlled by laypersons (i.e., Khaim, Gulkarov, and Israilov) instead of by its supposed owner (i.e., Ajudua), Hillcrest was operated in violation of New York law and was therefore ineligible to seek or collect No-Fault benefit payments under Insurance Law § 5102(a)(1).

**4.   Unlawful Operation and Control of Smart Choice Medical, P.C.**

393.   The Defendants expanded this scheme yet again in January 2016 by opening another clinic in a different part of the New York City area.

394.   This new clinic was opened at a facility located at 1767 Southern Boulevard in Bronx, New York.

395.   As discussed below, this clinic was relocated to 409 Rockaway Avenue in Brooklyn, NY after Khaim and Gulkarov, through A&P Holding, purchased the building situated at 407-409 Rockaway Avenue.

396.   To further their scheme, Khaim and Gulkarov recruited a different physician to lend his name and license for the purpose of organizing a new PC.

397.   Upon information and belief, Khaim and Gulkarov chose the new clinic location and new physician because Ajudua had come under investigation for his No-Fault billing practices through Hollis and Starrett.

398.   Defendant Rolando Jose Mendez Chumaceiro, M.D. ("Chumaceiro") was recruited to organize a new PC named Smart Choice Medical, P.C. ("Smart Choice").

399.   Smart Choice was organized using Chumaceiro's name and medical license, and Chumaceiro was represented to the public as Smart Choice's sole officer, director, and shareholder.

400.   The representations about Smart Choice's ownership were false, however, because Smart Choice was always under the control of Khaim and Gulkarov.

401.   In many ways, Smart Choice was operated in the same way as the Hollis, Starrett, and Hillcrest enterprises.

402.   To start this enterprise, the Manager Defendants (a) secured a clinic location, (b) hired clinic staff, (c) organized the opening of a medical practice, and (d) recruited a licensed physician (i.e., Chumaceiro) to serve as the nominal owner of the professional corporation.

403.   Notably, the location chosen for Smart Choice was ideal because the building also housed a pharmacy that was owned and operated by Khaim and Gulkarov.

404.   Similar to the Hollis, Starrett, and Hillcrest enterprises, once Smart Choice was organized, Chumaceiro was held out to the public as Smart Choice's sole officer, director, and shareholder when, in fact, the actual ownership and control of Smart Choice rested entirely with Khaim and Gulkarov.

405.   Despite representing to the New York State Education Department and New York Secretary of State that he was the sole officer, director, and shareholder of Smart Choice, Chumaceiro was nothing more than a figure head—a nominal owner put in place by the Manager Defendants to satisfy PC ownership requirements under New York law.

406.   The Defendants knew that Smart Choice was, at all times, controlled by Khaim, Gulkarov, and Israilov.  The Defendants were also aware that the success of this scheme was contingent on their ability to conceal the fact that Khaim, Gulkarov, and Israilov, as non-physicians, were actually in control of Smart Choice.

407.   To facilitate the unlawful operation and control of Smart Choice, Chumaceiro was, upon information and belief, instructed to install Gulkarov as an employee-manager of Smart

Choice, which allowed Gulkarov to exert control over the operation, management, and finances of Smart Choice.

408.   As a management-level employee of Smart Choice, Gulkarov was able to control the day-to-day operation and management of Smart Choice—including entering into agreements on behalf of the professional corporation.

409.   Overall, Smart Choice essentially operated as an extension of the PCs "owned" by Ajudua; in fact, Smart Choice was caused to transact with many of the same managers, employees, transportation company, landlord, funding, marketing and billing companies as the Hollis, Starrett and Hillcrest enterprises.

410.   For example, just like the Hollis, Starrett, and Hillcrest enterprises, Smart Choice was caused to enter agreements and/or engage in transactions with several Shell Companies owned by Khaim, Gulkarov, and Israilov.

411.   The Shell Companies associated with the Smart Choice enterprise included A&P Holding and Billing For You.

412.   In some cases, the Shell Companies never provided any actual services to Smart Choice or anyone else; in fact, the companies existed only to (a) conceal Khaim, Gulkarov, and Israilov's control over Smart Choice, and (b) facilitate the channeling of monies from Smart Choice.

413.   In other cases, the Shell Companies were used to siphon-off Smart Choice's professional fees and profits.

414.   For example, Khaim used A&P Holding to lease the building at Smart Choice's first location, and then caused Smart Choice to sublease the space from A&P Holding on commercially unreasonable terms.

415.   Later on, Khaim used A&P Holding to purchase a building located at 407-409 Rockaway Avenue in Brooklyn, which was converted for use as a medical clinic and a pharmacy.

416.   Once converted, Smart Choice was again caused to lease space from A&P Holding on commercially unreasonable terms.

417.   The leases between A&P Holding and Smart Choice allowed Khaim to exert control over Smart Choice and its finances because Smart Choice's ability to operate was dependent upon the space and services provided by A&P Holding.

418.   Having Smart Choice operate from locations under A&P Holding also gave Khaim the opportunity to direct and control the prescription practices of Smart Choice because Khaim also owned and controlled pharmacies that were located in the same buildings as Smart Choice.

419.   Specifically, Khaim owned and controlled Sutter Pharmacy and Excellent Choice.

420.   Khaim also owned Rx For You's assets and accounts receivable, which were acquired by Khaim when he caused Sutter Pharmacy to purchase the business assets of Rx For You.

421.   As set out below, prescriptions given to Smart Choice patients were directed to Sutter Pharmacy and Excellent Choice.

422.   Smart Choice was also financially dependent upon Khaim and the Manager Defendants because, upon information and belief, the start-up of Smart Choice was funded by one or more Shell Company owned by Khaim.

423.   The Manager Defendants also caused Smart Choice to enter into sham agreements with other Shell Companies.

424.   For instance, Smart Choice entered into an agreement with Billing For You, which was one of the Shell Companies owned by Gulkarov.

425.    The agreement with Billing For You obligated Smart Choice to make monthly payments to Gulkarov totaling $7,000.00 per month.

426.    Upon information and belief, Smart Choice made monthly payments to Billing For You even though Billing For You did not provide any actual billing services to Smart Choice.

427.    Consistent with the operation and management of the Hollis, Starrett, and Hillcrest enterprises, the arrangements structured between Smart Choice and the Shell Companies were designed to allow the Manager Defendants to operate, control, and profit from Smart Choice.

428.    Overall, Chumaceiro knowingly and purposely relinquished control to the unlicensed Defendants, consequently compromising patient care and violating New York law.

429.    Because Smart Choice was owned and controlled by laypersons (i.e., Khaim and Gulkarov) instead of by its supposed owner (i.e., Chumaceiro), Smart Choice was operated in violation of New York law and was therefore ineligible to seek or collect No-Fault benefit payments under Insurance Law § 5102(a)(1).

## C.    UNLAWFUL OPERATION OF PHARMACY DEFENDANTS

430.    The Manager Defendants broadened this scheme by operating a series of pharmacies, each of which was used to dispense medications prescribed to patients of the PC Defendants.

431.    The Manager Defendants used their control over the PC Defendants and their patient bases to further exploit the generous No-Fault benefits available to Claimants by facilitating the prescribing and dispensing of medications that were not medically necessary.

432.    Starting in 2015, the Manager Defendants started acquiring and then operating a string of pharmacies to be used in this scheme.

433.   The first pharmacy was started using an entity named Rx For You, which was organized in August 2015.

434.   Rx For You was organized using 1767 Southern Boulevard in Bronx, New York as its principal place of business.

435.   Although organized in August 2015, Rx For You did not commence pharmacy operations until early 2016 when it was certified for opening by the Board of Pharmacy.

436.   Rx For You was always under the control of the Manager Defendants.

437.   First, Rx For You was organized under Mushyakov's name at or around the same time that Mushyakov was also working for (or getting paid by) Hollis and Starrett.

438.   Second, Rx For You was caused to lease pharmacy space from A&P Holding—one of the Shell Companies owned by Khaim.

439.   Notably, A&P Holding secured a lease for the 1767 Southern Boulevard location in August 2015, just days before the formation of Rx For You.

440.   Third, Rx For You was adhered to lease obligations with A&P Holding that were commercially unreasonable and designed to cover the Manager Defendants' costs to lease the Southern Boulevard space from its owner.

441.   For example, Rx For You made monthly lease payments to A&P Holding that were substantially equivalent to A&P Holding's monthly cost to lease the Southern Boulevard location; therefore, A&P Holding was able to generate a substantial profit through its lease with Smart Choice, the terms of which covered the same space at the same time.

442.   Fourth, the Manager Defendants orchestrated a transaction wherein Sutter Pharmacy acquired the business assets of Rx For You.

443.   Once the transaction was closed, Sutter Pharmacy sought, and was granted, permission to operate Sutter Pharmacy under the assumed business name of "Rx For You."

444.   The Rx For You-Sutter Pharmacy transaction was significant because the sale gave Khaim, as the registered owner of Sutter Pharmacy, control over the pharmacy operation at the Southern Boulevard location.

445.   The Rx for You-Sutter Pharmacy transaction was also significant because it represented another step in the Manager Defendants' longstanding plan to devise this scheme.

446.   For example, Sutter Pharmacy was incorporated by Gulkarov back in 2014, but was left dormant until February 2017 when Sutter Pharmacy purchased Rx For You's business assets.

447.   Overall, the Pharmacy Defendants were intended to look like they were separate and independent of each other; in fact, they were purposely arranged this way to (a) avoid detection, (b) conceal the number of prescriptions originating from the PC Defendants and (c) conceal the unlawful and collusive arrangements between the Pharmacy Defendants and the prescribing physicians.

448.   In reality, all three pharmacies were owned and controlled by Khaim and Gulkarov even though representations were made to the New York State Board of Pharmacy and New York State Education Department, Office of the Professions that Defendant Mushyakov owned Rx For You and Defendant Khaimov owned Excellent Choice.

449.   Khaim and Gulkarov sought to hide their involvement and give the impression that Rx For You, Sutter Pharmacy, and Excellent Choice were separate and distinct community-based pharmacies, when in fact, the pharmacies were one in the same.

450.   For example, the Pharmacy Defendants shared similar addresses, phone numbers, supervising pharmacists, and referring physicians.

451.   The Pharmacy Defendants also dispensed many of the same medications—in identical quantities and formulations—even though some of the medications (i.e., the compounded topical pain medications) were supposed to be specifically tailored for individual patient needs.

452.   As part of this scheme, the prescribing providers, including Defendants Ajudua and Chumaceiro, were directed to prescribe various prescription drugs including medically unnecessary topical compounded pain medications, Diclofenac Sodium Gel, and pain patches.

453.   The prescribing providers, including Defendants Ajudua and Chumaceiro, generated multiple prescriptions pursuant to a pre-determined protocol of treatment to financially enrich the Defendants.

454.   In furtherance of the scheme, the prescriptions generated by Defendants Ajudua and Chumaceiro were directed to the pharmacies owned and controlled by Khaim and Gulkarov.

455.   Upon information and belief, the patients were never offered an option of where to fill their prescriptions; in fact, most medications were delivered to the patient with the patient having no knowledge of the impending delivery.

456.   Throughout the course of this scheme, Allstate was caused to make payments to Pharmacy Defendants for medications that were not medically necessary and therefore not compensable under New York's No-Fault laws.

457.   The Defendants caused Allstate to make payments to each of the Pharmacy Defendants knowing that the charges for such items were not compensable under New York law.

458.   Overall, the Pharmacy Defendants were never eligible to seek or collect payments from Allstate under New York's No-Fault laws because the pharmacy services were (a) not medically necessary, (b) prescribed pursuant to a pre-determined protocol of treatment, and (c) the product of collusive and unlawful arrangements for the purpose of increasing profits.

### D. Fraudulent Dispensing of Medically Worthless Compounded Products

459. Rx For You, Sutter Pharmacy, and Excellent Choice submitted bills to Allstate seeking payments for Compounded Products and other drugs.  *See* Exhibit 3-5.

460. Rx For You, Sutter Pharmacy, and Excellent Choice's bills for the Compounded Products were not compensable under New York's No-Fault laws for the reasons set out below.

### 1. No Clinical Basis for Compounded Products

461. For several drugs used in the the Pharmacy Defendants' Compounded Products, there is no clinical evidence that these drugs actually provide any meaningful therapeutic benefits to patients when used in a topical form.

462. Also, there is nothing to support the formulas or combinations of drugs used by the Pharmacy Defendants in producing the Compounded Products—there is certainly nothing to support why numerous patients, with different injuries and different medical needs, would each warrant the same mixture of the same drugs in the same pre-determined amounts.

463. It was simply never necessary to prescribe the Pharmacy Defendants' unproven, ineffective Compounded Products when there were other proven, FDA-approved alternatives already available.

464. Patients could obtain the same or greater benefit from these commercially available alternatives, some of which were already offered in different  topical formulations.

465. Several alternatives have abundant and high quality evidence supporting their effectiveness for patients with musculoskeletal pain and neuropathies, are widely used among practitioners treating these conditions, and are FDA approved.  The Compounded Products are not.

## 2.      No Unique Tailoring of Compounded Products

466.   Compounded Products must be formulated for individual patients based upon the receipt of a valid prescription for an identified individual patient, or a notation on a prescription that a compounded product is necessary for the identified patient.  *See* 21 U.S.C. § 353a.

467.   However, the Compounded Products prescribed to Allstate Claimants, and then purportedly dispensed and delivered by the Pharmacy Defendants, were never tailored to each claimant's unique needs, and were never necessary to address the claimant's alleged accident-related conditions.

468.   In many instances, physicians, including Defendants Ajudua and Chumaceiro, prescribed the Pharmacy Defendants' Compounded Products using a form supplied by the Pharmacy Defendants.

469.   Indeed, the Pharmacy Defendants provided the prescribers, including Defendants Ajudua and Chumaceiro, with a pre-printed, pre-determined menu of Compounded Products and other non-prescription drugs.

470.   Prescribers like Defendants Ajudua and Chumaceiro were instructed to prescribe these medications to their patients, and then deliver the prescriptions to the Pharmacy Defendants so the medications could be dispensed to Claimants.

471.   In direct conflict with the purpose of compounding, the Allstate Claimants' prescribing physicians are steered into prescribing Compounded Products that are pre-determined and pre-formulated in set amounts.

472.   The Pharmacy Defendants' prescription forms even identify the specific conditions for which the Compounded Products should be prescribed.

473.   For example, with respect to the nine (9) "General Pain" lotions offered by the Pharmacy Defendants, the formulation for each such Compounded Product is set forth in pre-determined amounts on the prescription form.

474.   Like mass-produced, commercially-available medications, the Pharmacy Defendants' "General Pain" lotions have specific names, such as "GP1" (intended for musculoskeletal pain) and "GP5" (intended for arthritis pain).

475.   As a further example of the pre-determined nature of the Pharmacy Defendants' Compounded Products, each of the four Compounded Products listed for "Neuropathic and Other Conditions" are also listed with pre-set formulations.

476.   Just like the "General Pain" lotions, the Compounded Products that appear in the "Neuropathic and Other Conditions" are also listed like mass-produced, commercially-available medications with labels such as "NP3" (intended for back pain) and "FBGCL" (intended as an anti-inflammatory treatment for neuropathic pain).

477.   Notably, with the exception of two products listed in the "General Pain" category (i.e., "GP4" and "GP7"—both intended for "general pain"), there is only one Compounded Product listed for a specific condition.

478.   As a result, for those Allstate Claimants, for example, who were diagnosed with musculoskeletal pain, there was only one available option—"GP1"—which was prescribed and then dispensed in a pre-set, pre-determined formulation.

479.   The same singular options existed for those Allstate Claimants who were prescribed Compounded Products for, among other things, tendonitis, back pain, joint pain, and stress/tension headaches.

480.   Additionally, the quantity of each Compounded Product to be prescribed and then dispensed through the Pharmacy Defendants' prescription form is also pre-determined because the prescribers have no choice but to prescribe a 4-week supply of 300 milliliters, or a 2-week supply of 150 milliliters.

481.   As a result of the pre-determined nature of the Compounded Products offered by the Pharmacy Defendants, Allstate Claimants were provided with identical Compounded Products, which were never tailored to their unique circumstances.

482.   None of these prescriptions identify why a compound was necessary or why a commercially available FDA-approved drug would not be appropriate or reference any patient condition that necessitates the prescribed drug, let alone a compound of any kind.

483.   Overall, the dispensing of the Pharmacy Defendants' Compounded Products was never the product of a prescription necessary to address the unique needs of any individual patient; rather, these items were provided across many patients by different physicians without regard to the particular circumstances of any one patient.

484.   Because the Pharmacy Defendants' Compounded Products were not compounded for individual patients, they then required FDA approval as new drugs, and the Pharmacy Defendants' Compounded Products had no such FDA approval.  *See* 21 U.S.C. § 355 and 21 U.S.C. 353a(a).  By manufacturing and distributing its mass-produced drugs under the guise of purported compounds exempt from FDA approval, the Pharmacy Defendants deliberately sought to avoid the FDA approval regime intended to protect the health and safety of patients.

485.   Likewise, because the Pharmacy Defendants' Compounded Products were not individualized, were not tailored to the unique characteristics of each Allstate Claimant, were not provided pursuant to legitimate prescriptions, and were apparently compounded in pre-set, pre-

determined quantities, then the Pharmacy Defendants were never exempt from the applicable New York state licensing requirements.

486.   As a result, the Defendants violated one or more applicable state licensing requirements when dispensing and delivering Compounded Products to Allstate Claimants.

### 3.   Unlawful Template Prescriptions for Compounded Products

487.   As described above, many of the Compounded Products were dispensed and delivered to Allstate Claimants by the Pharmacy Defendants based on a pre-determined, pre-formulated prescription.

488.   Moreover, these pre-determined, pre-formulated prescriptions were utilized by a wide number of physicians operating in the New York metropolitan area.

489.   Here, the form prescriptions issued for the Pharmacy Defendants' Compounded Products violate provisions of New York law whose purpose is clearly to prevent the kinds of practices these prescriptions represent.

490.   Indeed, the listing of multiple pre-determined Compounded Products from which physicians can select violates New York Education Law § 6810(7)(a).  *See* N.Y. Educ. Law § 6810(7)(a) ("No prescription for a drug written in this state by a person authorized to issue such prescription shall be on a prescription form which authorizes the dispensing or compounding of any other drug.  No drug shall be dispensed by a pharmacist when such prescription form includes any other drug.").

491.   Moreover, the use of blank forms in which a physician's name is handwritten violates New York Education Law § 6810(8).  *See* N.Y. Educ. Law § 6810(8) ("Every prescription (whether or not for a controlled substance) written in this state by a person authorized to issue such prescription and containing the prescriber's signature shall, in addition to such signature, be

64

imprinted or stamped legibly and conspicuously with the printed name of the prescriber who has signed the prescription."); *see also Izzo v. Manhattan Med. Grp., P.C.* 164 A.D.2d 13, 560 N.Y.S.2d 644 (1990).

492.   Additionally, none of the form prescriptions contain the following language required on every prescription in New York:   "THIS PRESCRIPTION WILL BE FILLED GENERICALLY UNLESS PRESCRIBER WRITES 'd a w' IN THE BOX BELOW." N.Y. Educ. Law § 6810(6)(a).

493.   Thus, form prescriptions utilized by the Defendants directly violate New York law, and, in doing so, unduly (a) direct/influence the Prescribing Physicians' prescribing decisions, (b) limit the Allstate Claimants' choices, and (c) hinder effective healthcare.

### E.   FRAUDULENT BILLING FOR DICLOFENAC SODIUM GEL 3%

494.   The Pharmacy Defendants frequently dispensed medically unnecessary Diclofenac Sodium Gel 3% to patients during the relevant period regardless of whether the patient even wanted or needed the medication.  *See* Exhibit 3-5.

495.   The Pharmacy Defendants regularly charged Allstate in excess of $1,800.00 for each Diclofenac Sodium Gel 3% prescription even though this medication was not effective or approved for the treatment of the patients' conditions.

496.   Indeed, Diclofenac Sodium Gel 3% is FDA-approved for the topical treatment of a skin condition called actinic keratosis, which is characterized by rough, scaly lesions caused by long-term sun exposure.

497.   Diclofenac Sodium Gel 3% is not approved for use topically in the treatment of traumatic pain or arthritic pain.

498.   Even though Diclofenac Sodium Gel 1%, a non-steroidal anti-inflammatory drug (NSAID), may be effective in the treatment of pain in the peripheral joints, such as the hand or knee, it has not been evaluated for larger and deeper joints, such as the spine or shoulder.

499.   Moreover, neither Diclofenac Sodium Gel 1% and Diclofenac Sodium Gel 3% are effective for complaints of pain to multiple areas of the body.

500.   Merely because Diclofenac Sodium Gel 3% is triple the concentration of Diclofenac Sodium Gel 1%, it does not mean that Diclofenac Sodium Gel 3% has triple the effectiveness for the treatment of joint pain, for which Diclofenac Sodium Gel 3% has not been evaluated.

501.   Indeed, because Diclofenac Sodium Gel 3% is intended for use in treating a skin condition, it is designed for minimal depth of absorption to keep the drug in the skin to optimize treatment of actinic keratosis.

502.   Therefore, the Diclofenac Sodium Gel 3% does not have the absorption capability of Diclofenac Sodium Gel 1%, and the two are not bioequivalent.

503.   However, Diclofenac Sodium Gel 3% is still substantially more toxic topically and systematically than Diclofenac Sodium Gel 1%.

504.   Moreover, the use of Diclofenac Sodium Gel 3% in patients without actinic keratosis exposes the patients to increased and unnecessary risks, such as for skin irritation, hypersensitivity, and photosensitivity.

505.   Therefore, the Pharmacy Defendants were not eligible for No-Fault reimbursement for the Diclofenac Sodium Gel 3% purportedly dispensed to Allstate Claimants because this drug was not medically necessary or effective in treating the Claimants' complaints of pain.

1.     **Inflated and Excessive Charges for Diclofenac Sodium Gel 3%**

506.   The Pharmacy Defendants induced healthcare providers to prescribe Diclofenac Sodium Gel 3% to be dispensed by the Pharmacy Defendants as a means to inflate the amounts sought by—and, in some instances, received by—the Pharmacy Defendants from Allstate.

507.   For example, the amounts permissible under the No-Fault Fee Schedule for generic Diclofenac Sodium Gel 3% is far higher than the amounts permissible for generic Diclofenac Sodium Gel 1% (even assuming that either of these products was medically necessary and effective to treat the patients' pain, which they were not).

508.   Specifically, the Diclofenac Sodium Gel 3% purportedly dispensed by the Pharmacy Defendants under NDC 00168-0844-01 and NDC 00472-1783-10 has an AWP of 11.7946 per unit, while the Diclofenac Sodium Gel 3% dispensed by the Pharmacy Defendants under NDC 00115-1483-61 has an AWP of 11.3228 per unit.

509.   Meanwhile, the highest AWP of available generic Diclofenac Sodium Gel 1% is only 0.58340 per unit.

510.   Therefore, when patients were prescribed 200 grams of Diclofenac Sodium Gel 1%, the Pharmacy Defendants could only charge a total of $93.34 for each prescription.

511.   However, when patients were prescribed 200 grams of generic Diclofenac Sodium Gel 3%, the Pharmacy Defendants could charge over $1,800.00 for each prescription.

512.   Accordingly, it is clear that the Pharmacy Defendants were motivated by profit to ensure that prescribers ordered Diclofenac Sodium Gel 3% for their patients instead of the lesser expensive Diclofenac Sodium Gel 1% even though the 3% preparation is neither approved nor effective at treating joint pain.

### 2. Examples of Fraudulent Billing for Diclofenac Sodium Gel 3%

#### a. *Patient B.P. (claim no. 0442236873)*

513. B.P. was purportedly involved in a motor vehicle accident on January 5, 2017.

514. On February 23, 2017, B.P. was prescribed 200 grams of Diclofenac Sodium Gel 3%, which purportedly was dispensed by Rx For You on March 8, 2017.

515. According to B.P., he was not asked whether he wanted to fill the prescription at a pharmacy of his choosing.

516. However, according to records submitted to Allstate, on February 23, 2017, B.P. purportedly complained of severe cervical pain and severe lumbar pain rather than pain of any peripheral joint.

517. Therefore, even Diclofenac Sodium Gel 1% would not have been effective or indicated to treat B.P.'s spine as Diclofenac Sodium Gel 1% is only indicated for joints such as the hand or knee rather than joints that are covered by large muscle masses such as the spine.

518. Moreover, in addition to not being effective or indicated for B.P.'s spinal pain, the use of the more toxic Diclofenac Sodium Gel 3% put B.P. at risk for skin irritation, hypersensitivity, and photosensitivity by exposing B.P. to a topical medication intended to treat skin lesions.

519. Nonetheless, Rx For You submitted inflated charges to Allstate for the 200 grams of Diclofenac Sodium Gel 3% (NDC 00168-0844-01) dispensed on March 8, 2017 in the amount of $1,891.40.

520. Because the Diclofenac Sodium Gel 3% dispensed to B.P. by Rx For You was medically unnecessary and ineffective, Rx For You's charges for the Diclofenac Sodium Gel 3% purportedly dispensed to B.P. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

b. **Patient C.F. (claim no. 0468851548)**

521. C.F. was involved in an alleged motor vehicle accident on July 30, 2017.

522. On October 23, 2017, C.F. was prescribed 200 grams of Diclofenac Sodium Gel 3%, which purportedly was dispensed by Excellent Choice on October 24, 2017.

523. However, according to records submitted to Allstate, on October 23, 2017, C.F. purportedly complained of pain to his low back and neck.

524. Therefore, even Diclofenac Sodium Gel 1% would not have been effective or indicated to treat C.F.'s spine as Diclofenac Sodium Gel 1% is only indicated for joints such as the hand or knee rather than joints that are covered by large muscle masses such as the spine.

525. Moreover, in addition to not being effective or indicated for C.F.'s spinal pain, the use of the more toxic Diclofenac Sodium Gel 3% put C.F. at risk for skin irritation, hypersensitivity, and photosensitivity by exposing C.F. to a topical medication intended to treat skin lesions.

526. Nonetheless, Excellent Choice submitted inflated charges to Allstate for the 200 grams of Diclofenac Sodium Gel 3% (NDC 00168-0844-01) dispensed on October 24, 2017 in the amount of $1,891.40.

527. Because the Diclofenac Sodium Gel 3% dispensed to C.F. by Excellent Choice was medically unnecessary and ineffective, Excellent Choice's charges for the Diclofenac Sodium Gel 3% purportedly dispensed to C.F. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

c. **Patient C.S. (claim no. 0431586304)**

528. C.S. was purportedly involved in a motor vehicle accident on October 8, 2016.

529.     On January 12, 2017, C.S. was prescribed 200 grams of Diclofenac Sodium Gel 3%, which purportedly was dispensed by Rx For You on January 16, 2017.

530.     However, according to records submitted to Allstate, on January 12, 2017, C.S. purportedly complained of severe cervical and lumbar pain.

531.     Therefore, even Diclofenac Sodium Gel 1% would not have been effective or indicated to treat C.S.'s spine as Diclofenac Sodium Gel 1% is only indicated for joints such as the hand or knee rather than joints that are covered by large muscle masses such as the spine.

532.     Moreover, in addition to not being effective or indicated for C.S.'s spinal pain, the use of the more toxic Diclofenac Sodium Gel 3% put C.S. at risk for skin irritation, hypersensitivity, and photosensitivity by exposing C.S. to a topical medication intended to treat skin lesions.

533.     Nonetheless, Rx For You submitted inflated charges to Allstate for the 200 grams of Diclofenac Sodium Gel 3% (NDC 00115-1483-61) dispensed on January 16, 2017 in the amount of $1,816.20.

534.     Because the Diclofenac Sodium Gel 3% dispensed to C.S. by Rx For You was medically unnecessary and ineffective, Rx For You's charges for the Diclofenac Sodium Gel 3% purportedly dispensed to C.S. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

### d.     *Patient J.M. (claim no. 0467176129)*

535.     J.M. was purportedly involved in a motor vehicle accident on July 17, 2017.

536.     On August 10, 2017, J.M. was prescribed 200 grams of Diclofenac Sodium Gel 3%, which purportedly was dispensed by Sutter Pharmacy to J.M. on August 17, 2017.

537.    However, according to records submitted to Allstate, on August 10, 2017, J.M. purportedly complained of severe cervical and lumbar pain.

538.    Therefore, even Diclofenac Sodium Gel 1% would not have been effective or indicated to treat J.M.'s spine as Diclofenac Sodium Gel 1% is only indicated for joints such as the hand or knee rather than joints that are covered by large muscle masses such as the spine.

539.    Moreover, in addition to not being effective or indicated for J.M.'s spinal pain, the use of the more toxic Diclofenac Sodium Gel 3% put J.M. at risk for skin irritation, hypersensitivity, and photosensitivity by exposing J.M. to a topical medication intended to treat skin lesions.

540.    Nonetheless, Sutter Pharmacy submitted inflated charges to Allstate for the 200 grams of Diclofenac Sodium Gel 3% (NDC 00168-0844-01) dispensed on August 17, 2017 in the amount of $1,891.40.

541.    Additionally, Sutter Pharmacy also dispensed a refill of the Diclofenac Sodium Gel 3% to J.M. on September 22, 2017 for which Sutter Pharmacy again charged Allstate in the amount of $1,891.40.

542.    Because the Diclofenac Sodium Gel 3% dispensed to J.M. by Sutter Pharmacy was medically unnecessary and ineffective, Sutter Pharmacy's charges for the Diclofenac Sodium Gel 3% purportedly dispensed to J.M. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

e.    *Patient M.G. (claim no. 0457191351)*

543.    M.G. was involved in an alleged motor vehicle accident on April 27, 2017.

544.    On June 20, 2017, M.G. was prescribed 200 grams of Diclofenac Sodium Gel 3%, which was dispensed by Sutter Pharmacy on June 23, 2017.

545.    However, according to records submitted to Allstate, on June 20, 2017, M.G. purportedly complained of severe cervical and lumbar pain.

546.    Therefore, even Diclofenac Sodium Gel 1% would not have been effective or indicated to treat M.G.'s spine as Diclofenac Sodium Gel 1% is only indicated for joints such as the hand or knee rather than joints that are covered by large muscle masses such as the spine.

547.    Moreover, in addition to not being effective or indicated for M.G.'s spinal pain, the use of the more toxic Diclofenac Sodium Gel 3% put M.G. at risk for skin irritation, hypersensitivity, and photosensitivity by exposing M.G. to a topical medication intended to treat skin lesions.

548.    Nonetheless, Sutter Pharmacy submitted inflated charges to Allstate for the 200 grams of Diclofenac Sodium Gel 3% (NDC 00168-0844-01) dispensed on June 23, 2017 in the amount of $1,891.40.

549.    Additionally, Sutter Pharmacy also dispensed two refills of the Diclofenac Sodium Gel 3% to M.G. on August 31, 2017 (NDC 00472-1783-10) and July 28, 2017 (NDC 00168-0844-01) for which Sutter Pharmacy again charged Allstate in the amount of $1,891.40 for each refill.

550.    According to M.G., he did not request these refills and they were delivered to his home automatically.

551.    Because the Diclofenac Sodium Gel 3% dispensed to M.G. by Sutter Pharmacy was medically unnecessary and ineffective, Sutter Pharmacy's charges for the Diclofenac Sodium Gel 3% purportedly dispensed to M.G. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

F.   **BILLING FOR FRAUDULENT HEALTHCARE SERVICES**

552.   When treating patients of the PC Defendants, Ajudua and Chumaceiro engaged in numerous unlawful acts, including (a) recommending and administering a battery of excessive and unwarranted examinations, tests, and treatments, and (b) prescribing medically unnecessary drugs and medications, including Compounded Products, Levatio Patches and Diclofenac Sodium Gel to be exclusively dispensed by a Pharmacy Defendant.

553.   The documents and invoices created and submitted to Allstate by (or on behalf of) the PC Defendants routinely misrepresented that the billed-for services were performed in a legitimate and clinically-reasonable manner.

554.   However, as explained below, the tests and treatments provided to patients of the PC Defendants were medically unnecessary and excessive.

555.   The PC Defendants also falsely billed Allstate by misrepresenting the nature and extent of the services that were actually provided.

556.   As alleged herein, not only has this scheme injured Allstate, but it has also compromised and/or endangered the well-being of the PC Defendants' patients by subjecting them to tests and treatments that were not warranted, and to medications that were not proven safe or effective.

557.   Because of the misconduct described below, none of the PC Defendants' claims for No-Fault reimbursement under Insurance Law § 5102 are—or ever were—compensable.

1.   **Patient Examinations**

558.   The initial patient examinations were a crucial component of the Defendants' scheme.

559.     These initial patient encounters enabled the Defendants to lay the groundwork for excessive and unwarranted medical billing.

560.     Thee results of these examinations were often used to justify the battery of tests that were provided to patients, including range of motion (ROM) testing, electrodiagnostic (EDX) testing, and other services, which were provided by different providers working at the clinics.

561.     Initial patient examinations were conducted as a means to (a) inflate the patient charges ultimately submitted to Allstate, and (b) create the false impression that the patients required additional medical care.

562.     The examinations also provided a chance to write prescriptions for costly medications which were nearly always dispensed by a Pharmacy Defendant.

563.     The examinations were performed below the standard of care, and the findings of these examinations were misrepresented.

564.     The general accepted standard of care for an initial examination includes comprehensive evaluation of the musculoskeletal and neuromuscular systems, and range of motion (ROM) assessments of the affected body parts, especially when the patient complains of neck and/or lower back pain, with or without associated symptoms into any one of four limbs.

565.     Instead, when patients complained of neck pain during an initial examination, their cervical ROM was not assessed.  Likewise, when patients complained of back pain during their initial examination, their lumbar ROM was not assessed.

566.     Further, an adequate initial examination includes a basic neuromuscular assessment to investigate possible nerve involvement as the result of the motor vehicle accident. A standard examination performed at the generally accepted standard of care includes assessment of muscle stretch reflexes (MSR), sensation, and muscle strength via manual testing (MMT).

567.    However, the initial examinations purportedly conducted on patients of Hollis, Starrett, Hillcrest, and Smart Choice regularly omitted at least one of these standard neuromuscular tests.

568.    The findings of these initial examinations were also misrepresented.

569.    Specifically, records created and submitted by Hollis, Starrett, Hillcrest, and Smart Choice often documented positive findings from a straight leg raise (SLR) test that were inconsistent with the definition of a positive SLR test.

570.    The SLR test, a neural tension test, is performed to assess for the possibility of lumbar disc herniation in patients with lower back pain and sciatica (radiating pain generally from the buttocks down to below the knee).

571.    A SLR test is positive when it reproduces radicular symptoms with passive hip flexion of the supine patient, which creates sciatic nerve tension at 30-60 degrees.

572.    Therefore, the test can only be positive if the patient already has radiating pain in their lower limbs and the SLR test reproduces that pain. If the patient does not have any complaints of lower limb radiating pain, then the SLR test, by its very definition, cannot be positive.

573.    However, despite this clear definition, patients of Hollis, Starrett, Hillcrest, and Smart Choice had documented positive SLR without any reports of radiating pain in their lower limbs, which is impossible.

574.    Therefore, the records created and submitted by Hollis, Starrett, Hillcrest, and Smart Choice are poorly documented and marked by rudimentary musculoskeletal and neurologic examinations, along with a complete absence of any thought process or differential diagnosis (i.e., the distinguishing of a disease or condition from others presenting with similar signs and symptoms).

575.     As a result, Hollis, Starrett, Hillcrest, and Smart Choice's charges for these examinations were false and fraudulent.

576.     As detailed above, the Fee Schedule is used by providers and insurers to determine the level of reimbursement payable on legitimate claims.

577.     The Fee Schedule uses Current Procedural Terminology ("CPT") codes, modifiers, and descriptions.

578.     CPT codes are created and owned by the American Medical Association ("AMA"), and are found in the CPT codebook, a publication that is updated annually. The CPT codes reflect current medical practice.

579.     To receive correct payment for their services, providers must correctly identify the procedure performed.

580.     Generally, the Fee Schedule's reimbursement rates are determined by considering (a) the physician work associated with the procedure, (b) the practice expense associated with providing the service, and (c) the malpractice expense.

581.     Reimbursement for medical services is directly proportionate to the level of the CPT code billed (i.e., the higher the level of CPT code billed, the greater the amount of reimbursement).

582.     Billing a service at a higher level CPT code than actually performed, for the purpose of receiving greater reimbursement, is an example of a fraudulent billing practice, and such charges are not compensable.

583.     Hollis, Starrett, Hillcrest, and Smart Choice charged Allstate for patient examinations under CPT codes 99204 and 99205.

584.    These charges were false and fraudulent because, by using these CPT codes, the records created and submitted by Hollis, Starrett, Hillcrest, and Smart Choice contained several misrepresentations about the nature and extent of these examinations and evaluations.

585.    For example, any charges for examinations submitted under CPT codes 99204 or 99205 must meet the criteria listed below:

| CPT Code | History | Examination | Medical Decision Making | Face to Face Time |
|---|---|---|---|---|
| 99202 | Expanded Problem Focused | Expanded Problem Focused | Straight forward | 20 minutes |
| 99203 | Detailed | Detailed | Low complexity | 30 minutes |
| 99204 | Comprehensive | Comprehensive | Moderate complexity | 45 minutes |
| 99205 | Comprehensive | Comprehensive | High complexity | 60 minutes |

586.    Thus, any charges for examinations classified under CPT codes 99204 or 99205 must necessarily include (a) a comprehensive history, (b) a comprehensive examination, (c) medical decision making of "moderate complexity" or "high complexity," and (d) face-to-face time of either forty-five (45) or sixty (60) minutes.

587.    In the case of such patient examinations, the factors considered to determine the "complexity" of medical decision making when assigning a proper CPT code designation include:

| Type of Decision Making | Number of Diagnoses or Management Options | Amount and/or Complexity of Data To Be Reviewed | Risk of Complications and/or Morbidity or Mortality |
|---|---|---|---|
| Straight forward medical decision making (CPT 99202) | Minimal | Minimal or none | Minimal |

| Type of Decision Making | Number of Diagnoses or Management Options | Amount and/or Complexity of Data To Be Reviewed | Risk of Complications and/or Morbidity or Mortality |
|---|---|---|---|
| Low complexity decision making (CPT 99203) | Limited | Limited | Low |
| Moderate complexity medical decision making (CPT 99204) | Multiple | Moderate | Moderate |
| High complexity decision making (CPT 99205) | Extensive | Extensive | High |

588.    To qualify for a given type of decision making, two of the three elements in the table must be met or exceeded.

589.    Because their examinations were actually minimal and insubstantial, Hollis, Starrett, Hillcrest, and Smart Choice's representations about the nature and extent of the services were false, and the charges based upon these misrepresentations were equally false.

590.    The bills submitted to Allstate by Hollis, Starrett, Hillcrest, and Smart Choice under CPT codes 99204 or 99205 for these examinations are therefore not compensable under New York No-Fault laws, including, but not limited to, the bills listed in Exhibit 6.

591.    Allstate is entitled to recover all payments made to Hollis, Starrett, Hillcrest, and Smart Choice in connection with any examinations billed under CPT codes 99204 or 99205.

592.    Allstate is also under no obligation to make any further payments to Hollis, Starrett, Hillcrest, or Smart Choice in connection with any examinations billed under CPT codes 99204 or 99205 because the examinations were falsely billed, and are therefore not compensable under New York's No-Fault laws.

##### 2. <u>**Fraudulent Electrodiagnostic Testing**</u>

593.    Hollis, Starrett, Hillcrest, and Smart Choice regularly provided, and billed for, unnecessary, excessive, and improperly performed electrodiagnostic ("EDX") testing services, such as needle electromyography ("EMG") studies and nerve conduction velocity ("NCV") studies. *See* Exhibit 7-8.

594.    The provision of EDX testing services to patients was of great benefit to the Defendants' overall scheme to defraud Allstate because (a) the studies are expensive, and (b) the results of the studies could—and would—most often be used to justify the prescription and provision of further unnecessary medical services.

595.    Two major types of EDX tests are NCV studies and needle EMG tests.

596.    NCV studies are non-invasive studies in which peripheral nerves are stimulated with electrical current.

597.    EMG tests measure the electrical activity of muscles, and are often done in connection with NCV studies.

598.    An EMG test involves the insertion of a needle into various muscles in the spinal area ("paraspinal muscles"), and in the arms and/or legs to measure electrical activity in each muscle.

599.    The results of the tests are compared with well-defined norms to identify the existence, nature, extent, and location of any abnormalities in the muscles, nerves, or nerve roots (close to the spine).

600.    EDX testing is generally used in the clinical evaluation of patients with disorders of the peripheral and/or central nervous system because the testing can help a practitioner evaluate symptoms, generate a proper diagnosis, and monitor patient response to treatments.

601.    EDX testing should not be administered uniformly across a provider's patient population.

602.    Because proper EDX testing should involve the use of a dynamic (i.e., patient-specific) approach, the nature and scope of the testing should change and evolve as the testing is administered to a patient.

603.    As a result, the nature and extent of EDX studies should vary from patient to patient.

604.    Moreover, the nerves and muscles chosen for EDX testing must depend on each patient's specific complaints, physical examination findings, and prior EDX findings.

605.    In other words, the nature and extent of EDX testing should never be the same for every patient.

606.    Throughout the course of this scheme, Hollis, Starrett, Hillcrest, and Smart Choice deployed EDX testing without any basis in evidence-based guidelines and contrary to the standard of care.

607.    For example, Hollis, Starrett, Hillcrest, and Smart Choice consistently purported to render EDX studies bilaterally without any medical indication whatsoever, which indicates that the tests were never tailored to the particulars of each patient, and rather, were performed improperly pursuant to a protocol.

608.    Moreover, as explained below, the EDX testing performed, and billed for, by Hollis, Starrett, Hillcrest, and Smart Choice was excessive.

609.    For instance, the EDX studies were so excessive that many patients of Hollis, Starrett, Hillcrest, and Smart Choice were subjected to this testing on all four limbs, which is exceedingly uncommon.

610.    In addition to being excessive, the EDX testing administered by Hollis, Starrett, Hillcrest, and Smart Choice reflect a pervasive pattern of diagnostic and billing errors, which highlights the thoughtless manner in which these services were prescribed and administered.

611.    Overall, Hollis, Starrett, Hillcrest, and Smart Choice's EDX tests were performed below the standard of care in a manner that disregarded the welfare of their patients.

612.    Because the EDX tests were deployed in this manner, it is clear that the tests were wholly unnecessary to evaluate and assess each patient's condition.  Not only was such EDX testing unnecessary, but it also posed a risk of serious harm to patients because (a) patients were most often needlessly subjected to invasive tests and possible infection, (b) the tests yielded incorrect or inaccurate findings and diagnoses, and (c) the providers performing and interpreting the tests on behalf of Hollis, Starrett, Hillcrest, and Smart Choice often disregarded or ignored the results of the tests, meaning that their patients did not receive proper care.

### a.    *Fraudulent Nerve Conduction Studies*

613.    In a legitimate clinical setting, NCSs are administered to measure nerve conduction by stimulating the nerves with a small electrical current.

614.    NCSs involve both F-Wave ("F-Wave") and H-Reflex ("H-Reflex") studies.

615.    The amount of electricity subsequently transmitted by the nerve is measured by this stimulation that, in turn, creates the nerve response platform, which is displayed on the screen. The screen displays the latency, amplitude, area, and duration of the nerve response through a graphic display of the waveforms for each nerve.

616.    NCSs typically confirm whether or not the nerves are functioning properly.

617. NCSs should be applied in a dynamic rather than protocol manner; in other words, the format and application of these studies should vary from patient to patient and should also be based on the patient's unique symptoms, findings, and suspect diagnosis.

618. Here, the providers performing EDX testing for patients of Hollis, Starrett, Hillcrest, and Smart Choice administered the NCSs without regarding to their patients' symptoms, findings or suspect diagnoses; rather, these providers applied an excessive number of NCSs in the majority of cases, not including H-Reflex or F-Wave studies.

619. According to the AMA, the utilization of dynamic decision-making in EDX testing is a prerequisite to properly bill under CPT codes for EDX testing.

620. Dynamic decision making regarding each individual test is required by the provider to properly administer EDX testing such as NCSs.

621. Here, the providers performing EDX testing for patients of Hollis, Starrett, Hillcrest, and Smart Choice followed a protocol approach to the utilization of NCSs, which resulted in both the overutilization of NCS and the administration of the same studies to most of Hollis, Starrett, Hillcrest, and Smart Choice's patients.

622. Indeed, patients of Hollis, Starrett, Hillcrest, and Smart Choice were routinely subjected to an excessive number of NCS, regardless of their diagnosis, which is unreasonable and unnecessary.

623. Specifically, even though an evaluation for radiculopathy typically only requires up to five (5) NCSs, the providers performing EDX testing for patients of Hollis, Starrett, Hillcrest, and Smart Choice regularly subjected patients to more than five (5) NCSs without any justification for these additional studies.

624. The providers performing EDX testing for patients of Hollis, Starrett, Hillcrest, and Smart Choice also misrepresented that the NCSs were performed within the standard of care because the results of these studies display a lack of attention and concern for the accuracy and reliability of these studies, which deficiencies may result in incorrect diagnoses, thus placing patients at risk.

625. For example, in many instances, the providers performing EDX testing for patients of Hollis, Starrett, Hillcrest, and Smart Choice failed to properly ensure that the NCSs were performed correctly and would render valid and medically meaningful results.

626. Specifically, where a specific nerve's amplitude is measured at less than half of the amplitude of the same nerve on the opposite side, when stimulated from the same site, such a finding may be indicative of a nerve pathology or of an error in the performance of the study. In either event, the standard of care requires that the provider identify and address the apparent abnormality.

627. However, the providers performing EDX testing for patients of Hollis, Starrett, Hillcrest, and Smart Choice failed to address such reduced amplitudes or correct the findings.

628. The EDX testing was a sham—it was routinely used by Hollis, Starrett, Hillcrest, and Smart Choice as part of a predetermined protocol designed to (a) generate billing, (b) create phony reasons for additional tests and services, and (c) produce profits.

629. The bills submitted to Allstate by Hollis, Starrett, Hillcrest, and Smart Choice for nerve conduction velocity studies are therefore not compensable under New York No-Fault laws, including, but not limited to, the bills listed in Exhibit 7.

### b.      *Fraudulent EMG Studies*

630.     EMGs measure electrical activity in specific muscles, and are often performed in conjunction with NCSs.

631.     EMGs involve the insertion of a needle into various muscles, and the studies can be performed on any muscle accessible to an EMG needle. If the muscles are found to be functioning normally, then an inference is created that the connection between the motor nerve and the spinal cord is normal.

632.     An abnormal result from an EMG study indicates, among other possibilities, the presence of problems with the nerve root near the spinal cord, or with the peripheral nerve near the muscle.

633.     A diagnosis of radiculopathy, which results from pinched or damages nerve roots, requires findings of abnormalities in at least two muscles.

634.     Similar to NCSs, the utilization of EMGs should vary from patient to patient; otherwise, the testing provider risks reaching an incorrect diagnosis if the same muscles are tested in the same number and sequence across the patient population.

635.     In a legitimate clinical setting, the decision concerning the extent of a particular patient's EMG test is determined based on a history and detailed neurological and physical examination of the individual patient, along with an analysis of the real time results obtained during the EMG test and the previously performed NCV study.

636.     As such, EMGs should be utilized with a dynamic rather than protocol approach, and the number of limbs and the specific muscles tested during an EMG test should vary from patient to patient.

637.    For instance, when screening for cervical or lumbosacral radiculopathy, the standard of care dictates performance of EMG in at least five (5) muscles in each limb suspected of having symptoms related to radiculopathy, in addition to the corresponding paraspinal muscles.

638.    In the event that the EMG reveals abnormalities, the study must be extended to additional muscles.

639.    Because each patient should be evaluated based upon their individual needs, EMGs should be limited and reserved for when specific outcomes are being investigated, such as when a single limb's muscles are being reviewed for radiculopathy.

640.    Furthermore, the muscles selected for EMGs should present the least amount of pain possible for the patient.  As such, the testing provider should know how to test each muscle, and know how to best limit the amount of pain for the patient.

641.    When a predetermined and protocol-based approach to diagnostic tests and studies is used, much like the one employed by Ajudua and Chumaceiro (or those working under their direction and control) when testing patients of Hollis, Starrett, Hillcrest, and Smart Choice, the testing is inaccurate and excessive.

642.    Testing in this manner is not just excessive and medically unnecessary, but it can also harm the patient.

643.    Regardless of these limitations, Ajudua and Chumaceiro (or those working under their direction and control) utilized a protocol approach when administering EMGs to patients of Hollis, Starrett, Hillcrest, and Smart Choice, and never tailored the EMGs to the specific, individualized needs of the patient.

644.    Indeed, certain of the EMGs administered to patients of Hollis, Starrett, Hillcrest, and Smart Choice involved the same set of muscles, including the following:

- Upper limbs:  biceps, triceps, deltoid, flexor carpi radialis, abductor pollicus brevis, and abductor digiti minimi muscles; and

- Lower limbs:  anterior tibial, peroneus long, medial gastrocnemius, and vastus medialis muscles.

645.    In the extremely unlikely event that these patients actually required an EMG study, the odds that certain patients' conditions would warrant the same study of the same exact muscles on numerous occasions is virtually impossible.

646.    The EMG studies were also a sham—they were routinely used by Hollis, Starrett, Hillcrest, and Smart Choice as part of a predetermined protocol designed to (a) generate billing, (b) createphony reasons for additional tests and services, and (c) produce profits.

647.    The bills submitted to Allstate by Hollis, Starrett, Hillcrest, and Smart Choice for EMG studies are therefore not compensable under New York No-Fault laws, including, but not limited to, the bills listed in Exhibit 8.

### c.    *Fraudulent F-Wave Studies*

648.    F-Wave studies involve motor nerve conduction, and the studies have limited use with identifying and diagnosing radiculopathy.

649.    F-Wave studies are performed by stimulating motor nerves through supramaximal stimulus, which creates a reaction in the nerve and produces muscle responses, the second of which is referred to as the F-Wave.

650.    In an F-Wave study, measurements are obtained by attaching electrodes to a patient's skin and then recording reactions using an EMG machine.

651.    To obtain a reading that is of medical significance, each F-Wave study must involve, at a minimum, ten (10) separate instances of nerve stimulation on **each** motor nerve, i.e., the patient is subjected to ten (10) electric shocks.

652.    Therefore, performing fewer than ten (10) stimulations is below the standard of care and precludes a provider from legitimately billing for the F-Wave studies under CPT code 95903.

653.    F-Wave studies are generally not useful in diagnosing radiculopathy.

654.    First, F-Wave studies generally return abnormal results that are not helpful.

655.    Second, the method of measuring reactions during F-Wave studies is uncomfortable for patients.

656.    Overall, the F-Wave studies administered by Ajudua and Chumaceiro (or those acting under their direction and control) were not medically necessary because nearly every patient was subjected to these studies regardless of their age, gender, symptoms, or diagnoses.

657.    Moreover, in addition to not being medically necessary, these F-Wave studies also were rendered below the standard of care because Ajudua and Chumaceiro (or those acting under their direction and control) consistently failed to perform the minimum number of stimulations to obtain the minimum number of F-Waves required to produce accurate results.

658.    Additionally, the results of the F-Wave studies performed for patients of Hollis, Starrett, Hillcrest, and Smart Choice contain inaccuracies that invalidate the results of the studies.

659.    For example, in certain instances, the F-Wave latencies for patients of Hollis, Starrett, Hillcrest, and Smart Choice were reported as being identical even though such results are extremely rare given that F-Wave latencies are variable in nature.

660.    Patients of Hollis, Starrett, Hillcrest, and Smart Choice were subjected to needless and unwarranted F-Wave studies as part of a predetermined protocol that was intentionally employed to (a) generate billing for otherwise unnecessary services, (b) create a false foundation for the provision of additional tests and services, and (c) produce profits for Hollis, Starrett, Hillcrest, and Smart Choice.

661.    Because the F-Wave studies were neither medically necessary nor performed in accordance with the standard of care, they are not compensable under New York No-Fault laws.

### d.    *Fraudulent H-Reflex Studies*

662.    Submaximal stimulation of select mixed nerves cause an H-Reflex to occur.

663.    While this can occur in multiple mixed nerves, H-Reflex testing is best practiced clinically through stimulation of the tibial nerve and at the S-1 level.

664.    The H-Reflex at the S-1 level is also useful for finding evidence of radiculopathy in that region.

665.    H-Reflex testing is only rarely practiced on additional mixed nerves and, even then, it is mainly for research purposes.

666.    Therefore, H-Reflex testing should not be performed as part of a set protocol, and rather should only be performed in the presence of a suspicion for S-1 radiculopathy based on the patient's symptoms and clinical exam findings.

667.    Moreover, even where an S-1 radiculopathy is suspected, EMG and NCS are more than adequate in diagnosing radiculopathy in the lower limbs.

668.    Ajudua and Chumaceiro (or those working under their direction and control) consistently included H-Reflex testing in the studies of patients' lower limbs and made no attempt to consider the needs or symptoms of the patients when using H-Reflex testing.

669.    The provision of H-Reflex testing in this manner provides further evidence that Ajudua and Chumaceiro (or those working under their direction and control) simply followed a predetermined protocol of treatment that blatantly ignored the age, gender, prior medical history, and the individualized needs of their patients.

670.    Moreover, Ajudua and Chumaceiro (or those working under their direction and control) also misrepresented the H-Reflex findings to support their conclusions, despite some cases involving the actual absence of H-Reflexes.

671.    Patients of Hollis, Starrett, Hillcrest, and Smart Choice were subjected to needless and unwarranted (and sometimes painful) H-Reflex tests as part of a predetermined protocol that was intentionally employed to (a) generate billing for otherwise unnecessary services, (b) create a false foundation for the provision of additional tests and services, and (c) produce profits for Hollis, Starrett, Hillcrest, and Smart Choice.

672.    In this case, the H-Reflex testing administered to patients by Ajudua and Chumaceiro (or those working under their direction and control) was excessive and not medically necessary, and the results were materially misrepresented.

673.    As a direct result of this protocol approach to H-Reflex tests—including (a) the overutilization of these studies, (b) misinterpretation of the results, and (c) misrepresentation of the diagnoses—the charges submitted to Allstate for H-Reflex tests were excessive and not compensable under New York No-Fault laws.

**e.    *Fraudulent Billing for F-Wave Studies***

674.    To obtain medically significant findings, each F-Wave study must consist of a bare minimum of ten (10) separate instances of electrical stimulation on each motor nerve, i.e., the patient is subjected to ten (10) separate electric shocks.

675.    To submit a valid charge for F-Wave studies under CPT code 95903, the study must record a minimum of ten (10) F-Waves.

676.    The failure to conduct the minimum number of stimulations will return study findings that are neither medically significant nor usable for diagnostic purposes.

677.    Ajudua and Chumaceiro (or those working under their direction and control) always failed to reach these minimum standards when subjecting patients of Hollis, Starrett, Hillcrest, and Smart Choice to F-Wave studies.

678.    By submitting bills for F-Wave studies under CPT code 95903, Hollis, Starrett, Hillcrest, and Smart Choice represented to Allstate that the studies were performed properly.

679.    By failing to conduct the minimum number of stimulations, Ajudua and Chumaceiro (or those working under their direction and control) failed to properly perform the F-Wave studies.

680.    Hollis, Starrett, Hillcrest, and Smart Choice materially misrepresented the nature and compensability of the F-Wave studies each time they submitted a bill to Allstate under CPT code 95903.  *See* Exhibit 7.

### f.      *Fraudulent Billing for H-Reflex Studies*

681.    CPT codes 95934 and 95936 are used to bill for unilateral H-Reflex studies.

682.    Typically, only two (2) H-Reflex studies are performed in a given examination because H-Reflex studies usually must be performed bilaterally for the purpose of determining whether the response on each side is symmetrical.

683.    A bilateral H-Reflex study should be reported by appending modifier "-50" to the CPT code reported.

684.    When an H-Reflex study is denoted as being performed bilaterally through the use of modifier "-50," reimbursement is reduced by fifty percent for the second H-Reflex performed.

685.    Hollis, Starrett, Hillcrest, and Smart Choice avoided using the modifier "-50" when billing for H-Reflex studies under CPT code 95934.

686.    Hollis, Starrett, Hillcrest, and Smart Choice materially misrepresented the nature and compensability of the H-Reflex studies each time they submitted a bill to Allstate under CPT code 95934.  *See* Exhibit 7.

### 3.      Fraudulent Range of Motion Testing

687.    Range of motion ("ROM") testing is utilized to measure spinal ROM in three planes of motion:  sagittal (i.e., extension-flexion), frontal or coronal (i.e., lateral bending to the left and right), and transverse or axial (i.e., rotation).

688.    Spinal ROM consists of all three segments of the spine:  cervical, thoracic, and lumbar.

689.    If a spinal region is found to have two or more impaired motions, then ratings for each ROM impairment are added.

690.    In many instances, Ajudua and Chumaceiro (or those working under their direction and control) failed to measure ROM in all three required planes of motion when administering spinal ROM testing of each segment of the spine to patients of Hollis, Starrett, Hillcrest, and Smart Choice.

691.    As a result, the ROM testing purportedly administered for patients of Hollis, Starrett, Hillcrest, and Smart Choice are incomplete and have limited clinical relevance.  This incomplete testing results in an inability to determine the extent of the injury.

692.    Even if the spinal ROM testing was complete, having already measured all three planes of motion, the computerized ROM was not medically necessary.

693.    Indeed, Ajudua and Chumaceiro (or those working under their direction and control) purportedly administered computerized ROM testing when a manual determination of a patient's ROM in the initial evaluation was already sufficient.

694.    The charges submitted by Hollis, Starrett, Hillcrest, and Smart Choice for ROM testing were false and fraudulent and, therefore, not compensable because Hollis, Starrett, Hillcrest, and Smart Choice improperly and purposely unbundled the charges for these services as a means to artificially inflate the charges submitted to Allstate.

695.    The ROM tests purportedly provided by Ajudua and Chumaceiro (or those working under their direction and control) and billed for by Hollis, Starrett, Hillcrest, and Smart Choice required a separate written and signed report, and are intended to be billed under CPT code 95851.

696.    In this case, Hollis, Starrett, Hillcrest, and Smart Choice repeatedly billed Allstate for ROM tests under CPT code 95851 even though Ajudua and Chumaceiro (or those working under their direction and control) never provided a separate written and signed report.

697.    Accordingly, Hollis, Starrett, Hillcrest, and Smart Choice billed Allstate for services that were not rendered as represented.

698.    Additionally, in certain instances, Ajudua (or those working under his direction and control) documented medically incredible ROM testing data purporting to indicate that patients of Hollis, Starrett, and Hillcrest were unable to walk properly, which findings were directly contrary to the reported clinical examinations of these patients.

699.    For example, a knee flexion contracture measurement of greater than ten (10) degrees bilaterally means that the patient's ability to walk is moderately impaired.

92

700.    However, where a patient's knee flexion contracture was reported as greater than ten (10) degrees, there was no corresponding mention of an altered gait in the medical records for the patient.

701.    As a result, these reported ROM test results are simply not valid.

702.    Hollis, Starrett, Hillcrest, and Smart Choice materially misrepresented the nature and compensability of the ROM tests each time they submitted a bill to Allstate under CPT code 95851.  *See* Exhibit 9.

### 4.    Fraudulent Muscle Strength Testing

703.    Manual muscle testing ("MMT") is generally utilized to measure a patient's muscle strength by applying opposing, resistant forces against the body of the patient, who is attempting to move against this force.

704.    Here, the PC Defendants (or those working under their direction and control) administered computerized muscle testing even when a manual determination of a patient's muscle strength was sufficient.

705.    As part of the justification of such testing, the computerized muscle testing report stated that the testing was medically necessary because it was objective computerized testing and establishes a baseline level to work with.

706.    There is no such thing as "objective" computerized muscle testing because the patient's cooperation is required to determine their level of maximum strength, regardless of whether it was done manually or by way of a computer.

707.    A baseline level can be established in the initial or follow-up examination, thus further negating the "medical necessity" of this testing.

708.    The PC Defendants (or those working under their direction and control) also performed computerized muscle testing that was incomplete and only indicated a limited number of muscle groups being tested.

709.    By limiting itself to only a small sampling of muscle groups, the computerized muscle testing creates a situation where one cannot have a complete idea of the patient's strength and thus it presents incomplete data, which is clinically flawed.

710.    The PC Defendants (or those working under their direction and control) documented medically incredible muscle strength testing data purporting to indicate that patients of the PC Defendants were unable to stand up from a chair, with or without the use of the hands, hold their heads erect, and hold their trunks erect, which findings were directly contrary to the clinical examinations of these patients.

711.    As a result, these reported computerized muscle testing results are invalid.

712.    A combined force of 67.4 pounds for the left knee added to the right knee is required to stand from a chair without the use of hands. A combined force of 50.1 pounds for the left knee added to the right knee is require to standard from a chair with the use of hands.

713.    For certain patients of the PC Defendants, the combined knee extension force varied from as low as approximately 12.4 pounds to approximately 30 pounds of force. If a patient has this level of combined knee extension force, then they would be incapable of standing either with or without assistance from the hands.

714.    Despite this, there was no mention in the patients' records of an inability to stand from the seated position.

715.    The average adult head weighs 8 to 12 pounds, which is the amount of force necessary to support the head when centered directly on top of the spine.

716.    When a person moves their head from the center of gravity, however, the cervical spine muscles are necessary to supply the appropriate force to prevent the person's head from dropping down to the chest.

717.    Further, in order to for a person to lift their head off of the pillow while lying down (i.e., supine), the cervical flexion strength must exceed the weight of the head.

718.    Consequently, if the cervical flexion strength is less than 8 pounds, it is medically unlikely that the patient will be able to lift their head off of a pillow in the supine position.

719.    Remarkably, the PC Defendants (or those working under their direction and control) reported that certain patients undergoing computerized muscle strength testing lacked sufficient cervical muscle strength to simply hold their head up while sitting upright.

720.    However, these patients' purported inability to hold their heads up is inconsistent with the clinical medical reports for these same patients.

721.    Therefore, the computerized muscle testing of the cervical spine muscles reported for patients of the PC Defendants are false and fraudulent.

722.    To calculate the pounds of force required for a person to hold their trunk erect (i.e., sit up without assistance, stand up straight) requires a calculation of their body weight multiplied by the percentage of body weight that is in the trunk (35-48% of body weight on average).

723.    In the patients who received computerized muscle testing of the trunk, profound muscle weakness was reported to the degree that the patient would be unable to stand up, even though such results were inconsistent with the clinical medical reports for the same patients.

724.    Therefore, Hollis, Starrett, Hillcrest, and Smart Choice's reports for  computerized muscle testing of the trunk are false and fraudulent.

725.     Hollis, Starrett, Hillcrest, and Smart Choice materially misrepresented the nature, necessity, and compensability of the computerized muscle testing each time they submitted a bill to Allstate under CPT code 95831 and 95832.  *See* Exhibit 9.

### 5.      Fraudulent Physical Performance Testing

726.     Static strength testing is used to evaluate a patient's abilities to perform certain tasks, such as lifting tasks.

727.     The PC Defendants supposedly followed standard lift evaluation protocols outlined by the National Institute for Occupational Safety and Health ("NIOSH") when testing patients' lifting capabilities.

728.     However, the NIOSH static strength testing performed for patients of the PC Defendants was not medically necessary.

729.     Indeed, the patients of Hollis, Starrett, Hillcrest, and Smart Choice who underwent NIOSH static testing also received computerized muscle testing.

730.     However, there was no documented need for these patients to undergo both the computerized assessment of muscle strength as well as the NIOSH static strength testing.

731.     Therefore, both the computerized muscle testing and the NIOSH static strength testing performed for patients of Hollis, Starrett, Hillcrest, and Smart Choice—over and above a manual assessment of muscle strength conducted during examinations—were redundant and medically unnecessary.

732.     Hollis, Starrett, Hillcrest, and Smart Choice materially misrepresented the nature, necessity, and compensability of the physical performance testing each time they submitted a bill to Allstate under CPT code 97750.  *See* Exhibit 9.

6.    **Specific Examples of Billing For Fraudulent Healthcare Services**

    a.    *Patient G.J. (claim no. 0473921476)*

733.    G.J. was supposedly involved in a motor vehicle accident on August 18, 2017.

734.    Smart Choice billed for an initial examination of G.J. that purportedly took place on September 8, 2017 for which Smart Choice billed under high level CPT code 99205.

735.    As explained above, any charges for examinations classified under CPT code 99205 must necessarily include (a) a comprehensive history, (b) a comprehensive examination, (c) medical decision making of "high complexity," and (d) face-to-face time of sixty (60) minutes.

736.    However, the initial examination of G.J. did not meet these criteria for billing under CPT code 99205.

737.    For instance, the initial examination report notes that G.J. was not evaluated in the emergency room following the motor vehicle accident and was diagnosed with spinal sprains and strains and shoulder pain.

738.    Therefore, the examination of G.J. certainly did not require medical decision making of high complexity as required for the use of CPT code 99205, which includes extensive diagnoses, extensive review of data, and a high risk of complications and morbidity and/or mortality, all of which were absent from the examination of G.J.

739.    Notably, G.J. reportedly presented with complaints of pain to the neck, lower back, and shoulders, which complaints required an evaluation for potential neurologic injuries.

740.    However, Smart Choice failed to perform the basic elements of a neuromuscular examination on G.J. by neglecting to perform an evaluation of muscle strength reflexes ("MSR") and MMT.

741.    Despite the insufficiency of the initial examination of G.J., G.J. continued to receive unnecessary, invasive, and dangerous testing at Smart Choice.

742.    Indeed, the initial evaluation report for G.J. checked off several predetermined tests to be conducted as part of G.J.'s "treatment plan," including computerized ROM and muscle testing and physical capacity testing.

743.    Further, even though G.J.'s initial complaints did not include any radiating pain in the lower extremities, he was administered a SLR test.

744.    A positive SLR requires reproduction of radiating pain in the lower extremities, which was impossible because G.J. did not report any pain in his lower extremities and his lower back pain did not radiate.

745.    Nonetheless, the initial evaluation report for G.J. documented a positive SLR.

746.    Several days later, G.J. purportedly was subjected to computerized ROM testing at Smart Choice even though there was no indication of the need for computerized ROM.

747.    However, Smart Choice failed to measure G.J's lumbar ROM in all three (3) planes of motion, thus performing an incomplete measurement of G.J.'s lumbar ROM that fell below the standard of care.

748.    Consequently, the results of G.J.'s lumbar ROM test are virtually meaningless as the full extent of G.J.'s injury or impairment, or lack thereof, cannot be accurately determined based on incomplete data.

749.    The same day as the computerized ROM testing, G.J. also underwent computerized muscle strength testing at Smart Choice.

750.    The results of G.J.'s neck muscle strength test indicated that he could not support more than 5.7 pounds of force, which means that G.J. would have been unable to hold up his head.

751.    Moreover, because, according to the results of Smart Choice's computerized muscle testing, G.J. purportedly could not exert cervical flexion force in excess of 5.7 pounds and thus could not lift his head from a pillow in the supine position.

752.    However, there is no indication in Smart Choice's records for G.J. that he had such severe neck weakness that he could not even hold his own head upright or lift his head from a pillow.

753.    Therefore, Smart Choice fabricated, or otherwise misrepresented, the results of the muscle strength testing for G.J.'s neck.

754.    Because the testing and treatment allegedly purportedly rendered to G.J. by Smart Choice was excessive, medically unnecessary, and performed below the standard of care, Smart Choice's charges for the services purportedly provided to G.J. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

**b.    *Patient D.J. (claim no. 0406535294)***

755.    D.J. was purportedly involved in a motor vehicle accident on March 19, 2016.

756.    Smart Choice billed for an initial evaluation purportedly performed by Chumaceiro of D.J. at Smart Choice on April 21, 2016 and Smart Choice billed Allstate for this exam under high level CPT code 99205.

757.    As noted previously, any charges for examinations classified under CPT code 99205 must necessarily include (a) a comprehensive history, (b) a comprehensive examination, (c) medical decision making of "high complexity," and (d) face-to-face time of sixty (60) minutes.

758.    However, the initial examination of D.J. did not meet these criteria for billing under CPT code 99205.

759.    For instance, D.J. presented with complaints of mild to moderate pain in his neck and lower back and was diagnosed with cervical and lumbar sprains and a left shoulder sprain.

760.    The initial examination report for D.J. also does not recite any significant past medical history.

761.    Therefore, the examination of D.J. did not include a comprehensive history or examination nor medical decision making of high complexity whereas only several diagnoses of sprains resulted from this examination, there was no extensive data to be reviewed, and there were no high-level risks of complications or morbidity or mortality in connection with this examination that would support billing under CPT code 99205.

762.    Additionally, the initial evaluation of D.J. is notable due to the lack of sensory testing and lack of spinal ROM performed even though these are necessary elements of a complete neuromuscular physical examination, which is required for patients complaining of pain to the neck and lower back.

763.    Therefore, Chumaceiro misrepresented that the initial examination of D.J. was performed in accordance with the standard of care.

764.    On the same day as the initial evaluation, before D.J. had attempted a sufficient course of conservative care, Chumaceiro prescribed a compounded pain cream to D.J. that was purportedly produced and dispensed to D.J. by Rx For You.

765.    Despite Chumaceiro's deficient initial examination, D.J. was nonetheless subjected to unnecessary, invasive and dangerous testing.

766.    D.J. underwent computerized ROM and muscle strength testing on three (3) occasions at Smart Choice on April 27, 2016, July 29, 2016, and September 7, 2016.

767.    On all three (3) occasions, Smart Choice omitted lumbar rotation from the lumbar ROM testing, thus failing to perform lumbar ROM testing in all three (3) planes, which rendered the measurement incomplete.

768.    Therefore, Smart Choice repeatedly misrepresented that the lumbar ROM testing was performed at the standard level of care.

769.    Further, on all three (3) occasions, Smart Choice documented muscle strength results for D.J.'s neck of less than 8 pounds in at least one direction thus indicating that D.J.'s neck muscles were so weak that he could not hold his head upright.

770.    Indeed, on April 27, 2016, Smart Choice reported that D.J.'s neck muscles could support no more than 4.8 pounds of force.

771.    Moreover, on two (2) occasions, according to the reported results of Smart Choice's computerized muscle testing, D.J. purportedly could not exert cervical flexion force in excess of 6.7 pounds and thus could not lift his head from a pillow in the supine position.

772.    There is no indication in any of D.J.'s medical reports or documentation before or after the performance of this muscle testing of any such profound muscle weakness.

773.    Smart Choice further billed for NIOSH static strength testing purportedly performed for D.J. even though there was no indication for such redundant testing given that D.J. had been repeatedly subjected to computerized muscle testing.

774.    Therefore, the NIOSH static strength testing purportedly performed for D.J. was redundant and medically unnecessary.

775.    As a further component of the battery of unnecessary tests allegedly performed by Smart Choice for D.J., Smart Choice billed for EDX testing purportedly performed for D.J. on May 27, 2016 upon the referral of Chumaceiro.

776.    In keeping with the other services billed for by Smart Choice as to D.J., such EDX studies were excessive and medically unnecessary because D.J.'s medical records contain no evidence of neurological deficit or concerning physical exam finding to warrant such extensive testing.

777.    Indeed, the reports of follow-up examinations purportedly performed for D.J. do not document any pain, numbness, or tingling in the upper limbs.

778.    Nonetheless, D.J. purportedly underwent excessive and invasive EDX studies on the upper extremities.

779.    On a single day, Smart Choice performed ten (10) NCSs on D.J even though a maximum of five (5) NCSs are sufficient to make a diagnosis of radiculopathy.

780.    Smart Choice failed to provide any supplementary documentation to justify performing twice the necessary amount of NCSs for D.J.

781.    As explained above, when NCSs are performed, the results obtained are compared to certain parameters to determine if the NCS result is normal or abnormal. Additionally, if a specific nerve's amplitude is less than half of the amplitude of the same nerve on the opposite side when stimulated at the same site, this may be indicative of nerve pathology or that the NCS was not performed correctly.

782.    In either event, when such a variation in amplitude exists between the two (2) nerves, the physician must identify and address the apparent abnormality.

783.    However, Smart Choice failed to identify, address, or correct a noted difference of greater than 50% in side-to-side sensory nerve amplitudes for D.J.

784.    Specifically, Smart Choice reported an amplitude of 8.3 microvolts (uV) for D.J.'s right ulnar sensory nerve, which was only 41% of the amplitude of the same nerve on the opposite side, which was recorded at 20.4 uV.

785.    Despite this finding, the interpreting physician concluded that there was no evidence of cervical radiculopathy based on the results of the EDX test for D.J.

786.    The interpreting physician omitted any mention of the significance of the reduced right ulnar sensory amplitude and did not repeat the study to correct any technical errors.

787.    Further, Smart Choice over utilized F-wave tests as part of the protocol of studies they allegedly performed on every patient, including D.J.

788.    According to the EDX testing report submitted to Allstate, D.J. underwent both median and ulnar F-waves performed bilaterally as part of a protocol of treatment without any indication or documentation to warrant the testing.

789.    Indeed, F-wave testing is so limited in its usefulness to diagnose radiculopathy that it is typically only performed in cases where C8 or T1 radiculopathy is suspected.

790.    However, there was no indication in any clinical reports or documentation that D.J. had suspected C8 or T1 radiculopathy.

791.    Therefore, the four (4) F-waves purportedly performed for D.J. were unjustified.

792.    Further, the F-wave studies included as part of the EDX testing for D.J. were performed below the standard of care.

793.    Even though at least ten (10) F-waves must be obtained for adequate evaluation of the minimal F-wave latency, Smart Choice failed to perform this necessary required minimum of ten (10) stimulations for each of the four (4) F-waves performed in D.J.'s EDX study.

794.    As a result, the F-wave data for the EDX study purportedly performed for D.J. by Smart Choice is invalid and not useful for clinical diagnostic purposes.

795.    Moreover, identical F-waves obtained from the same nerve on opposite sides are implausible due to the variable nature of F-wave latencies.

796.    However, further illustrating the bogus nature of this EDX testing, Smart Choice represented that the results of D.J.'s F-wave testing showed identical F-wave latencies of 27.06 for the left and right median nerves.

797.    Such results indicate that Smart Choice either manipulated and misrepresented the results of the F-wave testing to achieve a certain outcome or disregarded their accuracy given that the results of the testing would not alter the treatment plan predetermined for D.J.

798.    Because the testing and treatment purportedly rendered to D.J. by Smart Choice was excessive, medically unnecessary, and performed below the standard of care, Smart Choice's charges for the services purportedly provided to D.J. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

### c.    *Patient A.M. (claim no. 0478175649)*

799.    A.M. was purportedly involved in a motor vehicle accident on October 11, 2017.

800.    Subsequently, Smart Choice billed Allstate for an initial evaluation for A.M. that purportedly took place on October 24, 2017 under CPT code 99205.

801.    However, the record of the initial examination of A.M. performed by Smart Choice does not support the use of such a high level code.

802.    Indeed, as explained above, any charges for examinations classified under CPT code 99205 must necessarily include (a) a comprehensive history, (b) a comprehensive

examination, (c) medical decision making of "high complexity," and (d) face-to-face time of either forty-five (45) or sixty (60) minutes.

803.    However, the report of A.M.'s initial examination at Smart Choice noted that she was not treated at an emergency room following the accident and missed no days of work as a result of the accident.

804.    Moreover, A.M. was diagnosed with several sprains and strains and there is no indication that these conclusions required medical decision making of "high complexity" involving extensive diagnoses, extensive data to be reviewed, and a high risk of complications and morbidity and/or mortality.

805.    Therefore, Smart Choice improperly billed for the initial examination of A.M. under CPT code 99205.

806.    According to the report of the initial examination submitted by Smart Choice, A.M. presented with complaints to her neck, mid-lower back, and right upper extremities.

807.    Given A.M.'s complaints of neck and lower back pain, which necessitate a complete neuromuscular physical examination, the initial evaluation of A.M. is notable for the exclusion of MSR and MMT.

808.    In reliance on the results of an insufficient initial examination, A.M. nonetheless allegedly was subjected to unnecessary, invasive, and dangerous testing.

809.    For instance, A.M. underwent EDX testing that, although performed by a non-party professional corporation, was referred by the Smart Choice physician who examined A.M. and purportedly was performed by a provider who also performs such testing on behalf of Smart Choice and one or more of the Ajudua PCs.

810.    Conspicuously absent from A.M.'s medical records was support to warrant such EDX studies, such as a neurological deficit or concerning physical exam finding.

811.    Nonetheless, A.M. purportedly underwent excessive and medically unnecessary EDX studies on her upper and lower extremities that contained misrepresentations regarding the reliability of the results of these studies.

812.    Because the testing and treatment purportedly rendered to A.M. by Smart Choice was excessive, medically unnecessary, and performed below the standard of care, Smart Choice's charges for the services purportedly provided to A.M. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

### d.    *Patient M.R. (claim no. 0413182361)*

813.    M.R. was supposedly involved in a motor vehicle accident on May 7, 2016.

814.    A few days later, Chumaceiro purportedly performed an initial evaluation of M.R. at Smart Choice on May 10, 2016 for which Smart Choice submitted a charge to Allstate under CPT code 99204.

815.    As noted previously, any charges for examinations classified under CPT code 99204 must necessarily include (a) a comprehensive history, (b) a comprehensive examination, (c) medical decision making of "moderate complexity," and (d) face-to-face time of forty-five (45) minutes.

816.    However, the initial examination of M.R. did not meet these criteria for billing under CPT code 99204.

817.    For instance, the initial examination report prepared by Chumaceiro for M.R. noted that M.R.'s past medical history was not contributory to the patient's condition and did not recite for this patient any medical history, any allergies, or any medications.

818.     According to the report of the initial examination submitted to Allstate, Chumaceiro diagnosed M.R. with cervical and lumbar spine sprains and sprain/strain to the hands.

819.     Therefore, the examination of M.R. did not include a comprehensive history or examination or require medical decision making of moderate complexity whereas there was no moderate amount of data to be reviewed and there were no moderate-level risks of complications or morbidity and/or mortality in connection with this examination that would support billing under CPT code 99204.

820.     M.R. purportedly presented at Smart Choice with complaints of pain to his neck and lower back.

821.     Notably, however, Chumaceiro failed to perform sensory testing and spinal ROM testing as part of M.R.'s initial evaluation even though, due to M.R.'s complaints of neck and lower back pain, a complete neuromuscular physical exam was warranted.

822.     Despite the insufficiency of M.R.'s initial examination, Smart Choice continued to subject M.R to unnecessary, invasive and dangerous testing.

823.     Additionally, following a follow-up examination on July 21, 2016, Chumaceiro prescribed ibuprofen to M.R., which medication was dispensed to M.R. by Rx For You.

824.     Smart Choice billed Allstate for computerized ROM purportedly provided to M.R. on three (3) occasions at Smart Choice.

825.     However, according to the results submitted t0o Allstate, Smart Choice failed to measure lumbar rotation ROM on all three (3) occasions even though the failure to perform the ROM measurements in all three planes of motion is below the standard of care.

826.     Smart Choicde also billed Allstate for computerized muscle strength testing purportedly performed for M.R. on three (3) different occasions at Smart Choice.

827.     However, on each occasion, Smart Choice consistently documented muscle strength results for M.R.'s cervical muscles as insufficient for M.R. to hold his head upright.

828.     For instance, on May 11, 2016, the day following the initial examination of M.R., the muscle strength results of M.R.'s neck indicated that M.R.'s neck muscles were so weak that he could not hold his upright.

829.     Moreover, the May 11, 2016 muscle strength testing of M.R.'s neck also indicated that M.R. could not exert cervical flexion force in excess of 3.8 pounds and thus could not lift his head from a pillow in the supine position.

830.     However, there is no indication in any of the medical reports or documentation before or after the muscle strength testing performed on M.R. that this patient suffered from such severe neck weakness.

831.     Smart Choice further billed Allstate for NIOSH static strength testing purportedly performed for M.R. even though there was no indication for such treatment and M.R. had already undergone computerized muscle strength testing.

832.     Therefore, the NIOSH static strength testing for M.R. was redundant and medically unnecessary.

833.     As part of the extensive battery of tests to which M.R. was subjected at Smart Choice, Chumaceiro referred M.R. for EDX testing.

834.     However, as with all of the other unnecessary and excessive testing referred by Chumaceiro, there was no evidence of neurological deficit or concerning physical exam finding for M.R. to warrant such extensive testing.

835.     Nonetheless, Smart Choice billed Allstate underwent excessive and invasive EDX studies purportedly performed on M.R.'s upper and lower extremities at Smart Choice.

836. For instance, according to the report of the EDX testing submitted to Allstate by Smart Choice, on a single day, M.R received ten (10) NCSs to his upper extremities even though a maximum of five (5) nerve conduction studies are necessary to make a diagnosis of radiculopathy.

837. Smart Choice failed to provide any supplementary documentation to justify these additional NCSs.

838. In conducting the bilateral upper limb EDX studies, Smart Choice failed to consider other diagnostic possibilities or pathologies other than radiculopathy.

839. In fact, abnormal parameters in M.R.'s EDX studies were not addressed by Smart Choice.

840. For instance, Smart Choice reported an amplitude of 21.7 uV for M.R.'s right median sensory nerve, which was only 36% of the amplitude of the same nerve on the opposite side, which was recorded at 60.3 uV.

841. Likewise, Smart Choice reported an amplitude of 59 uV for M.R.'s left ulnar sensory nerve, which was only 30% of the amplitude of the same nerve on the opposite side, which was recorded at 193.7 uV.

842. Despite these findings, the interpreting physician concluded that there was no evidence of cervical radiculopathy based on the results of the EDX test for M.R.

843. The interpreting physician omitted any mention of the significance of the reduced left ulnar sensory amplitude and did not repeat the study to correct any technical errors.

844. Moreover, the waveforms produced by the NCSs for M.R. are below the standard of care.

845.    Smart Choice had a duty to ensure optimal conditions for obtaining the best possible waveforms (e.g., washing off any skin lotions, wiping away perspiration, or gently debriding thick skin).

846.    Failure to take these steps may result in NCS waveforms that may be very difficult to properly interpret or that may contain electrical artifacts that obscure the waveform.

847.    The sensory waveforms produced in the course of the NCSs performed by Smart Choice for M.R. reflect that the testing was not performed in optimal conditions and resulted in contamination by a large stimulus artifact, which obscures the waveform.

848.    As a result of this poor technique and failure to address testing conditions on the part of Smart Choice, M.R.'s NCS results cannot be relied upon to accurately portray the functional status of the nerves, which may subsequently lead to an incorrect diagnosis or failure to accurately identify an existing problem.

849.    Additionally, M.R. was subjected to excessive F-wave testing as part of the protocol of studies performed for patients of Smart Choice.

850.    M.R. purportedly underwent four (4) F-wave tests on both his upper and lower extremities without any indication or documentation to warrant such testing.

851.    Indeed, there was no indication in any clinical reports or documentation that M.R. had suspected C8 or T1 radiculopathy.

852.    Further, the F-wave studies performed on M.R. were performed below the standard of care because Smart Choice failed to obtain and evaluate the minimum number of ten (10) F-waves.

853.    M.R. underwent fewer than ten (10) F-wave trials in each of the four (4) F-wave studies performed for M.R.'s upper and lower limbs.

854.    Therefore, the F-wave data in these studies for M.R. is invalid and not useful for clinical diagnostic purposes.

855.    Additionally, the results of M.R.'s upper and lower F-wave studies were labeled incorrectly by Smart Choice because Smart Choice ascribed a latency for the right tibial F-wave even though there was clearly no wave present on the waveform and because Smart Choice misplaced the cursor during the left ulnar F-wave test.

856.    Failure to properly label F-waves by either ascribing a latency to an F-wave that is absent or inaccurately placing the cursor during the F-wave study is below the standard of care and incorrectly labeled F-waves render the results of the testing invalid.

857.    As such, the results of the F-waves for M.R. are incredible and invalid.

858.    Moreover, Smart Choice represented that both of M.R.'s upper and lower F-wave studies resulted in identical F-wave latencies even though identical F-wave latencies down to the hundredth millisecond are implausible due to the variable nature of the F-wave.

859.    Consequently, it is apparent that M.R.'s F-wave testing results were either manipulated or the provider disregarded the accuracy of the results given that the results of the testing would not alter the treatment plan pre-determined for M.R.

860.    Because the testing and treatment purportedly rendered to M.R. by Smart Choice was excessive, medically unnecessary, and performed below the standard of care, Smart Choice's charges for the services purportedly provided to M.R. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

e.    *Patient J.M. (claim no. 0467176129)*

861.    J.M. was purportedly involved in a motor vehicle accident on July 17, 2017.

862.    Smart Choice billed for an initial evaluation of J.M. that allegedly took place on July 21, 2017 under CPT code 99205.

863.    However, the record of the initial examination of J.M. purportedly performed by Smart Choice does not support the use of such a high level code.

864.    As set forth above, any charges for examinations classified under CPT code 99205 must necessarily include (a) a comprehensive history, (b) a comprehensive examination, (c) medical decision making of "high complexity," and (d) face-to-face time of sixty (60) minutes.

865.    Indeed, according to the report of the initial examination submitted to Allstate, J.M. was diagnosed with several sprains and strains, a chest contusion, and right hand derangement and there is no indication that these conclusions required medical decision making of "high complexity" involving extensive diagnoses, extensive data to be reviewed, and a high risk of complications and morbidity and/or mortality.

866.    Therefore, Smart Choice improperly billed for the initial examination of J.M. on July 21, 2017 under CPT code 99205.

867.    According to the report of the July 21, 2017 initial examination, J.M. presented with complaints of pain to her neck, mid-lower back, and right upper extremity.

868.    Notably, Smart Choice's July 21, 2017 initial evaluation of J.M. failed to include MSR or MMT, which are required elements of a complete neuromuscular physical examination to be conducted when a patient complains of neck and/or lower back pain.

869.    Despite the insufficient initial examination of J.M., Smart Choice continued to bill for unnecessary and excessive testing purportedly rendered to J.M.

870.    Additionally, Smart Choice also billed for a a second "initial consultation" of J.M. that purportedly took place on November 1, 2017.

871.     Like the initial examination of July 21, 2017, Smart Choice also improperly billed for the November 1, 2017 "initial consultation" under CPT code 99205, particularly given that an initial examination had already been conducted several months prior and the patient still did not present with extensive data to be reviewed and a high risk of complications and morbidity and/or mortality.

872.     Following the November 1, 2017 "initial consultation," the provider allegedly conducting the examination prescribed a compounded pain product to J.M. that was purportedly produced and dispensed to J.M. by Sutter Pharmacy.

873.     The provider purporting to conduct the November 1, 2017 "initial consultation" of J.M. also prescribed a Lidoderm 5% external patch to J.M. that purportedly was dispensed to J.M. by Excellent Choice.

874.     J.M. allegedly underwent computerized ROM and muscle strength testing on two (2) occasions performed by Smart Choice and another non-party provider closely associated with Smart Choice (i.e., Hands of Hope PT, P.C.).

875.     On both occasions, Smart Choice and the other provider failed to measure lumbar rotation ROM even though the standard of care dictates that ROM be measured in all three (3) planes of motion.

876.     Likewise, on both occasions, Smart Choice and the other provider documented muscle strength results for J.M.'s cervical muscles as insufficient for J.M. to be able to hold her head upright.

877.     However, there is no indication in any of the medical reports or documentation before or after the muscle testing purportedly performed on J.M. that she had trouble holding her head erect.

878.    Additionally, on September 7, 2017, Smart Choice represented that J.M. could exert no more than a mere 1.7 pounds on neck flexion.  If that were the case, J.M. would be unable to lift her head from a pillow from the supine position.

879.    Likewise, on November 3, 2017, Hands of Hope PT, P.C. represented that J.M. could exert no more than 3 pounds on neck flexion.  Again, if that were the case, J.M. would be unable to lift her head from a pillow in the supine position.

880.    However, Smart Choice's and the other provider's records for J.M. never documented any such profound weakness in J.M.'s neck strength.

881.    J.M. also purportedly underwent excessive EDX studies on the upper extremities that, although performed by a non-party professional corporation, was conducted by a provider who also performs such testing on behalf of one or more of the Ajudua PCs.

882.    Because the testing and treatment purportedly rendered to J.M. by Smart Choice was excessive, medically unnecessary, and performed below the standard of care, Smart Choice's charges for the services purportedly provided to J.M. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

### f.    *Patient V.A. (claim no. 0423534049)*

883.    V.A. was supposedly involved in a motor vehicle accident on August 3, 2016.

884.    Subsequently, Hillcrest billed Allstate for an initial examination purportedly performed by Ajudua for V.A. at Hillcrest on August 10, 2016 under CPT code 99205.

885.    However, the record of the initial examination of V.A. purportedly performed by Hillcrest does not support the use of such a high-level code.

886.     As explained above, any charges for examinations classified under CPT code 99205 must necessarily include (a) a comprehensive history, (b) a comprehensive examination, (c) medical decision making of "high complexity," and (d) face-to-face time of sixty (60) minutes.

887.     The initial examination report for V.A. also does not recite any significant past medical history and V.A. did not treat at the emergency room following the motor vehicle accident.

888.     Additionally, according to V.A., the examination purportedly performed by Ajudua took about twenty (20) to thirty (30) minutes, which is well below the sixty (60) minutes required for an examination billed under CPT code 99205.

889.     Therefore, the examination of V.A. did not include a comprehensive history or examination nor medical decision making of high complexity whereas only several diagnoses of sprains resulted from this examination, there was no extensive data to be reviewed, and there were no high-level risks of complications or morbidity or mortality in connection with this examination that would support billing under CPT code 99205.

890.     Therefore, Hillcrest improperly billed for the initial examination of V.A. under CPT code 99205.

891.     Additionally, on the same day as the initial evaluation, Ajudua prescribed Naproxen 500 mg tablets to V.A., which medication purportedly was dispensed to V.A. by Rx For You.

892.     V.A. presented with complaints of pain to his neck, lower back and left shoulder.

893.     Ajudua's initial evaluation of V.A. notably lacks spinal ROM testing, sensory testing, MSR testing, and MMT even though such tests are required elements of a neuromuscular physical examination, which is required when evaluating patients who complain of neck and/or lower back pain.

894.    Additionally, although V.A.'s initial complaints did not include any radiating pain to the lower extremities, Ajudua nonetheless administered a SLR test and documented positive findings.

895.    A positive SLR test, however, must reproduce the radiating pain in the V.A.'s lower extremities, which would be impossible because V.A. did not report any such pain in his lower extremities.

896.    Despite the insufficiency of Ajudua's initial examination of V.A., Hillcrest purportedly continued to subject V.A. to unnecessary, invasive and dangerous testing.

897.    For instance, Hillcrest billed for computerized ROM testing purportedly provided to V.A. on three (3) occasions.

898.    However, on all three (3) occasions, Hillcrest failed to measure lumbar rotation ROM even though a failure to perform the ROM measurements in all three (3) planes of motion is below the standard of care.

899.    V.A. purportedly also underwent computerized muscle strength testing at Hillcrest on two different occasions.

900.    On August 16, 2016, Hillcrest documented muscle strength results for V.A.'s neck such that that V.A. would be unable to hold his head upright.

901.    Additionally, on August 16, 2016, Hillcrest reported cervical flexion muscle strength results for V.A. indicating that V.A. could exert no more than 4.9 pounds of force. If this was the case, V.A. would be unable to lift his head from the supine position.

902.    However, there is no indication in any of the medical reports or documentation before or after the muscle testing performed on V.A. that he suffered from any such significant muscle weakness of the neck.

116

903. Therefore, it is apparent that Hillcrest fabricated, or otherwise misrepresented, the results of the muscle strength testing for V.A.'s neck.

904. Hillcrest further billed for NIOSH static strength testing purportedly performed for V.A. even though there was no indication for such treatment and V.A. had already undergone computerized muscle strength testing.

905. Therefore, the NIOSH static strength testing purportedly performed for V.A. was redundant and medically unnecessary.

906. As further part of the treatment protocol that V.A. was subject to at Hillcrest, Ajudua referred V.A. for EDX testing of both the upper and lower limbs even though there was nothing in V.A's records warranting such EDX studies, such as evidence of neurological deficit or concerning physical exam findings.

907. Indeed, according to V.A., no one discussed the results of this testing with him or made recommendations for treatment based on these tests.

908. On a single day, V.A. underwent ten (10) NCSs performed to his upper limbs and eight (8) NCSs performed on his lower limbs, which is an excessive number of NCSs because a maximum of five (5) NCSs are necessary to make a diagnosis of radiculopathy.

909. Hillcrest failed to provide any supplementary documentation to justify the additional NCS purportedly performed for V.A.

910. In fact, the impressions recited in Hillcrest's reports of the upper and lower limb EDX studies for V.A. of "sensorimotor peripheral poly-neuropathy predominately affecting bilateral lower extremities" and "sensory peripheral neuropathy predominately affecting bilateral upper extremity" are not supported by the reported data.

911.    Hillcrest further failed to identify, address, or correct a noted difference of greater than 50% in side-to-side sensory and motor nerve amplitudes for V.A.

912.    For instance, Hillcrest reported an amplitude of 15 uV for V.A.'s right median sensory nerve, which was only 41% of the amplitude of the same nerve on the opposite side, which was recorded at 36.4 uV.

913.    Similarly, Hillcrest reported an amplitude of 4.2uV for V.A.'s right ulnar sensory nerve, which was only 18% of the amplitude of the same nerve on the opposite side, which was recorded at 23.6 uV.

914.    Additionally, Hillcrest reported an amplitude of 0.3 uV for the left tibial motor nerve, which was only 23% of the amplitude of the same nerve on the opposite side, which was recorded at 1.3 uV.

915.    The interpreting physician omitted any mention of the significance of the reduced right ulnar sensory amplitude, right median sensory amplitude, and left tibial motor amplitude and did not repeat the studies to correct any technical errors.

916.    Moreover, the waveforms for V.A's upper and lower limb NCSs were labeled improperly, which caused the documented results of the study to be physiologically impossible.

917.    For instance, in the NCS of V.A.'s right radial sensory nerve, the waveform was mislabeled, which resulted in an abnormally fast nerve conduction velocity being recorded for this nerve.

918.    However, even though the nerve conduction velocity recorded for V.A.'s right radial sensory nerve did not make physiologic sense, the provider purportedly performing the NCS on behalf of Hillcrest stated that this finding was normal, and, in doing so, misrepresented that the NCS for V.A. was performed within the standard of care.

919.    The lack of concern for the accuracy of these studies potentially places patients at risk by producing false NCS data, which may result in a failure to identify real problems or the making of an incorrect diagnosis.

920.    V.A. also purportedly received excessive F-wave testing as part of the protocol of EDX testing implemented at Hillcrest.

921.    Specifically, Hillcrest reported results for four (4) unnecessary F-wave tests purportedly performed on V.A.'s upper extremities even though there was no indication in any clinical reports or documentation that V.A. had suspected C8 or T1 radiculopathy.

922.    Further, the F-wave studies performed on V.A. were performed below the standard of care because an insufficient number of F-wave trials were performed for both the upper and lower extremities.

923.    It is the standard of care to obtain at least ten (10) F-waves for adequate evaluation of the minimal F-wave latency.

924.    Hillcrest, however, did not even attempt to obtain the necessary number of F-wave stimulations in the course of performing V.A.'s F-wave studies.

925.    As a result, the F-wave data purportedly obtained for V.A. is invalid and not useful for clinical diagnostic purposes.

926.    Hillcrest also incorrectly labeled the results of V.A.'s upper limb F-wave studies.

927.    Failure to properly label F-waves by either ascribing a latency to an F-wave that is absent or inaccurately placing the cursor during the F-wave study is below the standard of care and incorrectly labeled F-waves render the results of the testing invalid.

928.    The F-wave results reported for V.A. for the median and ulnar nerves reflect inaccurate waveform labeling of the F-wave, which invalidated the results of these F-waves for V.A.

929.    Moreover, identical F-waves obtained from the same nerve on opposite sides are implausible due to the variable nature of F-wave latencies.

930.    Incredibly, however, Hillcrest represented that the results of V.A.'s F-wave testing showed identical F-wave latencies of 29.97 for the left and right median nerves and 32.35 for the left and right ulnar nerves.

931.    Such results indicate that Hillcrest either manipulated and misrepresented the results of the F-wave testing to achieve a certain outcome or disregarded their accuracy given that the results of the testing would not alter the treatment plan pre-determined for V.A.

932.    V.A. also purportedly was subjected to an H-Reflex study of the bilateral tibial nerve as part of Hillcrest's protocol used for lower limb EDX testing.

933.    The H-Reflex study performed for V.A. further reflected inaccurate labeling of waveforms and data that contradicted the diagnosis provided by Hillcrest.

934.    Because the testing and treatment purportedly rendered to V.A. by Hillcrest was excessive, medically unnecessary, and performed below the standard of care, Hillcrest's charges for the services purportedly provided to V.A. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

>    **g.    *Patient L.A. (claim no. 0471412924)***

935.    L.A. was purportedly involved in a motor vehicle accident on August 21, 2017.

936.    Hillcrest  billed for an initial evaluation purportedly performed by Ajudua for L.A. at Hillcrest on September 14, 2017 under CPT code 99205, even though the use of such a high-level code was not justified by the record of this initial examination.

937.    As explained above, any charges for examinations classified under CPT code 99205 must necessarily include (a) a comprehensive history, (b) a comprehensive examination, (c) medical decision making of "high complexity," and (d) face-to-face time of sixty (60) minutes.

938.    The initial examination report for L.A. notes an absence of any significant medical history.

939.    Moreover, according to the report of the initial examination of L.A., Ajudua made only the following diagnoses:  (a) sprain/strain of the cervical spine, (b) strain of both shoulders, and (c) strain of the right knee.

940.    Therefore, the examination of L.A. did not include a comprehensive history or examination or medical decision making of high complexity whereas only several diagnoses of sprains and strains resulted from this examination, there was no extensive data to be reviewed, and there were no high-level risks of complications or morbidity or mortality in connection with this examination that would support billing under CPT code 99205.

941.    Therefore, Hillcrest improperly billed for the initial examination of L.A. under CPT code 99205.

942.    At the time of initial evaluation, L.A. purportedly presented with complaints of pain to the neck, both shoulders, and right knee.

943.    Ajudua's initial evaluation of L.A. is notable due to the lack of cervical and thoracic ROM, sensory testing, MSR testing, and MMT  even though such tests are required elements of a

neuromuscular physical examination, which is required when evaluating patients such as L.A. who complain of neck pain.

944.    Despite the insufficiency of L.A.'s initial exam, Hillcrest continued to purport to subject L.A. to unnecessary, invasive, and dangerous testing.

945.    For example, Hillcrest billed for computerized ROM and muscle strength testing that was purportedly conducted on September 19, 2017.

946.    However, Hillcrest reported ranges of motion for L.A.'s right and left knees indicating that L.A. could not walk normally.

947.    Specifically, Hillcrest reported a left knee extension measurement of twenty-one (21) degrees and a right knee extension measurement of twelve (12) degrees even though the report of Ajudua's initial examination of L.A. conducted just days before noted that L.A.'s range of motion of the extremities was "intact."

948.    Additionally, Hillcrest documented muscle strength results for L.A.'s neck muscles that were so low that L.A. would have been unable to hold his head upright.

949.    Moreover, Hillcrest reported L.A.'s neck flexion strength as 5.9 pounds, which result indicates an inability to lift one's head from a supine position.

950.    On September 19, 2017, Hillcrest also purported to document muscle strength testing results for L.A.'s knee strength.

951.     The combined knee extension force documented for L.A. was 23.1 pounds, which is well below the combined knee extension force of 50.1 pounds required to stand up from a chair with the assistance of the hands.

952.     Notably absent from any of the medical reports or documentation before or after the muscle testing performed on L.A. is any indication that L.A. suffered from such significant muscle weakness of the neck or possessed an inability to stand from a seated position.

953.     Because the testing and treatment purportedly rendered to L.A. by Hillcrest was excessive, medically unnecessary, and performed below the standard of care, Hillcrest's charges for the services purportedly provided to L.A. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

### h.     Patient T.B. (claim no. 0413765058)

954.     T.B. was purportedly involved in a motor vehicle accident on May 16, 2016.

955.     The following day, T.B. purportedly was initially examined by Ajudua at Starrett on May 17, 2016 for which Starrett submitted charges to Allstate under CPT code 99205.

956.     As explained above, any charges for examinations classified under CPT code 99205 must necessarily include (a) a comprehensive history, (b) a comprehensive examination, (c) medical decision making of "high complexity," and (d) face-to-face time of sixty (60) minutes.

957.     For instance, the initial examination report for T.B. does not reflect a review of extensive data or high-level risks of morbidity or mortality in connection with this examination that would support billing under CPT code 99205.

958.     Additionally, following the initial examination of T.B., Ajudua diagnosed T.B. with several sprains, including to T.B.'s cervical and lumbosacral paravertebral ligaments, right shoulder, and left knee, which diagnoses also do not indicate that Ajudua engaged in medical decision making of a high complexity for the purposes of billing under CPT code 99205.

959.     Therefore, Starrett improperly billed for the initial examination of T.B. under CPT code 99205.

960.    According to the report of the initial examination, T.B. presented with complaints of pain to his head, neck, lower back, thoracic spine, right shoulder, and both knees.

961.    Ajudua's initial evaluation of T.B. is notable because it failed to include sensory testing, MSR testing, MMT, and ROM testing even though such tests are required elements of a neuromuscular physical examination, which is required when evaluating patients who complain of neck and/or lower back pain.

962.    Additionally, although T.B.'s initial complaints did not include any radiating pain to the lower extremities, Ajudua nonetheless purportedly administered a SLR test and documented positive findings.

963.    A positive SLR test, however, must reproduce the radiating pain in the lower extremities, which would be impossible for T.B. because T.B. did not report any such pain in his lower extremities.

964.    Even though the initial examination of T.B. was clearly deficient, Starrett continued to purport to subject T.B. to unnecessary, invasive and dangerous testing.

965.    For example, T.B. underwent computerized ROM and muscle strength testing on two (2) occasions at Starrett.

966.    However, on both occasions, Starrett failed to measure lumbar rotation ROM even though a failure to perform the ROM measurements in all three (3) planes of motion is below the standard of care.

967.    T.B. also underwent computerized muscle strength testing at Starrett on two (2) different occasions.

968.    In both instances, Starrett documented muscle strength results for T.B.'s neck as insufficient for T.B. to hold his head upright.

969.    Additionally, Starrett reported neck flexion muscle strength results for T.B. indicating that T.B. could exert no more than 7 pounds of force, which would mean that T.B. would be unable to lift his head from the supine position.

970.    However, there is no indication in any of the medical reports or documentation before or after the muscle testing performed on T.B. that he suffered from any such significant muscle weakness such that he could not hold his head upright.

971.    Additionally, in both instances, Starrett also documented muscle strength results for T.B.'s trunk strength as insufficient for T.B. to walk erect.

972.    Specifically, Starrett reported T.B.'s trunk extension strength as between seven (7) and eight (8) pounds.

973.    However, given T.B.'s approximate weight of 240 pounds, he required trunk extension strength in excess of 85.9 pounds to stand upright and support the trunk of his body.

974.    Therefore, the trunk extension results reported by Starrett for T.B. are not medically credible.

975.    T.B. further received NIOSH static strength testing even though there was no indication for such treatment because T.B. had already received computerized muscle strength testing.

976.    Therefore, the NIOSH static strength testing performed for T.B. was redundant and medically unnecessary.

977.    As a further component of the treatment protocol that T.B. purportedly was subject to at Starrett, Ajudua referred T.B. for electrodiagnostic testing.

978.    Starrett billed for electrodiagnostic testing purportedly performed for T.B. on June 17, 2016 even though there was no evidence of neurological deficit or concerning physical exam finding to warrant such extensive testing.

979.    On a single day, T.B. underwent ten (10) NCSs performed to his upper limbs and eight (8) NCSs performed on his lower limbs.

980.    However, T.B. was subject to an excessive number of NCSs because a maximum of five (5) NCSs are necessary to make a diagnosis of radiculopathy.

981.    Starrett failed to provide any supplementary documentation to justify the additional NCSs performed for T.B.

982.    T.B. also received F-wave testing as part of the protocol of EDX testing implemented by Starrett.

983.    Specifically, T.B. underwent four (4) F-wave tests on his upper extremities even though there was no indication in any clinical reports or documentation that T.B. had suspected C8 or T1 radiculopathy.

984.    Further, the F-wave studies performed on T.B. were performed below the standard of care because an insufficient number of F-wave trials were performed for both the upper and lower extremities.

985.    It is the standard of care to obtain at least ten (10) F-waves for adequate evaluation of the minimal F-wave latency.

986.    Starrett, however, did not even attempt to obtain the requisite number of F-wave stimulations in the course of performing T.B.'s F-wave studies.

987.    As a result, the F-wave data purportedly obtained for T.B. is invalid and not useful for clinical diagnostic purposes.

988.    T.B. also purportedly underwent an H-Reflex study of the bilateral tibial nerve as part of Starrett's protocol for lower limb EDX testing even though there was no documented suspicion of S1 radiculopathy based on T.B.'s symptoms and clinical exam findings that would warrant an H-Reflex study.

989.    The H-Reflex study for T.B. further reflected inaccurate labeling of waveforms, which could lead to improper diagnosis and further unnecessary treatment.

990.    Because the testing and treatment purportedly rendered to T.B. by Starrett was excessive, medically unnecessary, and performed below the standard of care, Starrett's charges for the services purportedly provided to T.B. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

### i.    *Patient W.C. (claim no. 0469007974)*

991.    W.C. was purportedly involved in a motor vehicle accident on July 11, 2017.

992.     W.C. purportedly underwent an initial evaluation with Ajudua at Starrett on July 14, 2017, for which Starrett submitted charges to Allstate under CPT code 99204.

993.     As noted previously, any charges for examinations classified under CPT code 99204 must necessarily include (a) a comprehensive history, (b) a comprehensive examination, (c) medical decision making of "moderate complexity," and (d) face-to-face time of forty-five (45) minutes.

994.    However, the initial examination of W.C. did not meet these criteria for billing under CPT code 99204.

995.    According to the report of the initial examination, Ajudua diagnosed W.C. with cervical paraspinal muscles and ligaments, low back pain syndrome, lumbar disc bulge, and a left shoulder sprain.

996.    Therefore, the examination of W.C. did not require medical decision making of moderate complexity whereas only several diagnoses of sprains resulted from this examination, there was no moderate amount of data to be reviewed, and there were no moderate-level risks of complications or morbidity and/or mortality in connection with this examination that would support billing under CPT code 99204.

997.    Therefore, Starrett improperly billed for the initial examination of W.C. under CPT code 99204.

998.    Moreover, several days after his initial examination of W.C., Ajudua prescribed cyclobenzaprine (a muscle relaxant) and nabumetone (a non-steroidal anti-inflammatory drug) to W.C., which medications purportedly were dispensed to W.C. by Sutter Pharmacy.

999.    According to the report of the initial examination, W.C. presented with complaints of pain to his neck, lower back, left shoulder, and left elbow.

1000.   Ajudua's initial evaluation of W.C. notably lacks sensory testing, MSR testing, and ROM testing even though such tests are required elements of a neuromuscular physical examination, which is required when evaluating patients who complain of neck and/or lower back pain.

1001.   Despite the insufficiency of Ajudua's initial examination of W.C., Starrett purported to continue to subject W.C. to unnecessary, invasive and dangerous testing.

1002.   For instance, Starrett billed for computerized ROM and muscle strength testing on three (3) occasions purportedly performed for W.C. by Starrett and another non-party provider closely associated with Starrett.

1003.   However, on all three (3) occasions, Starrett and the other provider failed to measure lumbar rotation ROM even though a failure to perform the ROM measurements in all three (3) planes of motion is below the standard of care.

1004.   W.C. also purportedly underwent computerized muscle strength testing at Starrett and the other provider on three (3) different occasions.

1005.   In each instance of computerized muscle strength testing, Starrett and the other provider documented muscle strength results for W.C.'s neck, which, if valid, would mean that W.C. was unable to hold his head upright.

1006.   Additionally, both Starrett and the other provider reported neck flexion muscle strength results for W.C. indicating that W.C. could only exert five (5) to six (6) pounds of force, which would mean that W.C. would be unable to lift his head from the supine position.

1007.   However, there is no indication in any of the medical reports or documentation before or after the muscle testing performed on W.C. that he suffered from any such profound muscle weaknesses such that he could not hold his head upright.

1008.   Moreover, in two (2) instances, Starrett also documented muscle strength testing results for W.C.'s trunk strength as insufficient for W.C. to walk erect.

1009.   Specifically, Starrett reported W.C.'s trunk extension strength as five (5) pounds on August 25, 2017 and ten (10) pounds on July 25, 2017.

1010.   However, given W.C.'s approximate weight of 173 pounds, he required trunk extension strength in excess of 61.9 pounds to stand upright and support the trunk of his body.

1011.   Therefore, the trunk extension results reported by Starrett for W.C. are not medically credible.

1012.   Starrett further billed for NIOSH static strength testing purportedly rendered to W.C. even though there was no need for such testing given that W.C. had already undergone computerized muscle strength testing.

1013.   Therefore, the NIOSH static strength testing performed for W.C. was redundant and medically unnecessary.

1014.   Consistent with the treatment protocol implemented at Starrett, W.C. also purportedly was subjected to electrodiagnostic testing.

1015.   W.C. underwent electrodiagnostic testing at Starrett on August 16, 2017 even though there was no evidence of neurological deficit or concerning physical exam finding to warrant such testing.

1016.   On a single day, W.C. underwent eighteen (18) NCSs in his upper and lower limbs.

1017.   However, this was an excessive number of NCSs because a maximum of five (5) NCSs are necessary to make a diagnosis of radiculopathy.

1018.   Starrett failed to provide any supplementary documentation to justify the additional NCSs performed for W.C.

1019.   Further, Starrett failed to note or explain documented results from the NCS testing of W.C. that did not make physiological sense.

1020.   For example, the conduction velocities reported for W.C.'s left superficial peroneal and left sural sensory nerves were 100 m/s and 156 m/s, respectively, which are extremely fast and absurd for lower limb sensory nerves that have a normal conduction velocity in the 40-50 m/s range.

1021.   However, the Starrett provider purporting to perform W.C.'s NCSs failed to uphold their duty to identify or correct these nonsensical results, which were likely the product of an error in NCS technique.

1022.   Starrett also purported to perform F-wave testing for W.C. as part of the protocol of EDX testing implemented at Starrett.

1023.   Specifically, W.C. purportedly underwent four (4) F-Wave tests on his upper extremities as part of Starrett's protocol of studies even though there was no indication in any clinical reports or documentation that W.C. had suspected C8 or T1 radiculopathy.

1024.   Further, the F-wave studies allegedly performed on W.C. were performed below the standard of care because an insufficient number of F-wave trials were performed for both the upper and lower extremities.

1025.   It is the standard of care to obtain at least ten (10) F-waves for adequate evaluation of the minimal F-wave latency.

1026.   Starrett, however, did not report obtaining this minimum number of F-wave stimulations when performing W.C.'s F-wave studies.

1027.   As a result, the F-wave data purportedly obtained for W.C. is invalid and not useful for clinical diagnostic purposes.

1028.   What is more, Starrett incorrectly labeled the waveforms of W.C.'s left tibial and left peroneal F-wave studies, which is below the standard of care and also invalidates the results of these F-wave studies.

1029.   As a result of W.C.'s upper limb EDX studies, Starrett failed to consider other diagnostic possibilities or pathologies other than radiculopathy.

1030.   For example, where the amplitude of a specific nerve is less than half of the amplitude of the same nerve on the opposite side, when stimulated at the same time, this is considered an important finding that may be indicative of a nerve pathology or a technical error that must be addressed.

1031.   For W.C., Starrett reported an amplitude for the left radial sensory nerve of 17.1 uV, which was only 36% of the same nerve on the opposite side, which was reported to have an amplitude of 48.1 uV.

1032.   However, Starrett's report for W.C.'s EDX testing does not mention the reduced left radial sensory nerve amplitude, or that this might be indicative of a left radial sensory neuropathy, or a more diffuse neuropathy.

1033.   Likewise, Starrett reported an amplitude for W.C.'s left ulnar motor nerve of 3.8 uV, which was only 46% of the same nerve on the opposite side, which was reported to have an amplitude of 8.3 uV.

1034.   By failing to note or correct these findings, Starrett knowingly misrepresented the NCS purportedly rendered for W.C., and failed to act within the minimum standard of care.

1035.   Starrett also made a diagnosis for W.C. that was incompatible with the reported H-Reflex data.

1036.   Specifically, W.C. was diagnosed with a right L5-S1 radiculopathy despite the H-Reflexes being normal.

1037.   Where there is a latency difference of 2.0 msec or more between the right and left tibial nerves, a S1 radiculopathy is the most frequent cause of the slowing.

1038.   However, the H-Reflex studies performed for W.C. were normal.

1039.   By failing to account for the incompatibility of H-Reflex data with the stated diagnosis, Starrett potentially endangered W.C. by providing an inaccurate diagnosis, which may lead to inappropriate and invasive treatments.

1040.   Because the testing and treatment purportedly rendered to W.C. by Starrett was excessive, medically unnecessary, and performed below the standard of care, Starrett's charges for the services purportedly provided to W.C. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

### j.   *Patient T.C. (claim no. 0406835116)*

1041.   T.C. was purportedly involved in a motor vehicle accident on March 11, 2016.

1042.   Hillcrest billed for an initial examination of T.C. purportedly performed by Ajudua on March 23, 2016 under CPT code 99204.

1043.   As noted previously, any charges for examinations classified under CPT code 99204 must necessarily include (a) a comprehensive history, (b) a comprehensive examination, (c) medical decision making of "moderate complexity," and (d) face-to-face time of forty-five (45) minutes.

1044.   However, the initial examination of T.C. did not meet these criteria for billing under CPT code 99204.

1045.   For instance, the initial examination report prepared by Ajudua did not recite any medical or surgical history for this patient, any allergies, or any prior accidents.

1046.   According to the report of the initial examination, Ajudua diagnosed T.C. with sprains of the cervical and lumbosacral paravertebral ligaments and sprain to the left hip.

1047.   Therefore, the examination of T.C. did not include a comprehensive history or examination or require medical decision making of moderate complexity whereas only several

diagnoses of sprains resulted from this examination, there was no moderate amount of data to be reviewed, and there were no moderate-level risks of complications or morbidity and/or mortality in connection with this examination that would support billing under CPT code 99204.

1048.   Therefore, Hillcrest improperly billed for the initial examination of T.C. under CPT code 99204.

1049.   According to the report of the initial examination, T.C. presented with complaints of pain to his neck, lower back, and left hip.

1050.   Ajudua's initial evaluation of T.C. is notable for failing to perform MSR testing and spinal ROM testing even though such tests are required elements of a neuromuscular physical examination, which is required when evaluating patients who complain of neck and/or lower back pain.

1051.   Further, even though T.C.'s initial complaints did not include any radiating pain in the lower extremities, he purportedly was administered a SLR test.

1052.   A positive SLR test requires reproduction of radiating pain in the lower extremities, which was impossible because T.C. did not report any such pain in his lower extremities.

1053.   Nonetheless, Ajudua documented a positive SLR test for T.C. in the report of the initial examination.

1054.   Despite the insufficiency of Ajudua's initial examination of T.C., Hillcrest purportedly continued to subject T.C. to unnecessary, invasive and dangerous testing.

1055.   For instance, Hillcrest billed for computerized ROM purportedly performed for T.C.

1056.   However, according to the records submitted to Allstate, Hillcrest failed to measure lumbar rotation ROM even though a failure to perform the ROM measurements in all three (3) planes of motion is below the standard of care.

1057.   T.C. also purportedly underwent computerized muscle strength testing at Hillcrest.

1058.   Hillcrest documented muscle strength results for T.C.'s neck indicating that T.C. was unable to hold his head upright.

1059.   Additionally, Hillcrest reported neck flexion muscle strength results for T.C. indicating that T.C. could only exert 4.6 pounds of force, which, if valid, would mean that T.C. was unable to lift his head from a pillow.

1060.   However, there is no indication in any of the medical reports or documentation before or after the muscle testing purportedly performed on T.C. that he suffered from any such significant muscle weakness causing him to be unable to hold his head upright.

1061.   Hillcrest further billed for NIOSH static strength testing purportedly performed to T.C. even though T.C. had already received computerized muscle strength testing, thus rendering the NIOSH static strength testing redundant and medically unnecessary.

1062.   In keeping with Hillcrest's treatment protocol, Hillcrest also billed for unwarranted and excessive electrodiagnostic testing purportedly performed for T.C. even though there was no evidence of neurological deficit or concerning physical exam finding to warrant such testing.

1063.   On April 29, 2016, T.C. purportedly received ten (10) NCSs to his upper extremities and eight (8) NCSs to his lower extremities even though a maximum of five (5) NCSs are necessary to make a diagnosis of radiculopathy.

1064.   Hillcrest failed to provide any supplementary documentation to justify the additional NCSs performed for T.C.

135

1065.   T.C. also allegedly received F-wave testing as part of the protocol of EDX testing.

1066.   Specifically, T.C. underwent four (4) F-wave tests on his upper extremities and lower extremities as part of Hillcrest's protocol of studies even though there was no indication in any clinical reports or documentation that T.C. had suspected C8 or T1 radiculopathy.

1067.   Further, the F-wave studies performed on T.C. were performed below the standard of care because an insufficient number of F-wave trials were performed for both the upper and lower extremities.

1068.   Even though the standard of care requires the provider to obtain at least ten (10) F-waves for adequate evaluation of the minimal F-wave latency, Hillcrest did not obtain this minimum number of F-wave stimulations when performing T.C.'s F-wave studies.

1069.   As a result, the F-wave data purportedly obtained for T.C. is invalid and not useful for clinical diagnostic purposes.

1070.   As a result of T.C.'s upper limb EDX studies, Hillcrest failed to consider other diagnostic possibilities or pathologies other than radiculopathy.

1071.   For example, Hillcrest reported an amplitude for the right median sensory nerve of 13.4 uV, which was only 23% of the same nerve on the opposite side, which was reported to have an amplitude of 59.1 uV.

1072.   However, Hillcrest's report for T.C.'s EDX testing does not mention the reduced right median sensory nerve amplitude even though this is an important finding that may be indicative of a nerve pathology or a technical error that must be addressed.

1073.   By failing to note or correct these findings, Hillcrest knowingly misrepresented the NCS purportedly rendered for T.C., and failed to act within the minimum standard of care.

1074. T.C. also purportedly underwent an H-Reflex study of the bilateral tibial nerve as part of Hillcrest's protocol for lower limb EDX testing even though there was no documented suspicion of S1 radiculopathy based on T.C.'s symptoms and clinical exam findings that would warrant an H-Reflex study.

1075. Finally, according to the EDX testing report submitted to Allstate, Hillcrest failed to perform an adequate EMG for the evaluation of radiculopathy in T.C.'s lower limbs.

1076. Specifically, Hillcrest only reported the testing of four (4) lower limb muscles bilaterally, plus the paraspinal muscles, even though the standard of care required performance of EMG in at least five (5) limb muscles in each limb suspected of having symptoms related to radiculopathy, in addition to corresponding paraspinal muscles.

1077. Because the testing and treatment purportedly rendered to T.C. by Hillcrest was excessive, medically unnecessary, and performed below the standard of care, Hillcrest's charges for the services purportedly provided to T.C. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

**k.** *Patient D.L. (claim no. 0435975636)*

1078. D.L. was purportedly involved in a motor vehicle accident on October 23, 2016.

1079. Several days later, D.L. purportedly underwent an initial evaluation at Starrett on October 28, 2016, for which Starrett submitted charges to Allstate under CPT code 99205.

1080. As explained above, any charges for examinations classified under CPT code 99205 must necessarily include (a) a comprehensive history, (b) a comprehensive examination, (c) medical decision making of "high complexity," and (d) face-to-face time of sixty (60) minutes.

1081. However, the initial examination of D.L. did not meet these criteria for billing under CPT code 99205.

1082.   For instance, the initial examination report notes that D.L. was not evaluated in the emergency room following the motor vehicle accident, that his past medical history was not contributory to his existing condition, and that he was not taking any medications.

1083.   Additionally, according to the initial examination report, D.L. was diagnosed with several sprains and strains, including to the cervical and lumbar spine, right elbow, and right knee, as well as right knee derangement, an elbow contusion, and headaches.

1084.   Therefore, the examination of D.L. certainly did not require medical decision making of high complexity as required for the use of CPT code 99205, which includes extensive diagnoses, extensive review of data, and a high risk of complications and morbidity and/or mortality, all of which were absent from the examination of D.L.

1085.   Therefore, Starrett improperly billed for the initial examination of D.L. under CPT code 99205.

1086.   According to the report of the initial examination submitted to Allstate, D.L. presented with pain to his neck and lower back.

1087.   The initial evaluation is notable due to the lack of sensory testing, MSR testing, and spinal ROM testing even though such tests are required elements of a neuromuscular physical examination, which is required when evaluating patients who complain of neck and/or lower back pain.

1088.   Despite the insufficiency of the initial examination of D.L., Starrett continued to bill for unnecessary, invasive, and dangerous testing purportedly rendered to D.L.

1089.   For instance, D.L. purportedly underwent computerized ROM on three occasions at Starrett.

1090.   However, on all three (3) occasions, Starrett failed to measure lumbar ROM even though a failure to perform the ROM measurements in all three (3) planes of motion is below the standard of care.

1091.   D.L. also purportedly underwent computerized muscle strength testing at Starrett on three (3) different occasions.

1092.   In each instance of computerized muscle strength testing, Starrett documented results indicating that D.L.'s muscle strength was insufficient for D.L. to hold his head upright.

1093.   Additionally, Starrett reported neck flexion muscle strength results for D.L. indicating that D.L. could only exert between five (5) and seven (7) pounds of force, which would mean that D.L. would be unable to lift his head from the supine position.

1094.   However, there is no indication in any of the medical reports or documentation created before or after the muscle testing performed on D.L. that he suffered from any such profound muscle weaknesses such that he could not hold his head upright or raise it from a pillow.

1095.   Moreover, in all three (3) instances, Starrett also documented muscle strength testing results for D.L.'s trunk strength as insufficient for D.L. to walk upright.

1096.   Specifically, Starrett reported D.L.'s trunk extension strength as progressively decreasing in each instance of testing. For instance, Starrett reported D.L.'s trunk extension strength as ten (10) pounds on November 4, 2016, eight (8) pounds on December 7, 2016, and seven (7) pounds on January 9, 2017.

1097.   However, given D.L.'s approximate weight of 184 pounds, he required trunk extension strength in excess of 65.9 pounds to stand upright and support the trunk of his body.

1098.   However, there is no indication in any of the medical reports or documentation created before or after the muscle testing purportedly performed on D.L. that D.L. had any difficulty holding his torso erect.

1099.   Therefore, the trunk extension results reported by Starrett for D.L. are not medically credible.

1100.   Starrett further billed for NIOSH static strength testing purportedly provided D.L. even though, in light of the muscle strength testing purportedly performed for D.L. at Starrett, such testing was redundant and medically unnecessary.

1101.   Consistent with the treatment protocol implemented by Starrett, D.L. also was referred by Ajudua for electrodiagnostic testing, which D.L. purportedly received at Starrett on December 8, 2016 even though there was no evidence of neurological deficit or concerning physical exam finding to warrant such testing.

1102.   D.L. underwent an excessive number of NCSs in his lower limbs.

1103.   Specifically, eight (8) NCSs were performed on D.L.'s lower limbs even though a maximum of five (5) NCSs are necessary to make a diagnosis of radiculopathy.

1104.   Starrett failed to provide any supplementary documentation to justify the additional NCSs performed for D.L.

1105.   The report of the EDX testing also recorded excessive F-wave testing to D.L.'s upper and lower limbs as part of the protocol of EDX testing implemented at Starrett.

1106.   For instance, D.L. purportedly underwent four (4) F-wave tests on his upper extremities as part of Starrett's protocol of studies even though there was no indication in any clinical reports or documentation that D.L. had suspected C8 or T1 radiculopathy.

1107.   Further, the F-wave studies performed on D.L. were performed below the standard of care because an insufficient number of F-wave trials were performed for both the upper and lower extremities.

1108.   It is the standard of care to obtain at least ten (10) F-waves for adequate evaluation of the minimal F-wave latency.

1109.   Starrett, however, according to the records submitted to Allstate, did not obtain this minimum number of F-wave stimulations when performing D.L.'s F-wave studies.

1110.   As a result, the F-wave data purportedly obtained for D.L. is invalid and not useful for clinical diagnostic purposes.

1111.   D.L. was also subjected to H-Reflex testing at Starrett even though there was no documented suspicion of S1 radiculopathy based on T.B.'s symptoms and clinical exam findings that would warrant an H-Reflex study.

1112.   Starrett also made a diagnosis for D.L. that was incompatible with the reported H-Reflex data.

1113.   Specifically, D.L. was diagnosed with a right L5-S1 radiculopathy despite the H-Reflexes being normal.

1114.   By failing to account for the incompatibility of H-Reflex data with the stated diagnosis, Starrett potentially endangered D.L. by providing an inaccurate diagnosis, which may lead to inappropriate and invasive treatments.

1115.   The H-Reflex study for D.L. further reflected inaccurate labeling of waveforms, which could lead to improper diagnosis and further unnecessary treatment.

1116.   Finally, according to the report of the EDX report submitted to Allstate, Starrett failed to perform an adequate EMG for the evaluation of radiculopathy in D.L.'s lower limbs.

1117.   Specifically, Starrett only tested four (4) lower limb muscles bilaterally, plus the paraspinal muscles, even though the standard of care required performance of EMG in at least five (5) limb muscles in each limb suspected of having symptoms related to radiculopathy, in addition to corresponding paraspinal muscles.

1118.   Because the testing and treatment purportedly rendered to D.L. by Starrett was excessive, medically unnecessary, and performed below the standard of care, Starrett's charges for the services purportedly provided to D.L. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

**l.      *Patient J.B. (claim no. 0469007974)***

1119.   J.B. purportedly was involved in a motor vehicle accident on July 11, 2017.

1120.   Several days later, Ajudua purportedly conducted an initial examination of J.B. at Starrett on July 14, 2017.

1121.   According to the report of the initial examination, J.B. presented with complaints of pain to his neck, upper and lower back, right shoulder, and right lower extremity.

1122.   Ajudua's initial evaluation of J.B. notably lacks sensory testing, MSR testing, and spinal ROM testing even though such tests are required elements of a neuromuscular physical examination, which is required when evaluating patients who complain of neck and/or lower back pain.

1123.   Despite the insufficiency of Ajudua's initial examination of J.B., Starrett continued to bill for unnecessary, invasive, and dangerous testing purportedly performed for J.B.

1124.   For example, J.B. purportedly underwent computerized range of motion testing on three (3) occasions performed by the Starrett and another non-party provider closely associated with Starrett.

1125.   However, on all three (3) occasions, Starrett and the other provider failed to measure lumbar rotation ROM even though a failure to perform the ROM measurements in all three (3) planes of motion is below the standard of care.

1126.   Additionally, J.B. purportedly underwent computerized muscle strength testing on three (3) occasions performed by Starrett and the other provider.

1127.   In two (2) instances of computerized muscle strength testing, Starrett and the other provider documented muscle strength results for J.B.'s neck in at least one direction, which, if valid, would mean that J.B. was unable to hold his head upright.

1128.   However, there is no indication in any of the medical reports or documentation created before or after the muscle testing performed for J.B. that he suffered from such significant muscle weakness such that he could not hold his head upright.

1129.   Moreover, in all three (3) instances, Starrett and the other provider documented muscle strength testing results for J.B.'s trunk as insufficient for J.B. to walk upright.

1130.   Specifically, Starrett and the other provider reported J.B.'s trunk extension strength as ranging from between six (6) pounds and twelve (12) pounds.

1131.   However, given J.B.'s approximate weight of 180 pounds, he required trunk extension strength in excess of 64.4 pounds to stand upright and support his torso.

1132.   Therefore, the trunk extension results reported by Starrett and the other provider for J.B. are not medically credible.

1133.   Starrett further billed for NIOSH static strength testing purportedly performed for J.B. even though such testing was redundant and unnecessary because J.B. had already undergone computerized muscle testing.

1134.   As part of the treatment protocol implemented at Starrett, Ajudua referred J.B. for electrodiagnostic testing.

1135.   J.B. purportedly underwent electrodiagnostic testing at Starrett on August 30, 2017 even though there was no evidence of neurological deficit or concerning physical exam finding to warrant such testing.

1136.   Starrett purportedly subjected J.B. to excessive NCSs at Starrett.

1137.   Specifically, ten (10) nerve conduction studies were performed to J.B.'s upper limbs and eight (8) nerve conduction studies were performed on his lower limbs, which were excessive because a maximum of five (5) NCSs are necessary to make a diagnosis of radiculopathy.

1138.   Starrett failed to provide any supplementary documentation to justify the additional NCSs performed for J.B.

1139.   J.B. also purportedly received F-wave testing as part of the protocol of EDX testing.

1140.   Specifically, J.B. allegedly underwent four (4) unwarranted F-wave tests on his upper and lower extremities at Starrett.

1141.   Indeed, Starrett subjected J.B. to F-wave testing of the upper extremities even though there was no indication in any clinical reports or documentation that J.B. had suspected C-8 or T-1 radiculopathy.

1142.   Further, the F-wave studies performed on J.B. were performed below the standard of care because an insufficient number of F-wave trials were performed for both the upper and lower extremities.

1143.   It is the standard of care to obtain at least ten (10) F-waves for adequate evaluation of the minimal F-wave latency.

1144.   According to the report of the EDX testing purportedly performed for J.B., Starrett, however, did not obtain this minimum number of F-wave stimulations when performing J.B.'s F-wave studies.

1145.   As a result, the F-wave data purportedly obtained for J.B. is invalid and not useful for clinical diagnostic purposes.

1146.   Curiously, no upper or lower EMG testing was performed by Starrett for J.B. despite suspicions of cervical radiculopathy and lumbar radiculopathy.

1147.   However, Starrett did not offer any reason for the non-performance of EMG testing for J.B. even though failure to perform an EMG is considered below the standard of care as it is the most sensitive test for diagnosing radiculopathy.

1148.   Because the testing and treatment purportedly rendered to J.B. by Starrett was excessive, medically unnecessary, and performed below the standard of care, Starrett's charges for the services purportedly provided to J.B. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

## m.   *Patient L.T. (claim no. 0445677981)*

1149.   L.T. was purportedly involved in a motor vehicle accident on February 11, 2017.

1150.   Soon after, on February 16, 2017, Ajudua purportedly performed an initial examination of L.T. for which Hillcrest submitted charges to Allstate under CPT code 99205.

1151.   As explained above, any charges for examinations classified under CPT code 99205 must necessarily include (a) a comprehensive history, (b) a comprehensive examination, (c) medical decision making of "high complexity," and (d) face-to-face time of sixty (60) minutes.

1152.   For instance, the initial examination report for L.T. notes that although she was treated at the hospital following the accident, the x-rays and EKG performed were negative and

the patient's past medical history consisted of conditions that were unrelated to the injuries sustained in the motor vehicle accident and that were under control.

1153.   Overall, the initial examination of L.T. does not reflect a review of extensive data or high-level risks or morbidity or mortality in connection with this examination that would support billing under CPT code 99205.

1154.   Additionally, according to the report of the initial examination, L.T. was diagnosed with several sprains of the cervical and lumbosacral paravertebral musculature and ligaments and the right shoulder, which also does not indicate the performance of medical decision making of a high complexity for the purposes of billing under CPT code 99205.

1155.   Therefore, Hillcrest improperly billed for the initial examination of L.T. under CPT code 99205.

1156.   According to the report of the initial examination submitted to Allstate, L.T. presented with pain to her neck, lower back, right shoulder, both hands, and right knee.

1157.   The initial evaluation of L.T. is notable for the failure to perform MSR testing, sensory testing, and spinal ROM testing, even though such tests are necessary elements of a neuromuscular physical examination, which is required when evaluating patients who complain of neck and/or lower back pain.

1158.   Further, even though L.T.'s initial complaints did not include any radiating pain in the lower extremities, she purportedly was administered a SLR test.

1159.   A positive SLR test requires reproduction of radiating pain in the lower extremities, which was impossible because L.T. did not report any radiating lower back pain.

1160.   Nonetheless, the initial evaluation report for L.T. documented a positive SLR test.

1161.   Despite the insufficiency of the initial examination of L.T., Hillcrest continued to bill for unnecessary, invasive, and dangerous testing purportedly performed for L.T.

1162.   Indeed, L.T. purportedly underwent computerized ROM and muscle strength testing at Hillcrest and another non-party provider closely affiliated with Hillcrest.

1163.   However, according to the results submitted to Allstate, both Hillcrest and the other provider failed to measure L.T.'s lumbar rotation ROM even though a failure to perform the ROM measurements in all three (3) planes of motion is below the standard of care.

1164.   Hillcrest and the other provider documented muscle strength results for L.T.'s neck in at least one direction that, if valid, would mean that L.T.'s neck muscles were so weak that L.T. was unable to hold her head upright.

1165.   Additionally, the other provider also reported neck flexion muscle strength results for L.T. indicating that L.T. could only exert two (2) pounds of force, which would mean that L.T. would be unable to lift her head from the supine position.

1166.   However, there is no indication in any of the medical reports or documentation before or after the muscle testing being performed on L.T. that she suffered from any such profound muscle weakness of the neck.

1167.   As part of Hillcrest's treatment protocol, Ajudua also referred L.T. for excessive electrodiagnostic testing.

1168.   According to L.T., it seemed to her as though the EDX testing "was part of the protocol."

1169.   On June 1, 2017, Hillcrest subjected L.T. to eight (8) NCSs to her lower extremities even though a maximum of five (5) NCSs are necessary to make a diagnosis of radiculopathy.

1170.   Hillcrest failed to provide any supplementary documentation to justify the additional NCSs performed for L.T.

1171.   L.T. purportedly underwent four (4) F-wave tests on his upper extremities and lower extremities as part of Hillcrest's protocol of EDX testing.

1172.   Additionally, Hillcrest purportedly performed F-wave testing for L.T's upper extremities even though there was no indication in any clinical reports or documentation that L.T. had suspected C8 or T1 radiculopathy.

1173.   Further, according to the EDX testing reports submitted to Allstate, the F-wave studies purportedly performed on L.T. were performed below the standard of care because an insufficient number of F-wave trials were performed for both the upper and lower extremities.

1174.   Even though the standard of care required the provider to obtain at least ten (10) F-waves for adequate evaluation of the minimal F-wave latency, Hillcrest did not obtain the minimum number of F-wave stimulations when performing L.T.'s F-wave studies.

1175.   Hillcrest also incorrectly labeled the results of L.T.'s upper limb F-wave studies.

1176.   As a result, the F-wave data purportedly obtained for L.T. is invalid and not useful for clinical diagnostic purposes.

1177.   As a result of L.T.'s upper limb EDX studies, Hillcrest failed to consider other diagnostic possibilities or pathologies other than radiculopathy.

1178.   For example, Hillcrest reported a right radial sensory nerve amplitude of 22.9 uV, which was only 41% of the same nerve on the opposite side, which was reported to have an amplitude of 55.2 uV.

1179. However, Hillcrest's report for L.T.'s EDX testing does not mention the reduced right radial sensory nerve amplitude even though this is an important finding that may be indicative of a nerve pathology or a technical error that must be addressed.

1180. By failing to note or correct these findings, Hillcrest knowingly misrepresented the NCS purportedly rendered for L.T., and failed to act within the minimum standard of care.

1181. L.T. also underwent an H-Reflex study of the bilateral tibial nerve as part of Hillcrest's protocol for lower limb EDX testing even though there was no documented suspicion of S-1 radiculopathy based on L.T.'s symptoms and clinical exam findings that would warrant an H-Reflex study.

1182. Moreover, according to the EDX report submitted to Allstate, Hillcrest failed to perform an adequate EMG for the evaluation of radiculopathy in L.T.'s lower limbs.

1183. Specifically, Hillcrest only tested four (4) of L.T.'s lower limb muscles bilaterally, plus the paraspinal muscles, even though the standard of care required performance of EMG in at least five (5) limb muscles in each limb suspected of having symptoms related to radiculopathy, in addition to corresponding paraspinal muscles.

1184. Because the testing and treatment purportedly rendered to L.T. by Hillcrest was excessive, medically unnecessary, and performed below the standard of care, Hillcrest's charges for the services purportedly provided to L.T. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

## VI.   SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

1185. Throughout the course of this entire scheme, Khaim, Gulkarov, Israilov, Ajudua, Chumaceiro, Mushyakov, and Khaimov—working through the PC Defendants, the Pharmacy Defendants, A&P Holding, Billing For You, and the other Shell Companies—(a) created,

prepared, and submitted (or caused to be created, prepared, and submitted) false medical documentation, (b) intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and (c) placed, or caused to be placed, in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing, or attempting, such fraudulent schemes.

1186.  Unless otherwise pled to the contrary, all documents, notes, reports, health insurance claim forms, letters and requests for payment in connection with the insurance claims referenced throughout this pleading (and accompanying exhibits) traveled through the U.S. Mail.

1187.  Every automobile insurance claim detailed within this Complaint involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claim-related payments, and the return of the cancelled payment instruments to the financial institution(s) from which the draft(s) were drawn.

1188.  The Defendants either personally used (or caused the use of) the U.S. Mail to further this fraudulent scheme by causing patient medical records, pharmacy records, bills, invoices, and other No-Fault claim documents from the PC Defendants and Pharmacy Defendants to be mailed to Allstate, or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

## A.  HOLLIS ENTERPRISE

1189.  Ajudua, Khaim, Gulkarov, and Israilov caused Hollis to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that Hollis mailed (or was caused to mail) a demand for payment (i.e., invoice or bill) to Allstate.

1190. Khaim, Gulkarov, and Israilov's participation in the management and control of Hollis, combined with Khaim, Gulkarov, and Israilov's unlawful receipt of Hollis' professional physician fees and profits, rendered Hollis completely ineligible for No-Fault reimbursement under New York law.

1191. Because Hollis was, in fact, unlawfully controlled by Khaim, Gulkarov, and Israilov (persons who were not licensed to practice medicine, or allowed to operate, control, or profit from a professional corporation organized to provide medical services), Ajudua, Khaim, Gulkarov, and Israilov purposely caused Hollis to make a misrepresentation each and every time that Hollis mailed (or was caused to mail) a document to Allstate claiming eligibility for reimbursement.

1192. Moreover, because (a) Khaim, Gulkarov, and Israilov, as non-physicians, were never lawfully permitted to participate in the operation and management of Hollis, (b) Ajudua, Khaim, Gulkarov, and Israilov caused Hollis to seek No-Fault reimbursement from Allstate (even though Hollis was not lawfully entitled to such reimbursement), and (c) Hollis used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Ajudua, Khaim, Gulkarov, and Israilov committed mail fraud.

1193. At all relevant times, Ajudua, Khaim, Gulkarov, and Israilov knew that Hollis (including its employees, owner(s), contractors, and agents), Khaim, Gulkarov, and Israilov's Shell Companies (including, but not limited to, A&P Holding, Anturio Marketing, P&K Marketing, K&L Consultants, Billing For You, and All Network Marketing), a patient, a claimant, an insurance carrier, patient's attorney, other medical provider, or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by (or on behalf of) Hollis.

1194.  Allstate estimates that the unlawful operation of the Hollis enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 10 and incorporated herein by reference as if set forth in its entirety.

**B.**    **HILLCREST ENTERPRISE**

1195.  Ajudua, Khaim, Gulkarov, and Israilov caused Hillcrest to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that Hillcrest mailed (or was caused to mail) a demand for payment (i.e., invoice or bill) to Allstate.

1196.  Khaim, Gulkarov, and Israilov's participation in the management and control of Hillcrest, combined with Khaim, Gulkarov, and Israilov's unlawful receipt of Hillcrest's professional physician fees and profits, rendered Hillcrest completely ineligible for No-Fault reimbursement under New York law.

1197.  Because Hillcrest was, in fact, unlawfully controlled by Khaim, Gulkarov, and Israilov (persons who were not licensed to practice medicine, or allowed to operate, control, or profit from a professional corporation organized to provide medical services), Ajudua, Khaim, Israilov, and Gulkarov purposely caused Hillcrest to make a misrepresentation each and every time that Hillcrest mailed (or was caused to mail) a document to Allstate claiming eligibility for reimbursement.

1198.  Moreover, because (a) Khaim, Gulkarov, and Israilov, as non-physicians, were never lawfully permitted to participate in the operation and management of Hillcrest, (b) Ajudua, Khaim, Gulkarov, and Israilov caused Hillcrest to seek No-Fault reimbursement from Allstate (even though Hillcrest was not lawfully entitled to such reimbursement), and (c) Hillcrest used (or

was caused to use) the U.S. Mail to seek reimbursement, it is clear that Ajudua, Khaim, Gulkarov, and Israilov committed mail fraud.

1199. At all relevant times, Ajudua, Khaim, Gulkarov, and Israilov knew that Hillcrest (including its employees, owner(s), contractors, and agents), Khaim, Gulkarov, and Israilov's Shell Companies (including, but not limited to, Billing For You, Keepers For You, and All Network Marketing), a patient, a claimant, an insurance carrier, patient's attorney, other medical provider, or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by (or on behalf of) Hillcrest.

1200. Allstate estimates that the unlawful operation of Hillcrest's enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 11 and incorporated herein by reference as if set forth in its entirety.

### C. STARRETT ENTERPRISE

1201. Ajudua, Khaim, Gulkarov, and Israilov caused Starrett to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that Starrett mailed (or was caused to mail) a demand for payment (i.e., invoice or bill) to Allstate.

1202. Khaim, Gulkarov, and Israilov's participation in the management and control of Starrett, combined with Khaim, Gulkarov, and Israilov's unlawful receipt of Starrett's professional physician fees and profits, rendered Starrett completely ineligible for No-Fault reimbursement under New York law.

1203. Because Starrett was, in fact, unlawfully controlled by Khaim, Gulkarov, and Israilov (persons who were not licensed to practice medicine, or allowed to operate, control, or

profit from a professional corporation organized to provide medical services), Ajudua, Khaim, Gulkarov, and Israilov purposely caused Starrett to make a misrepresentation each and every time that Starrett mailed (or was caused to mail) a document to Allstate claiming eligibility for reimbursement.

1204.   Moreover, because (a) Khaim, Gulkarov, and Israilov, as non-physicians, were never lawfully permitted to participate in the operation and management of Starrett, (b) Ajudua, Khaim, Gulkarov, and Israilov caused Starrett to seek No-Fault reimbursement from Allstate (even though Starrett was not lawfully entitled to such reimbursement), and (c) Starrett used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Ajudua, Khaim, Gulkarov, and Israilov committed mail fraud.

1205.   At all relevant times, Ajudua, Khaim, Gulkarov, and Israilov knew that Starrett (including its employees, owner(s), contractors, and agents), Khaim, Gulkarov, and Israilov's Shell Companies (including, but not limited to, A&P Holding, K&L Consultants, Billing For You, Keepers For You, and All Network Marketing), a patient, a claimant, an insurance carrier, patient's attorney, other medical provider, or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by (or on behalf of) Starrett.

1206.   Allstate estimates that the unlawful operation of Starrett's enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 12 and incorporated herein by reference as if set forth in its entirety.

D.      SMART CHOICE ENTERPRISE

1207. Chumaceiro, Khaim, and Gulkarov caused Smart Choice to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that Smart Choice mailed (or was caused to mail) a demand for payment (i.e., invoice or bill) to Allstate.

1208. Khaim and Gulkarov's participation in the management and control of Smart Choice, combined with Khaim and Gulkarov's unlawful receipt of Smart Choice's professional physician fees and profits, rendered Smart Choice completely ineligible for No-Fault reimbursement under New York law.

1209. Because Smart Choice was, in fact, unlawfully controlled by Khaim and Gulkarov (persons who were not licensed to practice medicine, or allowed to operate, control, or profit from a professional corporation organized to provide medical services), Chumaceiro, Khaim, and Gulkarov purposely caused Smart Choice to make a misrepresentation each and every time that Smart Choice mailed (or was caused to mail) a document to Allstate claiming eligibility for reimbursement.

1210. Moreover, because (a) Khaim and Gulkarov, as non-physicians, were never lawfully permitted to participate in the operation and management of Smart Choice, (b) Chumaceiro, Khaim, and Gulkarov caused Smart Choice to seek No-Fault reimbursement from Allstate (even though Smart Choice was not lawfully entitled to such reimbursement), and (c) Smart Choice used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Chumaceiro, Khaim, and Gulkarov committed mail fraud.

1211. At all relevant times, Chumaceiro, Khaim, and Gulkarov knew that Smart Choice (including its employees, owner(s), contractors, and agents), Khaim and Gulkarov's Shell Companies (including, but not limited to, A&P Holding and Billing For You), a patient, a claimant,

an insurance carrier, patient's attorney, other medical provider, or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by (or on behalf of) Smart Choice.

1212.   Allstate estimates that the unlawful operation of the Smart Choice enterprise generated hundreds of mailings.   A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 13 and incorporated herein by reference as if set forth in its entirety.

### E.    RX FOR YOU ENTERPRISE

1213.   Throughout the course of this entire scheme, Khaim, Gulkarov, and Mushyakov (a) created, prepared, and submitted (or caused to be created, prepared, and submitted) false No-Fault claim reimbursement documentation, (b) intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses and representations, and (c) placed, or caused to be placed, in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States Postal Service in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing, or attempting, such fraudulent schemes.

1214.   Unless otherwise pled to the contrary, all documents, invoices, prescription forms, delivery receipts, health insurance claim forms, other No-Fault claim reimbursement documents, letters, and requests for payment in connection with the insurance claims referenced throughout this pleading (and accompanying exhibits) traveled through the U.S. Mail.

1215.   Every automobile insurance claim detailed within this Complaint involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial

policies, insurance payments, claim-related payments, and the return of the cancelled payment instruments to the financial institution(s) from which the draft(s) were drawn.

1216.   Khaim, Gulkarov, and Mushyakov either personally used (or caused the use of) the U.S. Mail to further this fraudulent scheme by causing Allstate Claimants' prescription records and invoices/bills from Rx For You to be mailed to Allstate (and/or counsel for claimants), or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

1217.   Khaim, Gulkarov, and Mushyakov caused Rx For You to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that Rx For You mailed (or was caused to mail) a demand for payment (i.e., invoice or bill) to Allstate.

1218.   Khaim, Gulkarov, and Mushyakov's participation in operation and management of Rx For You, which included, among other things, (a) directing prescribers to send prescriptions for medically unnecessary medications to be dispensed, (b) producing and dispensing Compounded Products in violation of applicable regulatory and licensing requirements, (c) dispensing and billing Allstate for Compounded Products and other drugs that were not medically necessary and were completely unjustified as a means of treating the Allstate Claimants' purported injuries, and (d) charging Allstate for Compounded Products and other drugs at grossly excessive rates, rendered Rx For You completely ineligible for No-Fault reimbursement under New York law.

1219.   As a result of the above-described conduct, Khaim, Gulkarov, and Mushyakov purposely caused Rx For You to make a misrepresentation each and every time that Rx For You mailed (or was caused to mail) a document to Allstate claiming eligibility for No-Fault reimbursement.

1220.   Moreover, because (a) Khaim, Gulkarov, and Mushyakov engaged in (or caused) the above-described unlawful conduct through their participation in the operation and management of Rx For You, (b) Khaim, Gulkarov, and Mushyakov caused Rx For You to seek No-Fault reimbursement from Allstate (even though Rx For You was not lawfully entitled to such reimbursement), and (c) Rx For You used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Khaim, Gulkarov, and Mushyakov committed mail fraud.

1221.   At all relevant times, Khaim, Gulkarov, and Mushyakov knew that Rx For You (including its employees, owner(s), contractors, and agents), a customer, an Allstate Claimant, an insurance carrier, an Allstate Claimants' attorney, other healthcare provider, or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by (or on behalf of) Rx For You.

1222.   Allstate estimates that the unlawful operation of the Rx For You enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 14 and incorporated herein by reference as if set forth in its entirety.

### F.   SUTTER PHARMACY ENTERPRISE

1223.   Throughout the course of this entire scheme, Khaim and Gulkarov (a) created, prepared, and submitted (or caused to be created, prepared, and submitted) false No-Fault claim reimbursement documentation, (b) intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses and representations, and (c) placed, or caused to be placed, in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States

Postal Service in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing, or attempting, such fraudulent schemes.

1224.   Unless otherwise pled to the contrary, all documents, invoices, prescription forms, delivery receipts, health insurance claim forms, other No-Fault claim reimbursement documents, letters, and requests for payment in connection with the insurance claims referenced throughout this pleading (and accompanying exhibits) traveled through the U.S. Mail.

1225.   Every automobile insurance claim detailed within this Complaint involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claim-related payments, and the return of the cancelled payment instruments to the financial institution(s) from which the draft(s) were drawn.

1226.   Khaim and Gulkarov either personally used (or caused the use of) the U.S. Mail to further this fraudulent scheme by causing Allstate Claimants' prescription records and invoices/bills from Sutter Pharmacy to be mailed to Allstate (and/or counsel for claimants), or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

1227.   Khaim and Gulkarov caused Sutter Pharmacy to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that Sutter Pharmacy mailed (or was caused to mail) a demand for payment (i.e., invoice or bill) to Allstate.

1228.   Khaim and Gulkarov's participation in the operation and management of Sutter Pharmacy, which included, among other things, (a) directing prescribers to send prescriptions for medically unnecessary medications to be dispensed, (b) producing and dispensing Compounded Products in violation of applicable regulatory and licensing requirements, (c) dispensing and billing Allstate for Compounded Products and other drugs that were not medically necessary and were completely unjustified as a means of treating the Allstate Claimants' purported injuries, and

(d) charging Allstate for Compounded Products and other drugs at grossly excessive rates, rendered Sutter Pharmacy completely ineligible for No-Fault reimbursement under New York law.

1229.   As a result of the above-described conduct, Khaim and Gulkarov purposely caused Sutter Pharmacy to make a misrepresentation each and every time that Sutter Pharmacy mailed (or was caused to mail) a document to Allstate claiming eligibility for No-Fault reimbursement.

1230.   Moreover, because (a) Khaim and Gulkarov engaged in (or caused) the above-described unlawful conduct through their participation in the operation and management of Sutter Pharmacy, (b) Khaim and Gulkarov caused Sutter Pharmacy to seek No-Fault reimbursement from Allstate (even though Sutter Pharmacy was not lawfully entitled to such reimbursement), and (c) Sutter Pharmacy used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Khaim and Gulkarov committed mail fraud.

1231.   At all relevant times, Khaim and Gulkarov knew that Sutter Pharmacy (including its employees, owner(s), contractors, and agents), a customer, an Allstate Claimant, an insurance carrier, an Allstate Claimants' attorney, other healthcare provider, or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by (or on behalf of) Sutter Pharmacy.

1232.   Allstate estimates that the unlawful operation of the Sutter Pharmacy enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 15 and incorporated herein by reference as if set forth in its entirety.

## G.   EXCELLENT CHOICE ENTERPRISE

1233.   Throughout the course of this entire scheme, Khaim and Khaimov (a) created, prepared, and submitted (or caused to be created, prepared, and submitted) false No-Fault claim

reimbursement documentation, (b) intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses and representations, and (c) placed, or caused to be placed, in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States Postal Service in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing, or attempting, such fraudulent schemes.

1234.   Unless otherwise pled to the contrary, all documents, invoices, prescription forms, delivery receipts, health insurance claim forms, other No-Fault claim reimbursement documents, letters, and requests for payment in connection with the insurance claims referenced throughout this pleading (and accompanying exhibits) traveled through the U.S. Mail.

1235.   Every automobile insurance claim detailed within this Complaint involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claim-related payments, and the return of the cancelled payment instruments to the financial institution(s) from which the draft(s) were drawn.

1236.   Khaim and Khaimov either personally used (or caused the use of) the U.S. Mail to further this fraudulent scheme by causing Allstate Claimants' prescription records and invoices/bills from Excellent Choice to be mailed to Allstate (and/or counsel for claimants), or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

1237.   Khaim and Khaimov caused Excellent Choice to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that Excellent Choice mailed (or was caused to mail) a demand for payment (i.e., invoice or bill) to Allstate.

1238.   Khaim and Khaimov's participation in the operation and management of Excellent Choice, which included, among other things, (a) directing prescribers to send prescriptions for

161

medically unnecessary medications to be dispensed, (b) producing and dispensing Compounded Products in violation of applicable regulatory and licensing requirements, (c) dispensing and billing Allstate for Compounded Products and other drugs that were not medically necessary and were completely unjustified as a means of treating the Allstate Claimants' purported injuries, and (d) charging Allstate for Compounded Products and other drugs at grossly excessive rates, rendered Excellent Choice completely ineligible for No-Fault reimbursement under New York law.

1239. As a result of the above-described conduct, Khaim and Khaimov purposely caused Excellent Choice to make a misrepresentation each and every time that Excellent Choice mailed (or was caused to mail) a document to Allstate claiming eligibility for No-Fault reimbursement.

1240. Moreover, because (a) Khaim and Khaimov engaged in (or caused) the above-described unlawful conduct through their participation in the operation and management of Excellent Choice, (b) Khaim and Khaimov caused Excellent Choice to seek No-Fault reimbursement from Allstate (even though Excellent Choice was not lawfully entitled to such reimbursement), and (c) Excellent Choice used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Khaim and Khaimov committed mail fraud.

1241. At all relevant times, Khaim and Khaimov knew that Excellent Choice (including its employees, owner(s), contractors, and agents), a customer, an Allstate Claimant, an insurance carrier, an Allstate Claimants' attorney, other healthcare provider, or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by (or on behalf of) Excellent Choice.

1242. Allstate estimates that the unlawful operation of the Excellent Choice enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in

furtherance of this scheme is annexed at Exhibit 16 and incorporated herein by reference as if set forth in its entirety.

### H.   A&P HOLDING ENTERPRISE

1243.   Ajudua, Chumaceiro, Khaim, Gulkarov, Israilov, Mushyakov, and Khaimov participated in the operation and management of the A&P Holding enterprise.

1244.   The Defendants used A&P Holding to control Hollis, Starrett, Smart Choice, Rx For You, Sutter Pharmacy, and Excellent Choice, including their finances.

1245.   Hollis, Starrett, Smart Choice, Rx For You, Sutter Pharmacy, and Excellent Choice used the U.S. Mail to submit No-Fault benefit claims to Allstate.

1246.   Ajudua, Chumaceiro, Khaim, Gulkarov, Israilov, Mushyakov, and Khaimov personally used (or caused the use of) the U.S. Mail when causing Hollis, Starrett, Smart Choice, Rx For You, Sutter Pharmacy, and Excellent Choice to mail documents in support of No-Fault benefit claims to Allstate, or they acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

1247.   Ajudua, Chumaceiro, Khaim, Gulkarov, Israilov, Mushyakov, and Khaimov caused Hollis, Starrett, Smart Choice, Rx For You, Sutter Pharmacy, and Excellent Choice to falsely certify that they were, in all respects, eligible to be reimbursed under New York's No-Fault laws each time No-Fault benefit claims were mailed to Allstate.

1248.   Ajudua, Chumaceiro, Khaim, Gulkarov, Israilov, Mushyakov, and Khaimov therefore caused Hollis, Starrett, Smart Choice, Rx For You, Sutter Pharmacy, and Excellent Choice to misrepresent or omit material facts each and every time that Hollis, Starrett, Smart Choice, Rx For You, Sutter Pharmacy, and Excellent Choice mailed (or were caused to mail) documents to Allstate in support of No-Fault benefit claims.

1249.  A&P Holding also used the U.S. Mail to carry-out the affairs of the enterprise, which involved leases and other arrangements between A&P Holding and Hollis, Starrett, Smart Choice, Rx For You, Sutter Pharmacy, and Excellent Choice that enabled Khaim and others to control these entities and their finances.

1250.  Ajudua, Chumaceiro, Khaim, Gulkarov, Israilov, Mushyakov, and Khaimov also knew that Allstate and others would use (or cause the use of) the U.S. Mail in connection with No-Fault benefit claims submitted by (or on behalf of) Hollis, Starrett, Smart Choice, Rx For You, Sutter Pharmacy, and Excellent Choice, including issuing payments based upon the documentation mailed by (or on behalf of) these entities.

1251.  The Defendants used A&P Holding to hide the illegal operation of Hollis, Starrett, Smart Choice, Rx For You, Sutter Pharmacy, and Excellent Choice.  A&P Holding was also used to channel these entities' No-Fault proceeds to Khaim.

1252.  Hollis, Starrett, Smart Choice, Rx For You, Sutter Pharmacy, and Excellent Choice therefore committed mail fraud in furtherance of the A&P Holding enterprise when they mailed documents to Allstate in support of No-Fault benefit claims.

1253.  Ajudua, Chumaceiro, Khaim, Gulkarov, Israilov, Mushyakov, and Khaimov also committed mail fraud in furtherance of the A&P Holding enterprise by mailing (or causing the mailing of) documents to Allstate in support of No-Fault benefit claims.

1254.  Allstate estimates that hundreds of documents were mailed using the U.S. Mail in connection with the A&P Holding enterprise.  Selected examples of mailings made in furtherance of the A&P Holding enterprise are annexed at Exhibit 17 and incorporated herein by reference as if set forth in their entirety.

**I.      Billing For You Enterprise**

1255.   Ajudua, Chumaceiro, Khaim, and Gulkarov participated in the operation and management of the Billing For You enterprise.

1256.   The Defendants used Billing for You to control Hollis, Starrett, Hillcrest, and Smart Choice, including their finances.

1257.   Hollis, Starrett, Hillcrest, and Smart Choice used the U.S. Mail to submit No-Fault benefit claims to Allstate.

1258.   Ajudua, Chumaceiro, Khaim, and Gulkarov personally used (or caused the use of) the U.S. Mail when causing Hollis, Starrett, Hillcrest, and Smart Choice to mail documents to Allstate in support of No-Fault claims, or they acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

1259.   Ajudua, Chumaceiro, Khaim, and Gulkarov caused Hollis, Starrett, Hillcrest, and Smart Choice to falsely certify that they were, in all respects, eligible to be reimbursed under New York's No-Fault laws each time No-Fault benefit claims were mailed to Allstate.

1260.   Ajudua, Chumaceiro, Khaim, and Gulkarov therefore caused Hollis, Starrett, Hillcrest, and Smart Choice to misrepresent or omit material facts each and every time that Hollis, Starrett, Hillcrest, and Smart Choice mailed (or were caused to mail) documents to Allstate in support of No-Fault benefit claims.

1261.   Billing For You also used the U.S. Mail to carry-out the affairs of the enterprise, which involved agreements or arrangements with Hollis, Starrett, Hillcrest, and Smart Choice that enabled Khaim and Gulkarov to control these entities and their finances.

1262.   Ajudua, Chumaceiro, Khaim, and Gulkarov also knew that Allstate and others would use (or cause the use of) the U.S. Mail in connection with No-Fault benefit claims submitted

by (or on behalf of) Hollis, Starrett, Hillcrest, and Smart Choice, including issuing payments based upon the documentation mailed by (or on behalf of) these entities.

1263.   The Defendants used Billing For You to hide the illegal operation of Hollis, Starrett, Hillcrest, and Smart Choice.  Billing For You was also used to channel these entities' No-Fault proceeds to Khaim and Gulkarov.

1264.   Hollis, Starrett, Hillcrest, and Smart Choice therefore committed mail fraud in furtherance of the Billing For You enterprise when they mailed documents to Allstate in support of No-Fault benefit claims.

1265.   Ajudua, Chumaceiro, Khaim, and Gulkarov also committed mail fraud in furtherance of the Billing For You enterprise when they mailed (or caused the mailing of) documents to Allstate in support of No-Fault benefit claims.

1266.   Allstate estimates that hundreds of documents were mailed using the U.S. Mail in connection with the Billing For You enterprise.  Selected examples of mailings made in furtherance of the Billing For You enterprise are annexed at Exhibit 18 and incorporated herein by reference as if set forth in their entirety.

## VII.   SPECIFIC ALLEGATIONS OF FRAUDULENT CONCEALMENT AND MATERIAL MISREPRESENTATIONS MADE TO AND RELIED UPON BY ALLSTATE

### A.   THE HOLLIS, STARRETT, HILLCREST, AND SMART CHOICE ENTERPRISES

1267.   Khaim, Gulkarov, and Israilov induced Ajudua and Chumaceiro to register with the State of New York as the sole officer, director, and shareholder of their respective professional corporations, namely Hollis, Starrett, Hillcrest, and Smart Choice (i.e., the PC Defendants).

1268.  The documents created and filed with the State of New York related to the PC Defendants deliberately omitted any reference to Khaim, Gulkarov, and Israilov's—or their Shell Companies'—involvement.

1269.  The documents created and filed with the State of New York related to the PC Defendants gave no indication to Allstate or the general public that Khaim, Gulkarov, or Israilov in any way maintained a controlling interest in Hollis, Hillcrest, Starrett, and Smart Choice.

1270.  Based on the representations contained within the four corners of the documents filed with State of New York on behalf of the PC Defendants, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Khaim, Gulkarov, and Israilov's domination of and control over Ajudua, Chumaceiro, and the PC Defendants.

1271.  Khaim, Gulkarov, and Israilov took purposeful steps to conceal their involvement in the day-to-day operations of each of the PC Defendants.  Further, they disguised payments of professional fees and profits (that they otherwise would not be eligible to receive) as legitimate costs for realty, marketing, and billing services.

1272.  For instance, Khaim, Gulkarov, and Israilov organized several sham entities—i.e., Shell Companies A&P Holding, Anturio Marketing, P&K Marketing, K&L Consultants, Billing For You, Keepers For You, and All Network Marketing—for the purposes of controlling each of the PC Defendants and funneling professional fees and profits to themselves for their own personal gain.

1273.  The Shell Companies were also organized by Khaim, Gulkarov, and Israilov for the purpose of evading detection and preventing Allstate (or anyone else) from uncovering that Khaim, Gulkarov, and Israilov operated, controlled, and profited from the PC Defendants.

1274. Ajudua, Chumaceiro, Khaim, Gulkarov, and Israilov's purposeful concealment of Khaim, Gulkarov, and Israilov's controlling interests in the PC Defendants allowed Khaim, Gulkarov, and Israilov to unlawfully control Hollis, Hillcrest, Starrett, and Smart Choice undetected.

1275. Overall, the Defendants' purposeful concealment of Khaim, Gulkarov, and Israilov's controlling interest in the PC Defendants allowed Khaim, Gulkarov, and Israilov's continued unlawful control over professional corporations in violation of New York law, and also prevented Allstate from discovering these Defendants' unlawful acts.

1276. At all relevant times during the operation of the PC Defendants, Ajudua, Chumaceiro, Khaim, Gulkarov, and Israilov purposely caused the PC Defendants to falsely certify that they were, in all respects, eligible to be reimbursed under New York's No-Fault laws as a means to induce Allstate to promptly pay charges related to healthcare services purportedly provided to patients.

1277. Khaim, Gulkarov, and Israilov used their roles as (a) management-level employees of the PC Defendants, and (b) owners/operators of the Shell Companies (including, but not limited to, A&P Holding, Anturio Marketing, P&K Marketing, K&L Consultants, Billing For You, Keepers For You, and All Network Marketing) to directly participate in the operation and management of the Hollis, Hillcrest, Starrett, and Smart Choice enterprises.

1278. Because neither Khaim, Gulkarov, and Israilov were persons who were not licensed to practice medicine, or allowed to operate, control, or profit from a professional corporation organized to provide medical services, and because each of the PC Defendants was organized as a physician-owned professional service corporation, Khaim, Gulkarov, and Israilov were never

lawfully entitled to participate in, or in any way direct, the operation and management of the PC Defendants.

1279.   Accordingly, because Khaim, Gulkarov, and Israilov unlawfully participated in the operation and management of the PC Defendants throughout the relevant period, Hollis, Starrett, Hillcrest, and Smart Choice were caused to falsely claim eligibility for No-Fault reimbursement each and every time that they sought No-Fault reimbursement from Allstate.

1280.   Further, throughout the relevant period, Ajudua and Chumaceiro attested (or caused the attestation) to the medical necessity of the services that they (or persons under their direction and control) allegedly performed in connection with the PC Defendants' patients, as well as the validity of the charges for such services.

1281.   At all relevant times, Ajudua and Chumaceiro, as a duly licensed physicians, were legally and ethically obligated to act honestly and with integrity, and were also legally and ethically obligated to act in accordance with each and every other aspect of their oath as licensed physicians.

1282.   As alleged above, Ajudua and Chumaceiro (or those persons working under their control) caused the PC Defendants to create and submit to Allstate treatment records and demands for payment relative to healthcare services that were (a) unnecessary, (b) fraudulently reported, and/or (c) not actually rendered as represented.

1283.   Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

1284.   Many of these facts—particularly (a) Khaim, Gulkarov, and Israilov's participation in and control over the operation and management of the PC Defendants and (b) the PC Defendants' unlawful splitting of professional physician fees and profits with Khaim, Gulkarov, and Israilov through transactions between the PC Defendants and the Shell Companies—are not

readily evident within the four corners of the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

1285.   Claims under New York's No-Fault laws can only be submitted, and reimbursed, for services that were provided in accord with all applicable New York state licensing requirements.

1286.   Thus, every time that Ajudua, Chumaceiro, Khaim, Gulkarov, and Israilov (along with those individuals working under their control) caused the PC Defendants to submit No-Fault reimbursement demands to Allstate, Ajudua, Chumaceiro, Khaim, Gulkarov, and Israilov (and those individuals working under their control) necessarily certified that the PC Defendants were, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1287.   The full extent of Ajudua, Chumaceiro, Khaim, Gulkarov, and Israilov's fraudulent and unlawful acts relative to their control over the Hollis, Hillcrest, Starrett, and Smart Choice enterprises—including (a) Khaim, Gulkarov, and Israilov's participation in and control over the operation and management of the PC Defendants, and (b) the unlawful channeling of the PC Defendants' professional proceeds to Khaim, Gulkarov, and Israilov through transactions that were structured between the PC Defendants and the Shell Companies—were not, and could not have been, known to Allstate until shortly before it commenced this action.

### B.      RX FOR YOU ENTERPRISE

1288.   At all relevant times during the operation of the Rx For You enterprise, Mushyakov, Khaim, Gulkarov, Israilov, Ajudua, and Chumaceiro purposely caused Rx For You to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws as a means to induce Allstate to promptly pay charges related to prescription drugs and other **p**harmacy

services purportedly provided to Allstate Claimants who were caused to be customers of Rx For You.

1289. At all relevant times, Mushyakov, Khaim, Gulkarov, and Israilov directly participated in the operation and management of Rx For You.

1290. During the relevant period, Mushyakov, Khaim, Gulkarov, and Israilov induced Ajudua and Chumaceiro (or those individuals working under their control) and other medical providers to furnish prescriptions for medically unnecessary drugs and medications, including Compounded Products, to be dispensed and charged for by Rx For You.

1291. Mushyakov, Khaim, Gulkarov, Israilov, Ajudua, and Chumaceiro (along with those individuals working under their control) purposely concealed the lack of medical necessity for the prescriptions for drugs and medications, including Compounded Products, to be dispensed and charged by Rx For You.

1292. Ajudua and Chumaceiro (or those working under their direction and control), through Hillcrest, Starrett, and Smart Choice, additionally created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of certain drugs and medications, including Compounded Products, that were prescribed by Ajudua and Chumaceiro, and purportedly dispensed and delivered by Rx For You, to an Allstate Claimant.

1293. Because Mushyakov, Khaim, Gulkarov, Israilov, Ajudua, and Chumaceiro were responsible for causing Rx For You's (a) producing and dispensing of Compounded Products in violation of applicable regulatory and licensing requirements, (b) dispensing, and billing Allstate for, Compounded Products and other drugs that were not medically necessary and were completely unjustified as a means of treating the Allstate Claimants' purported injuries, (c) falsely charging

for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (d) charging Allstate for Compounded Products and other drugs at grossly excessive rates, and (e) maintaining unlawful relationships with and inducing, through financial means or otherwise, prescribing providers, including Ajudua and Chumaceiro, to furnish prescriptions for medically unnecessary drugs and medications, including Compounded Products, that were to be filled exclusively by Rx For You, Rx For You was caused to falsely claim eligibility for No-Fault reimbursement each and every time that Rx For You sought No-Fault reimbursement from Allstate.

1294.   As alleged above, Mushyakov, Khaim, Gulkarov, Israilov, Ajudua, and Chumaceiro (or those persons working under their or their confederates' control) caused Rx For You to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to prescription drugs and other pharmacy services that were (a) unlawful, (b) fraudulently reported, (c) completely unnecessary, and (d) falsely charged.

1295.   Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

1296.   Many of the false, fraudulent, and unlawful acts, including, among other things, charging for services and products never actually provided, are not readily evident within the four corners of the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

1297.   Claims under New York's No-Fault laws can only be submitted, and reimbursed, for services that were provided in accord with all applicable New York state licensing requirements.

1298.  Thus, every time that Mushyakov, Khaim, Gulkarov, Israilov, Ajudua, and Chumaceiro (along with those individuals working under their control) caused Rx For You to submit No-Fault reimbursement demands to Allstate, Mushyakov, Khaim, Gulkarov, Israilov, Ajudua, and Chumaceiro (and those individuals working under their control) necessarily certified that Rx For You was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1299.  The full extent of Mushyakov, Khaim, Gulkarov, Israilov, Ajudua, and Chumaceiro's fraudulent and unlawful acts relative to their participation in the Rx For You enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

### C.   SUTTER PHARMACY ENTERPRISE

1300.  At all relevant times during the operation of the Sutter Pharmacy enterprise, Khaim, Gulkarov, Israilov, Ajudua and, Chumaceiro purposely caused Sutter Pharmacy to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws as a means to induce Allstate to promptly pay charges related to prescription drugs and other pharmacy services purportedly provided to Allstate Claimants who were caused to be customers of Sutter Pharmacy.

1301.  At all relevant times, Khaim, Gulkarov, Israilov, Ajudua, and Chumaceiro directly participated in the operation and management of Sutter Pharmacy.

1302.  During the relevant period, Khaim, Gulkarov, and Israilov induced Ajudua and Chumaceiro (or those individuals working under their control) and other medical providers to furnish prescriptions for medically unnecessary drugs and medications, including Compounded Products, to be dispensed and charged for by Sutter Pharmacy.

1303.   Khaim, Gulkarov, Israilov, Ajudua, and Chumaceiro (along with those individuals working under their control) purposely concealed the lack of medical necessity for the prescriptions for drugs and medications, including Compounded Products, to be dispensed and charged by Sutter Pharmacy.

1304.   Ajudua and Chumaceiro (or those working under their direction and control), through Hillcrest, Starrett, and Smart Choice, additionally created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of certain drugs and medications, including Compounded Products, that were prescribed by Ajudua and Chumaceiro, and purportedly dispensed and delivered by Sutter Pharmacy, to an Allstate Claimant.

1305.   Because Khaim, Gulkarov, Israilov, Ajudua, and Chumaceiro were responsible for causing Sutter Pharmacy's (a) producing and dispensing of Compounded Products in violation of applicable regulatory and licensing requirements, (b) dispensing, and billing Allstate for, Compounded Products and other drugs that were not medically necessary and were completely unjustified as a means of treating the Allstate Claimants' purported injuries, (c) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (d) charging Allstate for Compounded Products and other drugs at grossly excessive rates, and (e) maintaining unlawful relationships with and inducing, through financial means or otherwise, prescribing providers, including Ajudua and Chumaceiro, to furnish prescriptions for medically unnecessary drugs and medications, including Compounded Products, that were to be filled exclusively by Sutter Pharmacy, Sutter Pharmacy was caused to falsely claim eligibility for No-Fault reimbursement each and every time that Sutter Pharmacy sought No-Fault reimbursement from Allstate.

1306.   As alleged above, Khaim, Gulkarov, Israilov, Ajudua, and Chumaceiro (or those persons working under their or their confederates' control) caused Sutter Pharmacy to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to prescription drugs and other pharmacy services that were (a) unlawful, (b) fraudulently reported, (c) completely unnecessary, and (d) falsely charged.

1307.   Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

1308.   Many of the false, fraudulent, and unlawful acts, including, among other things, charging for services and products never actually provided, are not readily evident within the four corners of the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

1309.   Claims under New York's No-Fault laws can only be submitted, and reimbursed, for services that were provided in accord with all applicable New York state licensing requirements.

1310.   Thus, every time that Sutter Pharmacy (along with those individuals working under their control) caused Sutter Pharmacy to submit No-Fault reimbursement demands to Allstate, Khaim, Gulkarov, and Israilov (and those individuals working under their control) necessarily certified that Sutter Pharmacy was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1311.   The full extent of Khaim, Gulkarov, Israilov, Ajudua, and Chumaceiro's fraudulent and unlawful acts relative to their participation in the Sutter Pharmacy enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

### D.   EXCELLENT CHOICE PHARMACY ENTERPRISE

1312.   At all relevant times during the operation of the Excellent Choice enterprise, Khaim, Khaimov, Gulkarov, Ajudua, and Chumaceiro purposely caused Excellent Choice to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws as a means to induce Allstate to promptly pay charges related to prescription drugs and other pharmacy services purportedly provided to Allstate Claimants who were caused to be customers of Excellent Choice.

1313.   At all relevant times, Khaim, Khaimov, Gulkarov, Ajudua, and Chumaceiro directly participated in the operation and management of Excellent Choice.

1314.   During the relevant period, Khaim, Khaimov, and Gulkarov induced Ajudua and Chumaceiro (or those individuals working under their control) and other medical providers to furnish prescriptions for medically unnecessary drugs and medications, including Compounded Products, to be dispensed and charged for by Excellent Choice.

1315.   Khaim, Khaimov, Gulkarov, Ajudua, and Chumaceiro (along with those individuals working under their control) purposely concealed the lack of medical necessity for the prescriptions for drugs and medications, including Compounded Products, to be dispensed and charged by Excellent Choice.

1316.   Ajudua and Chumaceiro (or those working under their direction and control), through Hillcrest, Starrett and Smart Choice, additionally created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of certain drugs and medications, including Compounded Products, that were prescribed by Ajudua and Chumaceiro, and purportedly dispensed and delivered by Excellent Choice, to an Allstate Claimant.

1317.   Because Khaim, Khaimov, Gulkarov, Ajudua, and Chumaceiro were responsible for causing Excellent Choice's (a) producing and dispensing of Compounded Products in violation of applicable regulatory and licensing requirements, (b) dispensing, and billing Allstate for, Compounded Products and other drugs that were not medically necessary and were completely unjustified as a means of treating the Allstate Claimants' purported injuries, (c) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (d) charging Allstate for Compounded Products and other drugs at grossly excessive rates, and (e) maintaining unlawful relationships with and inducing, through financial means or otherwise, prescribing providers, including Ajudua and Chumaceiro, to furnish prescriptions for medically unnecessary drugs and medications, including Compounded Products, that were to be filled exclusively by Excellent Choice, Excellent Choice was caused to falsely claim eligibility for No-Fault reimbursement each and every time that Excellent Choice sought No-Fault reimbursement from Allstate.

1318.   As alleged above, Khaim, Khaimov, Gulkarov, Ajudua, and Chumaceiro (or those persons working under their or their confederates' control) caused Excellent Choice to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to prescription drugs and other pharmacy services that were (a) unlawful, (b) fraudulently reported, (c) completely unnecessary, and (d) falsely charged.

1319.   Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

1320.   Many of the false, fraudulent, and unlawful acts, including, among other things, charging for services and products never actually provided, are not readily evident within the four corners of the documents submitted to Allstate by these Defendants and upon which Allstate relied

in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

1321.   Claims under New York's No-Fault laws can only be submitted, and reimbursed, for services that were provided in accord with all applicable New York state licensing requirements.

1322.   Thus, every time that A. Khaimov (along with those individuals working under his control) caused Excellent Choice to submit No-Fault reimbursement demands to Allstate, Khaim, Khaimov, and Gulkarov (and those individuals working under his control) necessarily certified that Excellent Choice was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1323.   The full extent of Khaim, Khaimov, Gulkarov, Ajudua, and Chumaceiro's fraudulent and unlawful acts relative to their participation in the Excellent Choice enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

## VIII.  ALLSTATE'S JUSTIFIABLE RELIANCE

1324.   Each claim submitted to Allstate by (or on behalf of) Hollis, Hillcrest, Starrett, Smart Choice, Rx For You, Sutter Pharmacy, and Excellent Choice was verified pursuant to Insurance Law § 403.

1325.   At all relevant times, Ajudua and Chumaceiro, as duly licensed physicians, were legally and ethically obligated to act honestly and with integrity, and were also legally and ethically obligated to act in accordance with each and every other aspect of their oath as a licensed medical professional.

1326.   To induce Allstate to promptly pay Hollis, Hillcrest, Starrett, Smart Choice, Rx For You, Sutter Pharmacy, and Excellent Choice's patient invoices, the Defendants submitted (or

caused to be submitted) to Allstate NF-3 forms or CMS-1500 forms certifying that Hollis, Hillcrest, Starrett, Smart Choice, Rx For You, Sutter Pharmacy, and Excellent Choice were eligible to be reimbursed under New York's No-Fault laws.

1327. Further, to induce Allstate to promptly pay the fraudulent charges for medical services and prescription drug and other pharmacy services purportedly provided to Allstate Claimants, the Defendants hired attorneys and law firms to pursue collection of the fraudulent and/or non-compensable charges from Allstate. These attorneys and law firms routinely file time-consuming and expensive lawsuits and arbitration matters against Allstate in the event that Hollis, Hillcrest, Starrett, Smart Choice, Rx For You, Sutter Pharmacy, and Excellent Choice's charges are not promptly paid in full.

1328. Allstate is under statutory and contractual obligations to promptly and fairly process claims within thirty (30) days. The facially valid documents submitted to Allstate by (or on behalf of) Hollis, Hillcrest, Starrett, Smart Choice, Rx For You, Sutter Pharmacy, and Excellent Choice in support of the fraudulent and/or non-compensable charges at issue, combined with the material misrepresentations described above, were designed to, and did, cause Allstate to justifiably rely on them.

1329. At all relevant times, as alleged above, the Defendants concealed from Allstate the truth regarding Hollis, Hillcrest, Starrett, Smart Choice, Rx For You, Sutter Pharmacy, and Excellent Choice's reimbursement eligibility under New York law.

1330. In reasonable reliance on these misrepresentations, Allstate paid money to Hollis, Hillcrest, Starrett, Smart Choice, Rx For You, Sutter Pharmacy, and Excellent Choice to its detriment.

1331. Allstate would not have paid these monies had the Defendants provided true and accurate information about Hollis, Hillcrest, Starrett, Smart Choice, Rx For You, Sutter Pharmacy, and Excellent Choice's reimbursement eligibility under New York law, including (a) Hollis, Hillcrest, Starrett, Smart Choice, Rx For You, Sutter Pharmacy, and Excellent Choice's No-Fault reimbursement eligibility under N.Y. Insurance Law § 5101, *et seq.*, and (b) the fact and necessity of the services purportedly provided to those Allstate Claimants and patients of Hollis, Hillcrest, Starrett, Smart Choice, Rx For You, Sutter Pharmacy, and Excellent Choice eligible for insurance coverage under an automobile insurance policy issued by Allstate.

1332. As a result, Allstate was caused make No-Fault benefit payments totaling over $864,396.00 to Hollis, Hillcrest, Starrett, Smart Choice, Rx For You, Sutter Pharmacy, and Excellent Choice in reasonable reliance on Hollis, Hillcrest, Starrett, Smart Choice, Rx For You, Sutter Pharmacy, and Excellent Choice's false No-Fault claim reimbursement documentation, and their false representations regarding Hollis, Hillcrest, Starrett, Smart Choice, Rx For You, Sutter Pharmacy, and Excellent Choice's eligibility for reimbursement under New York's No-Fault laws.

1333. The Defendants' pattern of fraudulent and unlawful conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law. Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation (whereas Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, compensatory damages for:

a. Payments made to Hollis Novel Comprehensive Medical, P.C. in connection with No-Fault benefit claims totaling over $187,252.00, the exact amount to be determined at trial. The chart annexed at Exhibit 19, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Hollis in connection with No-Fault benefit claims determined to be fraudulent and not compensable as of the filing of this Complaint.

b. Payments made to Starrett City Medical, P.C. in connection with No-Fault benefit claims totaling over $81,687.00, the exact amount to be determined at trial. The chart annexed at

Exhibit 20, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Starrett in connection with No-Fault benefit claims determined to be fraudulent and not compensable as of the filing of this Complaint.

c.  Payments made to Hillcrest Medical Care, P.C. in connection with No-Fault benefit claims totaling over $117,375.00, the exact amount to be determined at trial.  The chart annexed at Exhibit 21, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Hillcrest in connection with No-Fault benefit claims determined to be fraudulent and not compensable as of the filing of this Complaint.

d.  Payments made to Smart Choice Medical, P.C. in connection with No-Fault benefit claims totaling over $183,355.00, the exact amount to be determined at trial.  The chart annexed at Exhibit 22, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Smart Choice in connection with No-Fault benefit claims determined to be fraudulent and not compensable as of the filing of this Complaint.

e.  Payments made to Rx For You Corp. in connection with No-Fault benefit claims totaling over $156,790.00, the exact amount to be determined at trial.  The chart annexed at Exhibit 23, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Rx For You in connection with No-Fault benefit claims determined to be fraudulent and not compensable as of the filing of this Complaint.

f.  Payments made to Sutter Pharmacy Inc. d/b/a Rx For You in connection with No-Fault benefit claims totaling over $121,070.00, the exact amount to be determined at trial.  The chart annexed at Exhibit 24, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Sutter Pharmacy in connection with No-Fault benefit claims determined to be fraudulent and not compensable as of the filing of this Complaint.

g.  Payments made to Excellent Choice Pharmacy, Inc. in connection with No-Fault benefit claims totaling over $16,864.00, the exact amount to be determined at trial.  The chart annexed at Exhibit 25, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Excellent Choice in connection with No-Fault benefit claims determined to be fraudulent and not compensable as of the filing of this Complaint.

## IX.   CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### HOLLIS NOVEL COMPREHENSIVE MEDICAL, P.C. ENTERPRISE
### (Against Azu Ajudua, M.D., Peter Khaim, Aleksandr Gulkarov, Roman Israilov, A&P Holding Group Inc., Anturio Marketing Inc., P&K Marketing Services Inc., K&L Consultants Inc., LL Consulting Group Inc. d/b/a Billing For You, Keepers For You Corp., and All Network Marketing Corp.)

1334.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1333 as if set forth fully herein.

1335.   In furtherance of their operation and management of Hollis Novel Comprehensive Medical, P.C. ("Hollis"), Defendants Azu Ajudua, M.D., Peter Khaim, Aleksandr Gulkarov, Roman Israilov, A&P Holding Group, Inc., Anturio Marketing Inc., P&K Marketing Services Inc., K&L Consultants Inc., LL Consulting Group Inc. d/b/a Billing For You, Keepers For You Corp., and All Network Marketing Corp. (collectively, "Count I Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false medical documentation in connection with Allstate insurance claims, in furtherance of their scheme to defraud.

1336.   The Count I Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 10.

1337.   Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1338.   Policies of insurance were delivered to insurers through the U.S. Mail.

1339.   Payments made by Allstate to Hollis Novel Comprehensive Medical, P.C. were delivered through the U.S. Mail.

1340.   As documented above, the Count I Defendants repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms and other claim-related documentation to Allstate related to expenses and/or services that were purportedly performed at Hollis for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1341.   As a result of, and in reasonable reliance upon, the mailing and/or submission of these misleading documents and materially false representations, Allstate, by its agents and

employees, issued drafts to Hollis, for the benefit of one or more of the Count I Defendants, that would not otherwise have been paid.

1342.   The Count I Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a long period of time, thus enabling the Count I Defendants to continue without being detected.

1343.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1344.   By creating and then mailing to Allstate (or directing the creation and subsequent mailing to Allstate) of numerous fraudulent documents and other claim-related materials in an ongoing scheme and the Count I Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1345.   The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Hollis for the benefit of the Count I Defendants.

1346.   Allstate is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1347.   Hollis constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

1348.   The Count I Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

1349.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3) injured in its business or property by reason of the Count I Defendants' conduct.

1350.   The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1351.   By virtue of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three (3) times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
## VIOLATIONS OF 18 U.S.C. § 1962(d)
## HOLLIS NOVEL COMPREHENSIVE MEDICAL, P.C. ENTERPRISE
### (Against Azu Ajudua, M.D., Peter Khaim, Aleksandr Gulkarov, Roman Israilov, A&P Holding Group Inc., Anturio Marketing Inc., P&K Marketing Services Inc., K&L Consultants Inc., LL Consulting Group Inc. d/b/a Billing For You, Keepers For You Corp., and All Network Marketing Corp.)

1352.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1333 as if set forth fully herein.

1353.   Throughout their participation in the operation and management of Hollis Novel Comprehensive Medical, P.C. ("Hollis"), Defendants Azu Ajudua, M.D., Peter Khaim, Akeksandr Gulkarov, Roman Israilov, A&P Holding Group, Inc., Anturio Marketing Inc., P&K Marketing Services Inc., K&L Consultants Inc., LL Consulting Group Inc. d/b/a Billing For You, Keepers For You Corp., and All Network Marketing Corp. (collectively, "Count II Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

1354.   The Count II Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Hollis by means of a pattern of racketeering activity, including numerous instances of mail fraud as set forth in Exhibit 10, and through the

preparation and mailing of fraudulent documents and other claim-related documents, including NF-3 forms, to Allstate.

1355. The purpose of the conspiracy was to obtain No-Fault benefit payments from Allstate on behalf of Hollis, even though Hollis, as a result of the Count II Defendants' unlawful conduct, was not eligible to collect such No-Fault benefit payments.

1356. The purpose of the conspiracy was also to seek No-Fault benefit payments from Allstate on behalf of Hollis in connection with medical services that were falsely reported, not medically necessary, falsely charged, and in certain instances, never actually rendered.

1357. The Count II Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of and mailing of documents and other claim-related materials, including NF-3 forms, containing material misrepresentations and/or material omissions.

1358. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count II Defendants' unlawful conduct described herein.

1359. By virtue of this violation of 18 U.S.C. § 1962(d), the Count II Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Count II Defendants, three (3) times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
## VIOLATIONS OF 18 U.S.C. § 1962(c)
## STARRETT CITY MEDICAL, P.C. ENTERPRISE
### (Against Azu Ajudua, M.D., Peter Khaim, Aleksandr Gulkarov, Roman Israilov, A&P Holding Group Inc., K&L Consultants Inc., LL Consulting Group Inc. d/b/a Billing For You, Keepers For You Corp., and All Network Marketing Corp.)

1360.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1333 as if set forth fully herein.

1361.   In furtherance of their operation and management of Starrett City Medical P.C. ("Starrett"), Defendants Azu Ajudua, M.D., Peter Khaim, Aleksandr Gulkarov, Roman Israilov, A&P Holding Group, Inc., K&L Consultants Inc., LL Consulting Group Inc. d/b/a Billing For You, Keepers For You Corp., and All Network Marketing Corp. (collectively, "Count III Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false medical documentation in connection with Allstate insurance claims, in furtherance of their scheme to defraud.

1362.   The Count III Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 12.

1363.   Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1364.   Policies of insurance were delivered to insurers through the U.S. Mail.

1365.   Payments made by Allstate to Starrett City Medical, P.C. were delivered through the U.S. Mail.

1366.   As documented above, the Count III Defendants repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms and other claim-related documentation to

186

Allstate related to expenses and/or services that were purportedly performed at Starrett for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1367. As a result of, and in reasonable reliance upon, the mailing and/or submission of these misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to Starrett, for the benefit of one or more of the Count III Defendants, that would not otherwise have been paid.

1368. The Count III Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a long period of time, thus enabling the Count III Defendants to continue without being detected.

1369. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1370. By creating and then mailing to Allstate (or directing the creation and subsequent mailing to Allstate of) numerous fraudulent documents and other claim-related materials in an ongoing scheme, the Count III Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1371. The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Starrett for the benefit of the Count III Defendants.

1372. Allstate is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1373.   Starrett constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

1374.   The Count III Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

1375.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3) injured in its business or property by reason of the Count III Defendants' conduct.

1376.   The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1377.   By virtue of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three (3) times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### STARRETT CITY MEDICAL, P.C. ENTERPRISE
**(Against Azu Ajudua, M.D., Peter Khaim, Aleksandr Gulkarov, Roman Israilov, A&P Holding Group Inc., K&L Consultants Inc., LL Consulting Group Inc. d/b/a Billing For You, Keepers For You Corp., and All Network Marketing Corp.)**

1378.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1333 as if set forth fully herein.

1379.   Throughout their participation in the operation and management of Starrett City Medical, P.C. ("Starrett"), Defendants Azu Ajudua, M.D., Peter Khaim, Aleksandr Gulkarov, Roman Israilov, A&P Holding Group, Inc., K&L Consultants Inc., LL Consulting Group Inc. d/b/a

Billing For You, Keepers For You Corp., and All Network Marketing Corp. (collectively, "Count IV Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

1380. The Count IV Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Starrett by means of a pattern of racketeering activity, including numerous instances of mail fraud as set forth in Exhibit 12, and through the preparation and mailing of fraudulent documents and other claim-related documents, including NF-3 forms, to Allstate.

1381. The purpose of the conspiracy was to obtain No-Fault benefit payments from Allstate on behalf of Starrett, even though Starrett, as a result of the Count IV Defendants' unlawful conduct, was not eligible to collect such No-Fault benefit payments.

1382. The purpose of the conspiracy was also to seek No-Fault benefit payments from Allstate on behalf of Starrett in connection with medical services that were falsely reported, not medically necessary, falsely charged, and in certain instances, never actually rendered.

1383. The Count IV Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of and mailing of documents and other claim-related materials, including NF-3 forms, containing material misrepresentations and/or material omissions.

1384. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count IV Defendants' unlawful conduct described herein.

1385. By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Count IV Defendants three (3) times the damages sustained by reason of the claims submitted by the

defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT V
## VIOLATIONS OF 18 U.S.C. § 1962(c)
## HILLCREST MEDICAL CARE, P.C. ENTERPRISE
## (Against Azu Ajudua, M.D., Peter Khaim, Aleksandr Gulkarov, Roman Israilov,  LL Consulting Group Inc. d/b/a Billing For You, Keepers For You Corp., and All Network Marketing Corp.)

1386.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1333 as if set forth fully herein.

1387.   In furtherance of their operation and management of Hillcrest Medical Care, P.C. ("Hillcrest"), Defendants Azu Ajudua, M.D., Peter Khaim, Aleksandr Gulkarov, Roman Israilov, LL Consulting Group Inc. d/b/a Billing For You, Keepers For You Corp., and All Network Marketing Corp. (collectively, "Count V Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false medical documentation in connection with Allstate insurance claims, in furtherance of their scheme to defraud.

1388.   The Count V Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 11.

1389.   Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1390.   Policies of insurance were delivered to insurers through the U.S. Mail.

1391.   Payments made by Allstate to Hillcrest Medical Care, P.C. were delivered through the U.S. Mail.

1392.   As documented above, the Count V Defendants repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms and other claim-related documentation to Allstate related to expenses and/or services that were purportedly performed at Hillcrest for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1393.   As a result of, and in reasonable reliance upon, the mailing and/or submission of these misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to Hillcrest, for the benefit of one or more of the Count V Defendants, that would not otherwise have been paid.

1394.   The Count V Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a long period of time, thus enabling the Count V Defendants to continue without being detected.

1395.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1396.   By creating and then mailing to Allstate (or directing the creation and subsequent mailing to Allstate of) numerous fraudulent documents and other claim-related materials in an ongoing scheme, the Count V Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1397.   The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Hollis for the benefit of the Count V Defendants.

1398.   Allstate is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1399.   Hillcrest constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

1400.   The Count V Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

1401.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3) injured in its business or property by reason of the Count V Defendants' conduct.

1402.   The Count V Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1403.   By virtue of the Count V Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three (3) times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT VI
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### HILLCREST MEDICAL CARE, P.C. ENTERPRISE
### (Against Azu Ajudua, M.D., Peter Khaim, Aleksandr Gulkarov, Roman Israilov,  LL Consulting Group Inc. d/b/a Billing For You, Keepers For You Corp., and All Network Marketing Corp.)

1404.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1333 as if set forth fully herein.

1405.   Throughout their participation in the operation and management of Hillcrest Medical Care, P.C. ("Hillcrest"), Defendants Azu Ajudua, M.D., Peter Khaim, Alexsandr Gulkarov, Roman Israilov, LL Consulting Group Inc. d/b/a Billing For You, Keepers For You Corp., and All Network Marketing Corp. (collectively, "Count VI Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

1406.   The Count VI Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Hillcrest by means of a pattern of racketeering activity, including numerous instances of mail fraud as set forth in Exhibit 11, and through the preparation and mailing of fraudulent documents and other claim-related documents, including NF-3 forms, to Allstate.

1407.   The purpose of the conspiracy was to obtain No-Fault benefit payments from Allstate on behalf of Hillcrest, even though Hillcrest, as a result of the Count VI Defendants' unlawful conduct, was not eligible to collect such No-Fault benefit payments.

1408.   The purpose of the conspiracy was also to seek No-Fault benefit payments from Allstate on behalf of Hillcrest in connection with medical services that were falsely reported, not medically necessary, falsely charged, and in certain instances, never actually rendered.

1409.   The Count VI Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of and mailing of documents and other claim-related materials, including NF-3 forms, containing material misrepresentations and/or material omissions.

1410.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count VI Defendants' unlawful conduct described herein.

1411.  By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Count VI Defendants three (3) times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**SMART CHOICE MEDICAL, P.C. ENTERPRISE**
**(Against Rolando Jose Mendez Chumaceiro, M.D., Peter Khaim, Aleksandr Gulkarov, A&P Holding Group Inc., and LL Consulting Group Inc. d/b/a Billing For You)**

1412.  Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1333 as if set forth fully herein.

1413.  In furtherance of their operation and management of Smart Choice Medical, P.C. ("Smart Choice"), Defendants Azu Ajudua, M.D., Peter Khaim, Aleksandr Gulkarov, A&P Holding Group, Inc., and LL Consulting Group Inc. d/b/a Billing For You (collectively, "Count VII Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false medical documentation in connection with Allstate insurance claims, in furtherance of their scheme to defraud.

1414.  The Count VII Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 13.

1415.  Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1416.  Policies of insurance were delivered to insurers through the U.S. Mail.

1417.   Payments made by Allstate to Smart Choice were delivered through the U.S. Mail.

1418.   As documented above, the Count VII Defendants repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms and other claim-related documentation to Allstate related to expenses and/or services that were purportedly performed at Smart Choice for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1419.   As a result of, and in reasonable reliance upon, the mailing and/or submission of these misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to Smart Choice, for the benefit of one or more of the Count VII Defendants, that would not otherwise have been paid.

1420.   The Count VII Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a long period of time, thus enabling the Count VII Defendants to continue without being detected.

1421.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1422.   By creating and then mailing to Allstate (or directing the creation and subsequent mailing to Allstate of) numerous fraudulent documents and other claim-related materials in an ongoing scheme, the Count VII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1423.   The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Smart Choice for the benefit of the Count VII Defendants.

1424.   Allstate is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1425.   Smart Choice constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

1426.   The Count VII Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

1427.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3) injured in its business or property by reason of the Count VII Defendants' conduct.

1428.   The Count VII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1429.   By virtue of the Count VII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three (3) times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>COUNT VIII</u>
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**SMART CHOICE MEDICAL, P.C. ENTERPRISE**
**(Against Rolando Jose Mendez Chumaceiro, M.D., Peter Khaim, Aleksandr Gulkarov,**
**A&P Holding Group Inc., and  LL Consulting Group Inc. d/b/a Billing For You)**

1430.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1333 as if set forth fully herein.

1431.   Throughout their participation in the operation and management of Smart Choice Medical, P.C. ("Smart Choice"), Defendants Rolando Jose Mendez Chumaceiro, M.D., Peter

Khaim, Aleksandr Gulkarov, A&P Holding Group, Inc., and LL Consulting Group Inc. d/b/a Billing For You (collectively, "Count VIII Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

1432.   The Count VIII Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Smart Choice by means of a pattern of racketeering activity, including numerous instances of mail fraud as set forth in Exhibit 13, and through the preparation and mailing of fraudulent documents and other claim-related documents, including NF-3 forms, to Allstate.

1433.   The purpose of the conspiracy was to obtain No-Fault benefit payments from Allstate on behalf of Smart Choice, even though Smart Choice, as a result of the Count VIII Defendants' unlawful conduct, was not eligible to collect such No-Fault benefit payments.

1434.   The purpose of the conspiracy was also to seek No-Fault benefit payments from Allstate on behalf of Smart Choice in connection with medical services that were falsely reported, not medically necessary, falsely charged, and in certain instances, never actually rendered.

1435.   The Count VIII Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of and mailing of documents and other claim-related materials, including NF-3 forms, containing material misrepresentations and/or material omissions.

1436.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count VIII Defendants' unlawful conduct described herein.

1437.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Count

VIII Defendants, three (3) times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT IX
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### RX FOR YOU CORP. ENTERPRISE
**(Against Vyacheslav Mushyakov, Peter Khaim, Azu Ajudua, M.D., Rolando Jose Mendez Chumaceiro, M.D., Hillcrest Medical Care, P.C., Starrett City Medical, P.C., and Smart Choice Medical, P.C.)**

1438.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1333 as if set forth fully herein.

1439.   In furtherance of their operation and management of Rx For You Corp. ("Rx For You"), Defendants Vyacheslav Mushyakov, Peter Khaim, Azu Ajudua, M.D., Rolando Jose Mendez Chumaceiro, M.D., Hillcrest Medical Care, P.C., Starrett City Medical, P.C., and Smart Choice Medical, P.C. (collectively, "Count IX Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false No-Fault claim reimbursement documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

1440.   The Count IX Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 14.

1441.   Among other things, NF-3 forms, documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, other No-Fault claim reimbursement documents, letters, and/or requests for payment were routinely delivered to Allstate through the U.S. Mail.

1442.   Policies of insurance were delivered to two (2) or more Allstate Claimants through the U.S. Mail.

1443.   Payments made by Allstate to Rx For You were delivered through the U.S. Mail.

1444.   As documented above, the Count IX Defendants repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms and other claim-related documentation to Allstate related to Compounded Products and other drugs dispensed and delivered by Rx For You for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1445.   As a result of, and in reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to Rx For You, for the benefit of one or more of the Count IX Defendants, that would not otherwise have been paid.

1446.   The Count IX Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count IX Defendants to continue perpetrating this scheme without being detected.

1447.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1448.   The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Rx For You for the benefit of the Count IX Defendants.

1449.   Allstate is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1450. Rx For You constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

1451. The Count IX Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

1452. Allstate is a "person" as defined by 18 U.S.C. § 1961(3) injured in its business or property by reason of the Count IX Defendants' conduct.

1453. The Count IX Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1454. By virtue of the Count IX Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three (3) times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT X
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### RX FOR YOU CORP. ENTERPRISE
**(Against Vyacheslav Mushyakov, Peter Khaim, Azu Ajudua, M.D., Rolando Jose Mendez Chumaceiro, M.D., Hillcrest Medical Care, P.C., Starrett City Medical, P.C., and Smart Choice Medical, P.C.)**

1455. Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 1333 as if fully set forth herein.

1456. Through their participation in the operation and management of Rx For You Corp. ("Rx For You"), Defendants Vycheslav Mushyakov, Peter Khaim, Azu Ajudua, M.D., Rolando Jose Mendez Chumaceiro, M.D., Hillcrest Medical Care, P.C., Starrett City Medical, P.C., and Smart Choice Medical, P.C. (collectively, the "Count X Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

1457.   The Count X Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Rx For You by means of a pattern of racketeering activity, including numerous acts of mail fraud as set forth in Exhibit 14, and through the preparation and/or submission of fraudulent insurance claim documents, including NF-3 forms, to Allstate.

1458.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Rx For You, even though Rx For You, as a result of the Count X Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

1459.   The Count X Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

1460.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

1461.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count X Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three (3) times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XI
## VIOLATIONS OF 18 U.S.C. § 1962(c)
## SUTTER PHARMACY INC. d/b/a RX FOR YOU ENTERPRISE
**(Against Peter Khaim, Aleksandr Gulkarov, Azu Ajudua, M.D., Rolando Jose Mendez Chumaceiro, M.D., Hillcrest Medical Care, P.C., Starrett City Medical, P.C., and Smart Choice Medical, P.C.)**

1462.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1333 as if set forth fully herein.

1463.   In furtherance of their operation and management of  Sutter Pharmacy, Inc. d/b/a Rx For You ("Sutter Pharmacy"), Defendants Peter Khaim, Aleksandr Gulkarov, Azu Ajudua, M.D., Rolando Jose Mendez Chumaceiro, M.D., Hillcrest Medical Care, P.C., Starrett City Medical, P.C., and Smart Choice Medical, P.C. (collectively, "Count XI Defendants"), intentionally prepared and mailed (or caused to be prepared and mailed) false No-Fault claim reimbursement documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

1464.   The Count XI Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 15.

1465.   Among other things, NF-3 forms, documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, peer-review rebuttals, other No-Fault claim reimbursement documents, letters, and/or requests for payment were routinely delivered to Allstate through the U.S. Mail.

1466.   Policies of insurance were delivered to two or more Allstate Claimants through the U.S. Mail.

1467.   Payments made by Allstate to Sutter Pharmacy were delivered through the U.S. Mail.

1468.   As documented above, the Count XI Defendants repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms and other claim-related documentation to Allstate related to Compounded Products and other drugs dispensed and delivered by Sutter Pharmacy for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1469.   As a result of, and in reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to Sutter Pharmacy, for the benefit of one or more of the Count XI Defendants, that would not otherwise have been paid.

1470.   The Count XI Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count XI Defendants to continue perpetrating this scheme without being detected.

1471.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1472.   The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Sutter Pharmacy for the benefit of the Count XI Defendants.

1473.   Allstate is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1474.   Sutter Pharmacy constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

1475.   The Count XI Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

1476.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3) injured in its business or property by reason of the Count XI Defendants' conduct.

1477.   The Count XI Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1478.   By virtue of the Count XI Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three (3) times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XII
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### SUTTER PHARMACY INC. d/b/a RX FOR YOU ENTERPRISE
**(Against Peter Khaim, Aleksandr Gulkarov, Azu Ajudua, M.D., Rolando Jose Mendez Chumaceiro, M.D., Hillcrest Medical Care, P.C., Starrett City Medical, P.C., and Smart Choice Medical, P.C.)**

1479.   Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 1333 as if fully set forth herein.

1480.   Through their participation in the operation and management of Sutter Pharmacy Inc. d/b/a Rx For You ("Sutter Pharmacy"), Defendants Peter Khaim, Aleksandr Gulkarov, Azu Ajudua, M.D., Rolando Joe Mendez Chumaceiro, M.D., Hillcrest Medical Care, P.C., and Smart Choice Medical, P.C. (collectively, the "Count XII Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

1481.   The Count XII Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Sutter Pharmacy by means of a pattern of

racketeering activity, including numerous acts of mail fraud as set forth in Exhibit15, and through the preparation and/or submission of fraudulent insurance claim documents, including NF-3 forms, to Allstate.

1482.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Sutter Pharmacy, even though Sutter Pharmacy, as a result of the Count XII Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

1483.   The Count XII Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

1484.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

1485.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count XII Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three (3) times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT XIII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### EXCELLENT CHOICE PHARMACY CORP. ENTERPRISE
**(Against Peter Khaim, Arkadiy Khaimov, Azu Ajudua, M.D., Rolando Jose Mendez Chumaceiro, M.D., Hillcrest Medical Care, P.C., Starrett City Medical, P.C., and Smart Choice Medical, P.C.)**

1486.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1333 as if set forth fully herein.

1487.   In furtherance of their operation and management of  Excellent Choice Pharmacy, Corp. ("Excellent Choice"), Defendants Peter Khaim, Arkadiy Khaimov, Azu Ajudua, M.D., Rolando Jose Mendez Chumaceiro, M.D., Hillcrest Medical Care, P.C., Starrett City Medical, P.C., and Smart Choice Medical, P.C. (collectively, "Count XIII Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false No-Fault claim reimbursement documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

1488.   The Count XIII Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 16.

1489.   Among other things, NF-3 forms, documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, peer-review rebuttals, other No-Fault claim reimbursement documents, letters, and/or requests for payment were routinely delivered to Allstate through the U.S. Mail.

1490.   Policies of insurance were delivered to two or more Allstate Claimants through the U.S. Mail.

1491.   Payments made by Allstate to Excellent Choice were delivered through the U.S. Mail.

1492.   As documented above, the Count XIII Defendants repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms and other claim-related documentation to Allstate related to Compounded Products and other drugs dispensed and delivered by Excellent Choice for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1493.   As a result of, and in reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to Excellent Choice, for the benefit of one or more of the Count XIII Defendants, that would not otherwise have been paid.

1494.   The Count XIII Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count XIII Defendants to continue perpetrating this scheme without being detected.

1495.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1496.   The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Excellent Choice for the benefit of the Count XIII Defendants.

1497.   Allstate is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1498.   Excellent Choice constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

1499.   The Count XIII Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

1500.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3) injured in its business or property by reason of the Count XIII Defendants' conduct.

1501.   The Count XIII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1502.   By virtue of the Count XIII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three (3) times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XIV**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**EXCELLENT CHOICE PHARMACY CORP. ENTERPRISE**
**(Against Peter Khaim, Arkadiy Khaimov, Azu Ajudua, M.D., Rolando Jose Mendez Chumaceiro, M.D., Hillcrest Medical Care, P.C., Starrett City Medical, P.C., and Smart Choice Medical, P.C.)**

1503.   Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 1333 as if fully set forth herein.

1504.   Through their participation in the operation and management of Excellent Choice Pharmacy Corp. ("Excellent Choice"), Defendants Peter Khaim, Arkadiy Khaimov, Azu Ajudua, M.D., Rolando Joe Mendez Chumaceiro, M.D., Hillcrest Medical Care, P.C., and Smart Choice Medical, P.C. (collectively, the "Count XIV Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

1505.   The Count XIV Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Excellent Choice by means of a pattern of racketeering activity, including numerous acts of mail fraud as set forth in Exhibit 16, and through the preparation and/or submission of fraudulent insurance claim documents, including NF-3 forms, to Allstate.

1506.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Excellent Choice, even though Excellent Choice, as a result of the Count XIV Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

1507.   The Count XIV Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

1508.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

1509.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count XIV Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three (3) times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XV
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### A&P HOLDING GROUP CORP. ENTERPRISE
**(Against Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Smart Choice Medical, P.C., Azu Ajudua, M.D., Rolando Jose Mendez Chumaceiro, M.D., Peter Khaim, Aleksandr Gulkarov, Roman Israilov, Vyacheslav Mushyakov, Arkadiy Khaimov, Rx For You Corp., Sutter Pharmacy Inc. d/b/a Rx For You, and Excellent Choice Pharmacy Corp.)**

1510.   Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 1333 as if fully set forth herein.

1511.   In furtherance of their operation and management of A&P Holding Group Corp. ("A&P Holding"), Defendants Hollis Novel Comprehensive Medical, P.C., Starrett City Medical,

P.C., Smart Choice Medical, P.C., Azu Ajudua, M.D., Rolando Jose Mendez Chumaceiro, M.D., Peter Khaim, Aleksandr Gulkarov, Roman Israilov, Vyacheslav Mushyakov, Arkadiy Khaimov, Rx For You Corp., Sutter Pharmacy Inc. d/b/a Rx For You, and Excellent Choice Pharmacy Corp. (collectively, "Count XV Defendants") used A&P Holding Group Corp. ("A&P Holding") to carry-out their scheme to defraud Allstate.

1512. The Count XV Defendants employed one or more mailings to demand and receive No-Fault benefit payments from Allstate on certain dates, including, but not limited to, those dates identified in the charts at Exhibits 17.

1513. The Count XV Defendants mailed the following documents to Allstate using the U.S. Mail: NF-3 forms, documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, peer-review rebuttals, and other No-Fault claim reimbursement documents.

1514. Policies of insurance were delivered to two or more Allstate Claimants through the U.S. Mail.

1515. Payments made by Allstate to Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Smart Choice Medical, P.C., Rx For You Corp., Sutter Pharmacy Inc. d/b/a Rx For You, and Excellent Choice Pharmacy Corp.—the proceeds of which were, in part, diverted to A&P Holding for the benefit of Peter Khaim—were delivered through the U.S. Mail.

1516. As documented above, the Count XV Defendants used A&P Holding to control and operate Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Smart Choice Medical, P.C., Rx For You Corp., Sutter Pharmacy Inc. d/b/a Rx For You, and Excellent Choice Pharmacy Corp. in violation of New York law.

1517.   The Count XV Defendants also used A&P Holding to enable the illegal siphoning of monies from Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., and Smart Choice Medical, P.C. by Peter Khaim.

1518.   When the Count XV Defendants mailed (or caused the mailing of) NF-3 forms and other claim-related documents to Allstate seeking No-Fault reimbursement, they materially misrepresented Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Smart Choice Medical, P.C., Rx For You Corp., Sutter Pharmacy Inc. d/b/a Rx For You, and Excellent Choice Pharmacy Corp.'s No-Fault reimbursement eligibility under New York law.

1519.   Allstate, by its agents and employees, made payments to Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Smart Choice Medical, P.C., Rx For You Corp., Sutter Pharmacy Inc. d/b/a Rx For You, and Excellent Choice Pharmacy Corp., for the benefit of one or more of the Count XV Defendants, as a direct and proximate result of, and in reasonable reliance upon, the misrepresentations and omissions of material fact made in the documents that they or their agents mailed to Allstate.

1520.   The Count XV Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count XV Defendants to continue perpetrating this scheme without being detected.

1521.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1522.   The Count XV Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1523.  The activities alleged in this case had the direct effect of causing No-Fault monies to be transferred from Allstate to Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Smart Choice Medical, P.C., Rx For You Corp., Sutter Pharmacy Inc. d/b/a Rx For You, and Excellent Choice Pharmacy Corp. for the benefit of one or more of the Count XV Defendants.

1524.  The unlawful activities alleged in this case also had the direct effect of causing these monies, including professional physician fees and profits, to be channeled to A&P Holding, and then transferred from A&P Holding to Peter Khaim for Peter Khaim's own personal use and unlawful financial gain.

1525.  Allstate is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1526.  A&P Holding constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

1527.  The Count XV Defendants associated with the A&P Holding enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

1528.  Allstate is a "person" as defined by 18 U.S.C. § 1961(3) injured in its business or property by reason of the Count XV Defendants' conduct.

1529.  The Count XV Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1530.  By virtue of the Count XV Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three (3) times the damages sustained by reason of the claims

submitted by them, and others acting in concert with them, on behalf of Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Smart Choice Medical, P.C., Rx For You Corp., Sutter Pharmacy Inc. d/b/a Rx For You, and Excellent Choice Pharmacy Corp., together with the costs of suit, including reasonable attorney's fees.

**COUNT XVI**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**A&P HOLDING GROUP CORP. ENTERPRISE**
**(Against Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Smart Choice Medical, P.C., Azu Ajudua, M.D., Rolando Jose Mendez Chumaceiro, M.D., Peter Khaim, Aleksandr Gulkarov, Roman Israilov, Vyacheslav Mushyakov, Arkadiy Khaimov, Rx For You Corp., Sutter Pharmacy Inc. d/b/a Rx For You, and Excellent Choice Pharmacy Corp.)**

1531. Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 1333 as if fully set forth herein.

1532. Through their participation in the operation and management of A&P Holding Group Corp. ("A&P Holding"), Defendants Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Smart Choice Medical, P.C., Azu Ajudua, M.D., Rolando Jose Mendez Chumaceiro, M.D., Peter Khaim, Aleksandr Gulkarov, Roman Israilov, Vyacheslav Mushyakov, Arkadiy Khaimov, Rx For You Corp., Sutter Pharmacy Inc. d/b/a Rx For You, and Excellent Choice Pharmacy Corp. (collectively, the "Count XVI Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

1533. The Count XVI Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of A&P Holding by means of a pattern of racketeering activity through Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Smart Choice Medical, P.C., Rx For You Corp., Sutter Pharmacy Inc. d/b/a Rx For You, and Excellent Choice Pharmacy Corp., including numerous instances of mail fraud as set forth in

Exhibits 17, which involved the preparation and mailing of fraudulent documents and other claim-related documents, including NF-3 forms, to Allstate.

1534.   The purpose of the conspiracy was to use A&P Holding to (a) control and operate Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Smart Choice Medical, P.C., Rx For You Corp., Sutter Pharmacy Inc. d/b/a Rx For You, and Excellent Choice Pharmacy Corp., and (b) collect No-Fault benefit payments from Allstate.

1535.   The purpose of the conspiracy was also to use A&P Holding to facilitate the illegal siphoning of monies from Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., and Smart Choice Medical, P.C. by Peter Khaim.

1536.   The Count XVI Defendants' use of A&P Holding enabled Khaim to control Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., and Smart Choice Medical, P.C., which was illegal under New York law.

1537.   The Count XVI Defendants' use of A&P Holding also allowed Khaim to share in the professional physician fees and profits collected by Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., and Smart Choice Medical, P.C., conduct which was also illegal under New York law.

1538.   The Count XVI Defendants were aware of these purposes, and agreed to take steps to meet the conspiracy's objectives.

1539.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments as a result of the Defendants' unlawful conduct described herein.

1540.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count XVI Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the

defendants identified three (3) times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XVII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**LL CONSULTING GROUP INC. d/b/a BILLING FOR YOU ENTERPRISE**
**(Against Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Hillcrest Medical Care, P.C., Smart Choice Medical, P.C., Azu Ajudua, M.D., Rolando Jose Mendez Chumaceiro, M.D., Peter Khaim, and Aleksandr Gulkarov)**

1541. Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 1333 as if fully set forth herein.

1542. In furtherance of their operation and management of LL Consulting Group Inc. d/b/a Billing For You ("Billing For You"), Defendants Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Hillcrest Medical Care, P.C., Smart Choice Medical, P.C., Azu Ajudua, M.D., Rolando Jose Mendez Chumaceiro, M.D., Peter Khaim, and Aleksandr Gulkarov (collectively, "Count XVII Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false No-Fault claim reimbursement documentation to Allstate in furtherance of this scheme to defraud.

1543. The Count XVII Defendants employed one or more mailings to demand and receive No-Fault benefit payments from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 18.

1544. The Count XVII Defendants mailed the following documents to Allstate using the U.S. Mail: NF-3 forms, documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, peer-review rebuttals, and other No-Fault claim reimbursement documents.

1545.   Policies of insurance were delivered to two or more Allstate Claimants through the U.S. Mail.

1546.   Payments made by Allstate to Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Hillcrest Medical Care, P.C., and Smart Choice Medical, P.C.—the proceeds of which were, in part, diverted to Billing For You for the benefit of Khaim and Gulkarov—were delivered through the U.S. Mail.

1547.   As documented above, the Count XVII Defendants used Billing For You to control and operate Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Hillcrest Medical Care, P.C., and Smart Choice Medical, P.C. in violation of New York law.

1548.   The Count XVII Defendants also used Billing For You to enable the illegal siphoning of monies from Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Hillcrest Medical Care, P.C., and Smart Choice Medical, P.C. by Khaim and Gulkarov.

1549.   When the Count XVII Defendants mailed (or caused the mailing of) NF-3 forms and other claim-related documents to Allstate seeking No-Fault reimbursement, they materially misrepresented Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Hillcrest Medical Care, P.C., and Smart Choice Medical, P.C.'s No-Fault reimbursement eligibility under New York law.

1550.   Allstate, by its agents and employees, made payments to Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Hillcrest Medical Care, P.C., and Smart Choice Medical, P.C., for the benefit of one or more of the Count XVII Defendants, as a direct and proximate result of, and in reasonable reliance upon, the misrepresentations and omissions of material fact made in the documents that they or their agents mailed to Allstate.

1551.   The Count XVII Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count XVII Defendants to continue perpetrating this scheme without being detected.

1552.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1553.   The Count XVII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c)

1554.   The activities alleged in this case had the direct effect of causing No-Fault monies to be transferred from Allstate to Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Hillcrest Medical Care, P.C., and Smart Choice Medical, P.C. for the benefit of one or more of the Count XVII Defendants.

1555.   The unlawful activities alleged in this case also had the direct effect of causing these monies, including professional physician fees and profits, to be channeled to Billing For You and then trasnffered to Khaim and Gulkarov for their own personal use and financial gain.

1556.   Allstate is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1557.   Billing For You constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

1558.   The Count XVII Defendants associated with the Billing For You enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

1559.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3) injured in its business or property by reason of the Count XVII Defendants' conduct.

1560.   The Count XVII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1561.   By virtue of the Count XVII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three (3) times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, on behalf of Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Hillcrest Medical Care, P.C., and Smart Choice Medical, P.C., together with the costs of suit, including reasonable attorney's fees.

## COUNT XVIII
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### LL CONSULTING GROUP INC. d/b/a BILLING FOR YOU ENTERPRISE
**(Against Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Hillcrest Medical Care, P.C., Smart Choice Medical, P.C., Azu Ajudua, M.D., Rolando Jose Mendez Chumaceiro, M.D., Peter Khaim, and Aleksandr Gulkarov)**

1562.   Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 1333 as if fully set forth herein.

1563.   Through their participation in the operation and management of LL Consulting Group Inc. d/b/a Billing For You ("Billing For You"), Defendants Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Hillcrest Medical Care, P.C., Smart Choice Medical, P.C., Azu Ajudua, M.D., Rolando Jose Mendez Chumaceiro, M.D., Peter Khaim, and Aleksandr

Gulkarov (collectively, the "Count XVIII Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

1564.   The Count XVIII Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Billing For You by means of a pattern of racketeering activity through Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Hillcrest Medical Care, P.C., and Smart Choice Medical, P.C., including numerous instances of mail fraud as set forth in Exhibit 18, which involved the preparation and mailing of fraudulent documents and other claim-related documents, including NF-3 forms, to Allstate.

1565.   The purpose of the conspiracy was to use Billing For You to (a) control and operate Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Hillcrest Medical Care, P.C., and Smart Choice Medical, P.C., and (b) collect No-Fault benefit payments from Allstate.

1566.   The purpose of the conspiracy was also to use Billing For You to facilitate the illegal siphoning of monies from Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Hillcrest Medical Care, P.C., and Smart Choice Medical, P.C. by Khaim and Gulkarov.

1567.   The Count XVIII Defendants' use of Billing For You enabled Khaim and Gulkarov to control Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Hillcrest Medical Care, P.C., and Smart Choice Medical, P.C., which was illegal under New York law

1568.   The Count XVIII Defendants' use of Billing For You also allowed Khaim and Gulkarov to share in the professional physician fees and profits collected by Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Hillcrest Medical Care, P.C., and Smart Choice Medical, P.C., conduct which wasalso illegal under New York law.

1569.   The Count XVIII Defendants were aware of these purposes, and agreed to take steps to meet the conspiracy's objectives.

1570.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments as a result of the Defendants' unlawful conduct described herein.

1571.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count XVIII Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified three (3) times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIX
## COMMON LAW FRAUD
### (Against All Defendants)

1572.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1333 as if set forth fully herein.

1573.   The Defendants intentionally and knowingly made false and fraudulent statements of material fact to Allstate, and also concealed material facts from Allstate during the course of this scheme and in the course of their submission of bills seeking payment for medical services under New York's No-Fault laws.

1574.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (a) in every claim, the representation that Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Hillcrest Medical Care, P.C., and Smart Choice Medical, P.C. were properly licensed and therefore eligible to seek and collect No-Fault benefit payments under Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12) even though they

were unlawfully owned and controlled by non-physicians; and (b) in every claim, the representation that Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Hillcrest Medical Care, P.C., and Smart Choice Medical, P.C. were eligible to seek and collect No-Fault benefit payments directly from Allstate under Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12) for the tests and treatments purportedly provided to Allstate Claimants when, in fact, Hollis was not eligible to seek or collect No-Fault benefit payments for these services because they were (i) not medically necessary, (ii) provided pursuant to a pre-determined protocol, (iii) not rendered as represented (if rendered at all), (iv) intentionally inflated or misrepresented to justify the continuation of medical treatment, and (v) purposely designed to financially enrich the non-physicians at the expense of patient care.

1575. The Defendants also intentionally and knowingly made false and fraudulent statements of material fact to Allstate, and also concealed material facts from Allstate during the course of this scheme and in the course of their submission of bills seeking payment for pharmacy services under New York's No-Fault laws.

1576. The false and fraudulent statements of material fact and acts of fraudulent concealment include representations made in every claim that Rx For You Corp., Sutter Pharmacy Inc. d/b/a Rx For You, and Excellent Choice Pharmacy Corp. were eligible to seek and collect No-Fault benefit payments directly from Allstate under Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12) for the Compounded Products and other medications purportedly dispensed to Allstate Claimants when, in fact, they were not eligible to seek or collect No-Fault benefit payments for these medications because they were (a) not medically necessary, (b) prescribed according to financial relationships between the Pharmacy Defendants and the prescribing providers, (c) repeatedly dispensed in excessive amounts that were harmful to patients,

(d) charged at inflated amounts and not billed in accordance with the fee schedule, (e) never specifically formulated for individual patients, and (f) mass produced and dispensed in violation of applicable regulatory and licensing requirements.

1577. The Defendants intentionally made the above-described false and fraudulent statements, and purposely concealed material facts for the purpose of inducing Allstate to pay charges submitted by (or on behalf of) Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Hillcrest Medical Care, P.C., Smart Choice Medical, P.C., Rx For You Corp., Sutter Pharmacy Inc. d/b/a Rx For You, and Excellent Choice Pharmacy Corp. that were not compensable under New York's No-Fault laws.

1578. Allstate reasonably relied, to its detriment, upon the Defendants' material misrepresentations concerning Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Hillcrest Medical Care, P.C., Smart Choice Medical, P.C., Rx For You Corp., Sutter Pharmacy Inc. d/b/a Rx For You, and Excellent Choice Pharmacy Corp.'s eligibility to receive No-Fault reimbursement when making payments on claims submitted by them or their agents.

1579. Allstate has been injured in its business and property by reason of the above-described conduct because Allstate has made No-Fault benefit payments totaling over $864,396.00 in connection with fraudulent bills submitted by the Defendants through Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Hillcrest Medical Care, P.C., Smart Choice Medical, P.C., Rx For You Corp., Sutter Pharmacy Inc. d/b/a Rx For You, and Excellent Choice Pharmacy Corp.

## COUNT XX
## UNJUST ENRICHMENT
### (Against All Defendants)

1580.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1333 as if set forth fully herein.

1581.   As detailed above, the Defendants have engaged in improper, unlawful, and unjust acts, all to the harm and detriment of Allstate.

1582.   The Defendants have been enriched at Allstate's expense through their receipt of payments made by Allstate in connection with No-Fault benefit claims submitted by (or on behalf of) Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Hillcrest Medical Care, P.C., Smart Choice Medical, P.C., Rx For You Corp., Sutter Pharmacy Inc. d/b/a Rx For You, and Excellent Choice Pharmacy Corp.

1583.   The payments received by the Defendants constituted a benefit that they voluntarily and willingly accepted despite their commission of improper, unlawful, and unjust acts in furtherance of this scheme.

1584.   The Defendants' retention of Allstate's payment violates fundamental principles of justice, equity, and good conscience.

1585.   By reason of the improper, unlawful, and unjust conduct described throughout this Complaint, the Defendants have been unjustly enriched in an amount totaling over $864,393.00, the exact amount to be determined at trial, which constitute No-Fault benefit payments that Allstate was wrongfully induced to make to Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Hillcrest Medical Care, P.C., Smart Choice Medical, P.C., Rx For You Corp., Sutter Pharmacy Inc. d/b/a Rx For You, and Excellent Choice Pharmacy Corp.

**COUNT XXI**
**DECLARATORY JUDGMENT, 28 U.S.C. §§ 2201 and 2202**
**(Against Hollis Novel Comprehensive Medical, P.C.)**

1586.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1 through 1333 as if set forth fully herein.

1587.   To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide professional medical services in New York.

1588.   In view of its (a) illegal corporate structure, (b) unlawful control by one or more non-physician (i.e., Peter Khaim, Aleksandr Gulkarov, and Roman Israilov), (c) unlawful sharing of professional physician fees with one or more non-physician, and (d) billing for medically unnecessary tests and treatments, Hollis Novel Comprehensive Medical, P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional healthcare services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to seek or collect any No-Fault benefit payments from Allstate, including, but not limited to, No-Fault benefits that were assigned to Hollis Novel Comprehensive Medical, P.C. by its patients.

1589.   Hollis Novel Comprehensive Medical, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1590.   Hollis Novel Comprehensive Medical, P.C. continues to challenge Allstate's prior claim denials.

1591.   Hollis Novel Comprehensive Medical, P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1592.   A justifiable controversy exists between Allstate and Hollis Novel Comprehensive Medical, P.C. because Hollis Novel Comprehensive Medical, P.C. rejects Allstate's ability to deny such claims.

1593.   Allstate has no adequate remedy at law.

1594.   Hollis Novel Comprehensive Medical, P.C. will also continue to demand No-Fault benefit payments from Allstate absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Hollis Novel Comprehensive Medical, P.C.

1595.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Hollis Novel Comprehensive Medical, P.C., at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and controlled by one or more non-physician, (c) engaged in the unlawful sharing of fees derived from the provision of professional physician services, and (d) billed for medically unnecessary treatments and tests, and thus has no standing to submit or receive assigned No-Fault benefits.

## COUNT XXII
### DECLARATORY JUDGMENT, 28 U.S.C. §§ 2201 and 2202
### (Against Starrett City Medical, P.C.)

1596.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1 through 1333 as if set forth fully herein.

1597.   To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide professional medical services in New York.

1598.   In view of its (a) illegal corporate structure, (b) unlawful control by one or more non-physician (i.e., Peter Khaim, Aleksandr Gulkarov, and Roman Israilov), (c) unlawful sharing of professional physician fees with one or more non-physician, and (d) billing for medically unnecessary tests and treatments, Starrett City Medical, P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional healthcare services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to seek or collect any No-Fault benefit payments from Allstate, including, but not limited to, No-Fault benefits that were assigned to Starrett City Medical, P.C. by its patients.

1599.   Starrett City Medical, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1600.   Starrett City Medical, P.C. continues to challenge Allstate's prior claim denials.

1601.   Starrett City Medical, P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1602.   A justifiable controversy exists between Allstate and Starrett City Medical, P.C. because Starrett City Medical, P.C. rejects Allstate's ability to deny such claims.

1603.   Allstate has no adequate remedy at law.

1604.   Starrett City Medical, P.C. will also continue to demand No-Fault benefit payments from Allstate absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Starrett City Medical, P.C.

1605.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Starrett City Medical, P.C., at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and controlled by one or more non-physician, (c) engaged in the unlawful sharing of fees derived from the provision of professional physician services, and (d) billed for medically unnecessary treatments and tests, and thus has no standing to submit or receive assigned No-Fault benefits.

## COUNT XXIII
## DECLARATORY JUDGMENT, 28 U.S.C. §§ 2201 and 2202
### (Against Hillcrest Medical Care, P.C.)

1606.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1 through 1333 as if set forth fully herein.

1607.   To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide professional medical services in New York.

1608.   In view of its (a) illegal corporate structure, (b) unlawful control by one or more non-physician (i.e., Peter Khaim, Aleksandr Gulkarov, and Roman Israilov), (c) unlawful sharing of professional physician fees with one or more non-physician, and (d) billing for medically unnecessary tests and treatments, Hillcrest Medical Care, P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional healthcare services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to seek or collect any No-Fault benefit payments from Allstate, including, but not limited to, No-Fault benefits that were assigned to Hillcrest Medical Care, P.C. by its patients.

1609.   Hillcrest Medical Care, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1610.   Hillcrest Medical Care, P.C. continues to challenge Allstate's prior claim denials.

1611.   Hillcrest Medical Care, P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1612.   A justifiable controversy exists between Allstate and Hillcrest Medical Care, P.C. because Hillcrest Medical Care, P.C. rejects Allstate's ability to deny such claims.

1613.   Allstate has no adequate remedy at law.

1614.   Hillcrest Medical Care, P.C. will also continue to demand No-Fault benefit payments from Allstate absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Hillcrest Medical Care, P.C.

1615.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Hillcrest Medical Care, P.C., at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and controlled by one or more non-physician, (c) engaged in the unlawful sharing of fees derived from the provision of professional physician services, and (d) billed for medically unnecessary treatments and tests, and thus has no standing to submit or receive assigned No-Fault benefits.

### COUNT XXIV

### DECLARATORY JUDGMENT, 28 U.S.C. §§ 2201 and 2202
(Against Smart Choice Medical, P.C.)

1616.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1 through 1333 as if set forth fully herein.

1617.   To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide professional medical services in New York.

1618.   In view of its (a) illegal corporate structure, (b) unlawful control by one or more non-physician (i.e., Peter Khaim, Aleksandr Gulkarov, and Roman Israilov), (c) unlawful sharing of professional physician fees with one or more non-physician, and (d) billing for medically unnecessary tests and treatments, Smart Choice Medical, P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional healthcare services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to seek or collect any No-Fault benefit payments from Allstate, including, but not limited to, No-Fault benefits that were assigned to Smart Choice Medical, P.C. by its patients.

1619.   Smart Choice Medical, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1620.   Smart Choice Medical, P.C. continues to challenge Allstate's prior claim denials.

1621.   Smart Choice Medical, P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1622.   A justifiable controversy exists between Allstate and Smart Choice Medical, P.C. because Smart Choice Medical, P.C. rejects Allstate's ability to deny such claims.

1623.   Allstate has no adequate remedy at law.

1624.   Smart Choice Medical, P.C. will also continue to demand No-Fault benefit payments from Allstate absent a declaration by this Court that its activities are unlawful, and that

Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Smart Choice Medical, P.C.

1625.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Smart Choice Medical, P.C., at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and controlled by one or more non-physician, (c) engaged in the unlawful sharing of fees derived from the provision of professional physician services, and (d) billed for medically unnecessary treatments and tests, and thus has no standing to submit or receive assigned No-Fault benefits.

## COUNT XXV
### DECLARATORY JUDGMENT, 28 U.S.C. §§ 2201 and 2202
### (Against Rx For You Corp.)

1626.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1333 as if set forth fully herein.

1627.   To be eligible to receive assigned No-Fault benefits, an assignee provider of healthcare services, including providers of pharmacy services, must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

1628.   In view of its (a) producing and dispensing of Compounded Products in violation of applicable regulatory and licensing requirements (including, without limitation, those regulations and licensing requirements concerning unlawful financial and other arrangements with prescribing providers, and the manufacturing of compounded medications), (b) dispensing and billing of Allstate for Compounded Products and other drugs that were not medically necessary and that were completely unjustified as a means of treating the Allstate Claimants' purported injuries, (c) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (d) charging of Allstate for Compounded Products

and other drugs at grossly excessive rates, and (e) maintaining unlawful relationships with and inducing, through financial means or otherwise, prescribing providers, including one or more PC Defendant, to furnish prescriptions for medically unnecessary drugs and medications, including Compounded Products, that were to be filled exclusively by Rx For You Corp., Rx For You Corp. was, at all relevant times, completely ineligible for No-Fault reimbursement under New York law, and thus has no standing to submit or receive assigned No-Fault benefits.

1629.   Rx For You Corp. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1630.   Rx For You Corp. continues to challenge Allstate's prior claim denials.

1631.   Rx For You Corp. continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1632.   A justifiable controversy exists between Allstate and Rx For You Corp. because Rx For You Corp. rejects Allstate's ability to deny such claims.

1633.   Allstate has no adequate remedy at law.

1634.   Rx For You Corp. also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay any past, present, or future No-Fault claims submitted by Rx For You Corp.

1635.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) that Rx For You Corp. has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any past, present, or future

bills that have been submitted to Allstate by, or on behalf of, Rx For You Corp. seeking payment under New York's No-Fault laws.

## COUNT XXVI
## DECLARATORY JUDGMENT, 28 U.S.C. §§ 2201 and 2202
### (Against Sutter Pharmacy Inc. d/b/a Rx For You)

1636.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1333 as if set forth fully herein.

1637.   To be eligible to receive assigned No-Fault benefits, an assignee provider of healthcare services, including providers of pharmacy services, must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

1638.   In view of its (a) producing and dispensing of Compounded Products in violation of applicable regulatory and licensing requirements (including, without limitation, those regulations and licensing requirements concerning unlawful financial and other arrangements with prescribing providers, and the manufacturing of compounded medications), (b) dispensing and billing of Allstate for Compounded Products and other drugs that were not medically necessary and that were completely unjustified as a means of treating the Allstate Claimants' purported injuries, (c) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (d) charging of Allstate for Compounded Products and other drugs at grossly excessive rates, and (e) maintaining unlawful relationships with and inducing, through financial means or otherwise, prescribing providers, including one or more PC Defendant, to furnish prescriptions for medically unnecessary drugs and medications, including Compounded Products, that were to be filled exclusively by Sutter Pharmacy Inc. d/b/a Rx For You, Sutter Pharmacy Inc. d/b/a Rx For You was, at all relevant times, completely ineligible for

No-Fault reimbursement under New York law, and thus has no standing to submit or receive assigned No-Fault benefits.

1639.   Sutter Pharmacy Inc. d/b/a Rx For You continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1640.   Sutter Pharmacy Inc. d/b/a Rx For You continues to challenge Allstate's prior claim denials.

1641.   Sutter Pharmacy Inc. d/b/a Rx For You continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1642.   A justifiable controversy exists between Allstate and Sutter Pharmacy Inc. d/b/a Rx For You because Sutter Pharmacy Inc. d/b/a Rx For You rejects Allstate's ability to deny such claims.

1643.   Allstate has no adequate remedy at law.

1644.   Sutter Pharmacy Inc. d/b/a Rx For You also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay any past, present, or future No-Fault claims submitted by Sutter Pharmacy Inc. d/b/a Rx For You.

1645.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) that Sutter Pharmacy Inc. d/b/a Rx For You has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on

any past, present, or future bills that have been submitted to Allstate by, or on behalf of, Sutter

Pharmacy Inc. d/b/a Rx For You seeking payment under New York's No-Fault laws.

## COUNT XXVII
## DECLARATORY JUDGMENT, 28 U.S.C. §§ 2201 and 2202
### (Against Excellent Choice Pharmacy Corp.)

1646.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in

paragraphs 1 through 1333 as if set forth fully herein.

1647.   To be eligible to receive assigned No-Fault benefits, an assignee provider of

healthcare services, including providers of pharmacy services, must adhere to all applicable New

York statutes that grant the authority to provide healthcare services in New York.

1648.   In view of its (a) producing and dispensing of Compounded Products in violation

of applicable regulatory and licensing requirements (including, without limitation, those

regulations and licensing requirements concerning unlawful financial and other arrangements with

prescribing providers, and the manufacturing of compounded medications), (b) dispensing and

billing of Allstate for Compounded Products and other drugs that were not medically necessary

and that were completely unjustified as a means of treating the Allstate Claimants' purported

injuries, (c) falsely charging for drugs with the knowledge that such drugs were not lawfully

reimbursable under New York's No-Fault laws, (d) charging of Allstate for Compounded Products

and other drugs at grossly excessive rates, and (e) maintaining unlawful relationships with and

inducing, through financial means or otherwise, prescribing providers, including one or more PC

Defendant, to furnish prescriptions for medically unnecessary drugs and medications, including

Compounded Products, that were to be filled exclusively by Excellent Choice Pharmacy Corp.,

Excellent Choice Pharmacy Corp. was, at all relevant times, completely ineligible for No-Fault

reimbursement under New York law, and thus has no standing to submit or receive assigned No-Fault benefits.

1649.   Excellent Choice Pharmacy Corp. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1650.   Excellent Choice Pharmacy Corp. continues to challenge Allstate's prior claim denials.

1651.   Excellent Choice Pharmacy Corp. continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1652.   A justifiable controversy exists between Allstate and Excellent Choice Pharmacy Corp. because Excellent Choice Pharmacy Corp. rejects Allstate's ability to deny such claims.

1653.   Allstate has no adequate remedy at law.

1654.   Excellent Choice Pharmacy Corp. also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay any past, present, or future No-Fault claims submitted by Excellent Choice Pharmacy Corp.

1655.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) that Excellent Choice Pharmacy Corp. has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any past, present, or future bills that have been submitted to Allstate by, or on behalf of, Excellent Choice Pharmacy Corp. seeking payment under New York's No-Fault laws.

X.      **DEMAND FOR RELIEF**

## COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### HOLLIS NOVEL COMPREHENSIVE MEDICAL, P.C. ENTERPRISE
**(Against Azu Ajudua, M.D., Peter Khaim, Aleksandr Gulkarov, Roman Israilov, A&P Holding Group Inc., Anturio Marketing Inc., P&K Marketing Services Inc., K&L Consultants Inc., LL Consulting Group Inc. d/b/a Billing For You, Keepers For You Corp., and All Network Marketing Corp.)**

    a.      AWARD Allstate's actual and consequential damages to be established at trial;

    b.      AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

    c.      GRANT injunctive relief enjoining the Count I Defendants from engaging in the wrongful conduct alleged in the Complaint; and

    d.      GRANT all other relief this Court deems just.

## COUNT II
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### HOLLIS NOVEL COMPREHENSIVE MEDICAL, P.C. ENTERPRISE
**(Against Azu Ajudua, M.D., Peter Khaim, Aleksandr Gulkarov, Roman Israilov, A&P Holding Group Inc., Anturio Marketing Inc., P&K Marketing Services Inc., K&L Consultants Inc., LL Consulting Group Inc. d/b/a Billing For You, Keepers For You Corp., and All Network Marketing Corp.)**

    a.      AWARD Allstate's actual and consequential damages to be established at trial;

    b.      AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

    c.      GRANT injunctive relief enjoining the Count II Defendants from engaging in the wrongful conduct alleged in the Complaint; and

    d.      GRANT all other relief this Court deems just.

## COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### STARRETT CITY MEDICAL, P.C. ENTERPRISE
**(Against Azu Ajudua, M.D., Peter Khaim, Aleksandr Gulkarov, Roman Israilov, A&P Holding Group Inc., K&L Consultants Inc., LL Consulting Group Inc. d/b/a Billing For You, Keepers For You Corp., and All Network Marketing Corp.)**

a.     AWARD Allstate's actual and consequential damages to be established at trial;

b.     AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c.     GRANT injunctive relief enjoining the Count III Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d.     GRANT all other relief this Court deems just.

## COUNT IV
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### STARRETT CITY MEDICAL, P.C. ENTERPRISE
**(Against Azu Ajudua, M.D., Peter Khaim, Aleksandr Gulkarov, Roman Israilov, A&P Holding Group Inc., K&L Consultants Inc., LL Consulting Group Inc. d/b/a Billing For You, Keepers For You Corp., and All Network Marketing Corp.)**

a.     AWARD Allstate's actual and consequential damages to be established at trial;

b.     AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c.     GRANT injunctive relief enjoining the Count IV Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d.     GRANT all other relief this Court deems just.

## COUNT V
## VIOLATIONS OF 18 U.S.C. § 1962(c)
## HILLCREST MEDICAL CARE, P.C. ENTERPRISE
**(Against Azu Ajudua, M.D., Peter Khaim, Aleksandr Gulkarov, Roman Israilov,   LL Consulting Group Inc. d/b/a Billing For You, Keepers For You Corp., and All Network Marketing Corp.)**

a.      AWARD Allstate's actual and consequential damages to be established at trial;

b.      AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c.      GRANT injunctive relief enjoining the Count V Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d.      GRANT all other relief this Court deems just.

## COUNT VI
## VIOLATIONS OF 18 U.S.C. § 1962(d)
## HILLCREST MEDICAL CARE, P.C. ENTERPRISE
**(Against Azu Ajudua, M.D., Peter Khaim, Aleksandr Gulkarov, Roman Israilov,  LL Consulting Group Inc. d/b/a Billing For You, Keepers For You Corp., and All Network Marketing Corp.)**

a.      AWARD Allstate's actual and consequential damages to be established at trial;

b.      AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c.      GRANT injunctive relief enjoining the Count VI Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d.      GRANT all other relief this Court deems just.

## COUNT VII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### SMART CHOICE MEDICAL, P.C. ENTERPRISE
**(Against Rolando Jose Mendez Chumaceiro, M.D., Peter Khaim, Aleksandr Gulkarov, A&P Holding Group Inc., and LL Consulting Group Inc. d/b/a Billing For You)**

a.      AWARD Allstate's actual and consequential damages to be established at trial;

b.      AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c.      GRANT injunctive relief enjoining the Count VII Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d.      GRANT all other relief this Court deems just.

## COUNT VIII
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### SMART CHOICE MEDICAL, P.C. ENTERPRISE
**(Against Rolando Jose Mendez Chumaceiro, M.D., Peter Khaim, Aleksandr Gulkarov, A&P Holding Group Inc., and LL Consulting Group Inc. d/b/a Billing For You)**

a.      AWARD Allstate's actual and consequential damages to be established at trial;

b.      AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c.      GRANT injunctive relief enjoining the Count VIII Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d.      GRANT all other relief this Court deems just.

## COUNT IX
## VIOLATIONS OF 18 U.S.C. § 1962(c)
## RX FOR YOU CORP. ENTERPRISE
**(Against Vyacheslav Mushyakov, Peter Khaim, Azu Ajudua, M.D., Rolando Jose Mendez Chumaceiro, M.D., Hillcrest Medical Care, P.C., Starrett City Medical, P.C., and Smart Choice Medical, P.C.)**

a.    AWARD Allstate's actual and consequential damages to be established at trial;

b.    AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c.    GRANT injunctive relief enjoining the Count IX Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d.    GRANT all other relief this Court deems just.

## COUNT X
## VIOLATIONS OF 18 U.S.C. § 1962(d)
## RX FOR YOU CORP. ENTERPRISE
**(Against Vyacheslav Mushyakov, Peter Khaim, Azu Ajudua, M.D., Rolando Jose Mendez Chumaceiro, M.D., Hillcrest Medical Care, P.C., Starrett City Medical, P.C., and Smart Choice Medical, P.C.)**

a.    AWARD Allstate's actual and consequential damages to be established at trial;

b.    AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c.    GRANT injunctive relief enjoining the Count X Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d.    GRANT all other relief this Court deems just.

## COUNT XI
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### SUTTER PHARMACY INC. d/b/a RX FOR YOU ENTERPRISE
**(Against Peter Khaim, Aleksandr Gulkarov, Azu Ajudua, M.D., Rolando Jose Mendez Chumaceiro, M.D., Hillcrest Medical Care, P.C., Starrett City Medical, P.C., and Smart Choice Medical, P.C.)**

a.    AWARD Allstate's actual and consequential damages to be established at trial;

b.    AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c.    GRANT injunctive relief enjoining the Count XI Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d.    GRANT all other relief this Court deems just.

## COUNT XII
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### SUTTER PHARMACY INC. d/b/a RX FOR YOU ENTERPRISE
**(Against Peter Khaim, Aleksandr Gulkarov, Azu Ajudua, M.D., Rolando Jose Mendez Chumaceiro, M.D., Hillcrest Medical Care, P.C., Starrett City Medical, P.C., and Smart Choice Medical, P.C.)**

a.    AWARD Allstate's actual and consequential damages to be established at trial;

b.    AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c.    GRANT injunctive relief enjoining the Count XII Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d.    GRANT all other relief this Court deems just.

**COUNT XIII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**EXCELLENT CHOICE PHARMACY CORP. ENTERPRISE**
**(Against Peter Khaim, Arkadiy Khaimov, Azu Ajudua, M.D., Rolando Jose Mendez**
**Chumaceiro, M.D., Hillcrest Medical Care, P.C., Starrett City Medical, P.C., and Smart**
**Choice Medical, P.C.)**

a. AWARD Allstate's actual and consequential damages to be established at trial;

b. AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c. GRANT injunctive relief enjoining the Count XIII Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d. GRANT all other relief this Court deems just.

**COUNT XIV**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**EXCELLENT CHOICE PHARMACY CORP. ENTERPRISE**
**(Against Peter Khaim, Arkadiy Khaimov, Azu Ajudua, M.D., Rolando Jose Mendez**
**Chumaceiro, M.D., Hillcrest Medical Care, P.C., Starrett City Medical, P.C., and Smart**
**Choice Medical, P.C.)**

a. AWARD Allstate's actual and consequential damages to be established at trial;

b. AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c. GRANT injunctive relief enjoining the Count XIV Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d. GRANT all other relief this Court deems just.

242

**COUNT XV**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**A&P HOLDING GROUP CORP. ENTERPRISE**
**(Against Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Smart Choice Medical, P.C., Azu Ajudua, M.D., Rolando Jose Mendez Chumaceiro, M.D., Peter Khaim, Aleksandr Gulkarov, Roman Israilov, Vyacheslav Mushyakov, Arkadiy Khaimov, Rx For You Corp., Sutter Pharmacy Inc. d/b/a Rx For You, and Excellent Choice Pharmacy Corp.)**

    a.    AWARD Allstate's actual and consequential damages to be established at trial;

    b.    AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

    c.    GRANT injunctive relief enjoining the Count XV Defendants from engaging in the wrongful conduct alleged in the Complaint; and

    d.    GRANT all other relief this Court deems just.

**COUNT XVI**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**A&P HOLDING GROUP CORP. ENTERPRISE**
**(Against Hollis Novel Comprehensive Medical, P.C., Starrett City Medical, P.C., Smart Choice Medical, P.C., Azu Ajudua, M.D., Rolando Jose Mendez Chumaceiro, M.D., Peter Khaim, Aleksandr Gulkarov, Roman Israilov, Vyacheslav Mushyakov, Arkadiy Khaimov, Rx For You Corp., Sutter Pharmacy Inc. d/b/a Rx For You, and Excellent Choice Pharmacy Corp.)**

    a.    AWARD Allstate's actual and consequential damages to be established at trial;

    b.    AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

    c.    GRANT injunctive relief enjoining the Count XVI Defendants from engaging in the wrongful conduct alleged in the Complaint; and

    d.    GRANT all other relief this Court deems just.

## COUNT XVII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### LL CONSULTING GROUP INC. d/b/a BILLING FOR YOU ENTERPRISE
**(Against Starrett City Medical, P.C., Hillcrest Medical Care, P.C., Azu Ajudua, M.D., Peter Khaim, and Aleksandr Gulkarov)**

a.      AWARD Allstate's actual and consequential damages to be established at trial;

b.      AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c.      GRANT injunctive relief enjoining the Count XVII Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d.      GRANT all other relief this Court deems just.


## COUNT XVIII
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### LL CONSULTING GROUP INC. d/b/a BILLING FOR YOU ENTERPRISE
**(Against Starrett City Medical, P.C., Hillcrest Medical Care, P.C., Azu Ajudua, M.D., Peter Khaim, Aleksandr Gulkarov, and A&P Holding Group Corp.)**

a.      AWARD Allstate's actual and consequential damages to be established at trial;

b.      AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c.      GRANT injunctive relief enjoining the Count XVIII Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d.      GRANT all other relief this Court deems just.

## COUNT XIX
## COMMON LAW FRAUD
### (Against All Defendants)

a.      AWARD Allstate's actual and consequential damages to be established at trial; and

b.      GRANT all other relief this Court deems just.

## COUNT XX
## UNJUST ENRICHMENT
### (Against All Defendants)

a.      AWARD Allstate's actual and consequential damages to be established at trial; and

b.      GRANT all other relief this Court deems just.

## COUNT XXI
## DECLARATORY JUDGMENT, 28 U.S.C. §§ 2201 and 2202
### (Against Hollis Novel Comprehensive Medical, P.C.)

a.      DECLARE that Hollis Novel Comprehensive Medical, P.C., at all relevant times, has been unlawfully organized, controlled, and/or operated by at least one non-physician, and otherwise operated in violation of at least one New York state or local licensing requirement necessary to provide professional physician services in New York;

b.      DECLARE that Hollis Novel Comprehensive Medical, P.C.'s activities are unlawful;

c.      DECLARE that Allstate has no obligation to pay any past, present, or future No-Fault insurance claims submitted by Hollis Novel Comprehensive Medical, P.C.; and

d.      GRANT all other relief this Court deems just.

**COUNT XXII**
**DECLARATORY JUDGMENT, 28 U.S.C. §§ 2201 and 2202**
**(Against Starrett City Medical, P.C.)**

a.     DECLARE that Starrett City Medical, P.C., at all relevant times, has been unlawfully organized, controlled, and/or operated by at least one non-physician, and otherwise operated in violation of at least one New York state or local licensing requirement necessary to provide professional physician services in New York;

b.     DECLARE that Starrett City Medical, P.C.'s activities are unlawful;

c.     DECLARE that Allstate has no obligation to pay any past, present, or future No-Fault insurance claims submitted by Starrett City Medical, P.C.; and

d.     GRANT all other relief this Court deems just.

**COUNT XXIII**
**DECLARATORY JUDGMENT, 28 U.S.C. §§ 2201 and 2202**
**(Against Hillcrest Medical Care, P.C.)**

a.     DECLARE that Hillcrest Medical Care, P.C., at all relevant times, has been unlawfully organized, controlled, and/or operated by at least one non-physician, and otherwise operated in violation of at least one New York state or local licensing requirement necessary to provide professional physician services in New York;

b.     DECLARE that Hillcrest Medical Care, P.C.'s activities are unlawful;

c.     DECLARE that Allstate has no obligation to pay any past, present, or future No-Fault insurance claims submitted by Hillcrest Medical Care, P.C.; and

d.     GRANT all other relief this Court deems just.

## COUNT XXIV
### DECLARATORY JUDGMENT, 28 U.S.C. §§ 2201 and 2202
### (Against Smart Choice Medical, P.C.)

a.  DECLARE that Smart Choice Medical, P.C., at all relevant times, has been unlawfully organized, controlled, and/or operated by at least one non-physician, and otherwise operated in violation of at least one New York state or local licensing requirement necessary to provide professional physician services in New York;

b.  DECLARE that Smart Choice Medical, P.C.'s activities are unlawful;

c.  DECLARE that Allstate has no obligation to pay any past, present, or future No-Fault insurance claims submitted by Smart Choice Medical, P.C.; and

d.  GRANT all other relief this Court deems just.

## COUNT XXV
### DECLARATORY JUDGMENT, 28 U.S.C. §§ 2201 and 2202
### (Against Rx For You Corp.)

a.  DECLARE that Rx For You Corp., at all relevant times, was caused to be operated in violation of one or more state licensing requirement applicable to pharmacies, thus rendering Rx For You Corp. completely ineligible to seek or receive reimbursement under New York's No-Fault laws;

b.  DECLARE that Rx For You Corp.'s activities are unlawful;

c.  DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Rx For You Corp.; and

d.  GRANT all other relief this Court deems just and appropriate.

## COUNT XXVI

### DECLARATORY JUDGMENT, 28 U.S.C. §§ 2201 and 2202
### (Against Sutter Pharmacy Inc. d/b/a Rx For You)

a.   DECLARE that Sutter Pharmacy Inc. d/b/a Rx For You, at all relevant times, was caused to be operated in violation of one or more state licensing requirement applicable to pharmacies, thus rendering Sutter Pharmacy Inc. d/b/a Rx For You completely ineligible to seek or receive reimbursement under New York's No-Fault laws;

b.   DECLARE that Sutter Pharmacy Inc. d/b/a Rx For You's activities are unlawful;

c.   DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Sutter Pharmacy Inc. d/b/a Rx For You; and

d.   GRANT all other relief this Court deems just and appropriate.

## COUNT XXVII
### DECLARATORY JUDGMENT, 28 U.S.C. §§ 2201 and 2202
### (Against Excellent Choice Pharmacy Corp.)

a.   DECLARE that Excellent Choice Pharmacy Corp., at all relevant times, was caused to be operated in violation of one or more state licensing requirement applicable to pharmacies, thus rendering Excellent Choice Pharmacy Corp. completely ineligible to seek or receive reimbursement under New York's No-Fault laws;

b.   DECLARE that Excellent Choice Pharmacy Corp.'s activities are unlawful;

c.   DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Excellent Choice Pharmacy Corp.; and

d.   GRANT all other relief this Court deems just and appropriate.

248

## JURY TRIAL DEMAND

The plaintiffs demand a trial by jury on all claims.


SMITH & BRINK, P.C.

*/s/ Richard D. King, Jr.*
_____
Richard D. King, Jr. (RK8381)
rking@smithbrink.com
Nathan A. Tilden (NT0571)
ntilden@smithbrink.com
Jasmine G. Vieux (JG1805)
jvieux@smithbrink.com
Michael W. Whitcher (MW7455)
mwhitcher@smithbrink.com
1325 Franklin Ave, Suite 320
Garden City, NY 11530
(347) 710-0050

Attorneys for the Plaintiffs,
*Allstate Insurance Company,*
*Allstate Property & Casualty Insurance Company,*
*and Allstate Fire and Casualty Insurance Company*

Dated: December 16, 2020